# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
:
In re:                                  :       Chapter 11
:
:       Case No. 09-12659 (___)
:
PROTOSTAR LTD., et al.,[1]              :       Joint Administration Requested
:
:
Debtors.                 :
-----------------------------------------------------------x

**MOTION FOR INTERIM AND FINAL ORDERS (i) AUTHORIZING DEBTORS PROTOSTAR LTD. AND PROTOSTAR I LTD. (A) TO OBTAIN POST-PETITION SENIOR SECURED SUPER-PRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c)(2), 364(c), 364(d)(1), 364(e) AND 507 AND (B) TO UTILIZE CASH COLLATERAL OF PRE-PETITION LENDERS, (ii) GRANTING ADEQUATE PROTECTION TO PRE-PETITION LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364 AND (iii) SCHEDULING FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

ProtoStar Ltd. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of an interim order, substantially in the form attached hereto (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363(c)(2), 364(c), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), (I) authorizing the Debtors (A) to obtain postpetition debtor-in-possession financing (the "Financing") up to an aggregate principal amount of approximately $16,000,000 under that certain Debtor-In-Possession Credit Agreement, by and among debtor ProtoStar Ltd. ("ProtoStar" or the "Borrower") and debtor ProtoStar I Ltd. ("PS I" or the "Guarantor," and

---

[1]     The Debtors, along with the last four digits of their respective federal tax identification numbers, are as follows: ProtoStar Ltd. (4245), ProtoStar I Ltd. (1042), ProtoStar II Ltd. (1244), ProtoStar Satellite Systems, Inc. (2615), ProtoStar Development Ltd. (none) and ProtoStar Asia Pte. Ltd. (none). The mailing address for ProtoStar is 100 California Street, Suite 700, San Francisco, CA 94111.

together with the Borrower, the "Credit Parties," and each a "Credit Party"), Wells Fargo Bank, National Association, as Administrative Agent (in such capacity, the "Agent") for itself and the lenders thereunder (in such capacity, the "DIP Lenders"), substantially in the form attached hereto as Exhibit A (the "DIP Credit Agreement," and together with each of the Loan Documents (as defined in the DIP Credit Agreement, the "DIP Documents") and (B) use cash collateral in which the Pre-Petition Lenders (as defined below) have an interest, (II) granting adequate protection to the Pre-Petition Lenders pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code and (III) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration Of Cynthia M. Pelini In Support Of ProtoStar's Chapter 11 Petitions And Various First Day Applications And Motions (the "Pelini Declaration"), which has been filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction And Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

A.     **Chapter 11 Cases**

2.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A motion seeking joint

2

administration of these chapter 11 cases for procedural purposes only is pending before this Court. No request for the appointment of a trustee or examiner has been made and no committees have been appointed or designated in the Debtors' chapter 11 cases.

3.      Contemporaneously herewith and in furtherance of these chapter 11 cases, ProtoStar, PS I, ProtoStar II Ltd. ("PS II") and ProtoStar Development Ltd. ("PSD," and together with ProtoStar, PS I and PS II, the "Bermuda Group") have commenced or will commence a coordinated proceeding in the Supreme Court of Bermuda. The Bermuda Group has or will be petitioning the Supreme Court of Bermuda to issue an order appointing John C. McKenna of Finance & Risk Services Ltd. as provisional liquidator (the "Provisional Liquidator") of the Bermuda Group. The Provisional Liquidator will seek authority from the Supreme Court of Bermuda to oversee the Bermuda Group under the control of its Board of Directors and under the supervision of the Supreme Court of Bermuda and this Court in the administration of these chapter 11 cases.

**B.      Debtors' Business Operations**

4.      ProtoStar is a satellite operator that was formed in 2005 to acquire, modify, launch and operate high-power geostationary (i.e., fixed with respect to a given point on Earth) communication satellites optimized for direct-to-home ("DTH") satellite television and broadband internet access across the Asia-Pacific region. The Debtors' business plan seeks to develop a constellation of high-powered geostationary satellites to lease satellite capacity to DTH and broadband service providers located in Asia within the coverage area of the Debtors' satellites. The Debtors' satellites and satellite network are designed to meet the needs of DTH service providers and allows the Debtors to offer a unique combination of services. The Debtors' target customers include privately-owned broadcasting networks, cable television programmers, DTH operators and private telecommunications networks.

3

5.     The Debtors currently operate two geostationary satellites, the ProtoStar I Satellite (the "PS I Satellite"), which is owned by PS I, and the ProtoStar II Satellite (the "PS II Satellite," and together with the PS I Satellite, the "Satellites"), which is owned by PS II.

6.     The PS I Satellite was launched on July 7, 2008. The PS I Satellite provides Ku-band coverage for digital DTH services, high-definition television and broadband internet to under-served areas from Southeast Asia to the Middle East, while C-band transponders on the satellite enable the Debtors to provide cellular backhaul, traditional last mile telecom and basic broadcasting services. As set forth in greater detail in the Pelini Declaration, the Debtors are not currently providing transponder capacity on the PS I Satellite to customers. The Debtors are engaged in active negotiations to procure an alternative sponsoring government or an alternative orbital slot to which the PS I Satellite can be relocated so it can provide capacity to customers.

7.     The PS II Satellite was launched on May 16, 2009. The PS II Satellite features high-powered capacity and will significantly expand the Debtors' capacity throughout the Asia-Pacific region. With the addition of the PS II Satellite to its fleet, the Debtors are able to provide optimized DTH satellite television service and broadband internet access across the Asia-Pacific region, reaching billions of people in India, Indonesia, Taiwan, the Philippines and Southeast Asia. The PS II Satellite became operational on or about June 17, 2009 following in-orbit testing and has already generated approximately $2.0 million in revenue under the Debtors' contract with PT Media Citra IndoStar and PT MNC Skyvision of Jakarta, Indonesia (commercially known as Indovision), the largest DTH satellite television service operator in Indonesia.

8.     For the fiscal year ending December 31, 2008, the Debtors generated approximately $3.1 million in revenues. As of December 31, 2008, the Debtors' consolidated

4

financial statements, which includes non-debtor affiliates, reflected assets totaling approximately $528 million (book value) and liabilities totaling approximately $463 million.

## C.    Additional Information

9.    Additional information regarding the Debtors' businesses, capital structure and the circumstances leading to the filing of these chapter 11 cases is contained in the Pelini Declaration, which has been filed contemporaneously herewith.

### Prepetition Indebtedness

## A.    Working Capital Facility

10.    ProtoStar and PS I are parties to that certain Credit Agreement, dated as of March 28, 2007 (as amended by Amendment No. 1, dated as of July 5, 2007; Amendment No. 2, dated as of February 23, 2009; and Amendment No. 3, dated as of May 29, 2009, and as otherwise amended, restated, or supplemented, the "WC Agreement" or "WC Facility"), among PS I, as borrower, ProtoStar, as guarantor, the lenders from time to time party thereto (collectively, the "WC Lenders" or "WC Facility Lenders"), The Bank of New York Mellon (as successor to The Bank of New York, "BNYM"), as first lien collateral agent (the "Prepetition First Lien Collateral Agent" or "WC Collateral Agent"), and Canyon Capital Advisors LLC ("Canyon" or the "WC Agent"), as administrative agent for the WC Lenders.  The WC Agreement and all obligations arising under or related to the WC Agreement (the "Existing WC Obligations") are secured by first priority liens, subject to any permitted liens, against, and security interests in (i) substantially all of the assets of PS I and (ii) the equity interests of PS I held by ProtoStar (collectively, the "PS I Collateral" or "Pre-Petition Collateral") and the proceeds thereof.  The obligations under the WC Agreement are unsecured against ProtoStar, other than ProtoStar's pledge of its equity interests in PS I as described above.  As of the Petition Date, the outstanding principal balance under the WC Agreement was $10,000,000.  Upon

information and belief, the outstanding principal balance under the WC Agreement is currently held by certain of the Secured Noteholders (as defined below).

**B.    PS I Secured Notes**

11.    PS I issued $160,000,000 of 12.5% Senior Secured Convertible Notes due 2012 (the "12.5% Secured Notes" and the holders thereof, from time to time, the "12.5% Noteholders"), pursuant to that certain indenture, dated as of September 28, 2006 (as amended by the Supplemental Indenture, dated as of February 23, 2009, and as otherwise amended, modified and supplemented from time to time, the "Secured Notes Indenture" or "Indenture," and together with the WC Agreement, the "Existing Credit Facilities" or "Pre-Petition Facilities"), between PS I, as issuer, ProtoStar, as guarantor, and BNYM, as indenture trustee (the "Indenture Trustee," and together with the WC Agent, the "Pre-Petition Agents"). BNYM also acts as collateral agent under the Guarantee and Security Agreement, dated as of September 28, 2006 (as amended, modified and supplemented from time to time), among PS I, ProtoStar, as guarantor, and BNYM (the "Prepetition Secured Notes Collateral Agent" or "Indenture Collateral Agent," and together with the WC Collateral Agent, the "Pre-Petition Collateral Agents"). The obligations under the Secured Notes (as defined below) are secured by liens, subject to permitted liens, against, and a security interest in, the PS I Collateral. The obligations under the Secured Notes are unsecured against ProtoStar, other than ProtoStar's pledge of its equity interests in PS I as described above. On February 23, 2009, PS I offered the 12.5% Noteholders the opportunity to exchange the 12.5% Secured Notes for new notes (with the same collateral package) bearing interest at 18.0 (the "18.0% Secured Notes," and together with the 12.5% Secured Notes, the "Secured Notes," and the holders thereof, from time to time, the "18.0% Noteholders," and together with the 12.5% Noteholders, the "Secured Noteholders" or "Pre-Petition Holders," and together with the WC Lenders, the "Pre-Petition Lenders"). As of

6

the Petition Date, the outstanding principal amount of the Senior Secured Notes was approximately $182.7 million.

## C. Intercreditor Agreement

12.     ProtoStar and PS I are party to that certain Intercreditor Agreement (the "Existing Intercreditor Agreement"), dated as of September 28, 2006, by and among all parties to the WC Agreement and Secured Notes Indenture, which, among other things, describes the relative priorities of the prepetition first term lien and second term lien with respect to the PS I Collateral.

## D. Credit Suisse Facility

13.     ProtoStar is party to that certain Facility Agreement (as amended, restated, or supplemented, the "CS Facility," and together with the Secured Notes Indenture and the WC Agreement, the "Prepetition Secured Facilities"), dated as of March 19, 2008, among ProtoStar, as borrower, PS II, PSD and ProtoStar Satellite Systems, Inc. ("PSS"), as guarantors, Credit Suisse, Singapore Branch, as Arranger, Agent, Security Agent, Calculation Agent and Account Bank (in its separate legal roles as Agent, Security Agent and Calculation Agent, "CS," and together with Canyon, the Prepetition First Lien Collateral Agent and the Prepetition Secured Notes Collateral Agent, the "Agents"), the Financial Institutions party thereto as lenders (collectively, the "CS Facility Lenders," and together with the Secured Noteholders and the WC Lenders, the "Prepetition Secured Lenders"), and Credit Suisse International, as Hedging Bank. The CS Facility and all obligations under the CS Facility are secured by first priority liens against, and a security interest in all or substantially all of the assets of ProtoStar (other than the stock of PS I held by ProtoStar), PS II, PSD and PSS.

7

## Restructuring Negotiations

14.     Beginning in late 2008, the Debtors sought to explore various strategic alternatives and solutions to a perceived potential liquidity crunch resulting principally from the failure of the PS I Satellite to generate sufficient revenue. The Debtors sought to raise capital through potential equity and debt investments and pursued negotiations with potential purchasers of one or both of the Satellites. The Debtors sought to negotiate an arrangement whereby its incumbent lenders would provide incremental funding for the operation of the Debtors' businesses to bridge to either a sale of one or both of the Satellites or a consensual comprehensive restructuring with all of the Debtors' stakeholders.

15.     Subsequently, the Debtors reached an agreement with the WC Lenders, Secured Noteholders and the CS Facility Lenders to provide financing for the operation of the Debtors' businesses to bridge to a sale of one or both of the Satellites. In connection therewith, the Debtors, the Secured Noteholders and the CS Facility Lenders executed restructuring agreements and agreed to terms of debtor in possession financing to fund the Debtors' operations and these chapter 11 cases.

16.     In conjunction with the postpetition financing described above, the Debtors have worked with the Secured Noteholders and the CS Facility Lenders to structure a sale process that the Debtors believe is the best way to maximize the value of the Debtors' assets. The Debtors anticipate filing a motion for authority to implement that sales process, including establishing bidding procedures in connection therewith, on or shortly after the Petition Date.

## Need For Postpetition Financing

17.     As discussed in greater detail in the Pelini Declaration, difficulties related to the PS I Concession and economic forces beyond the Debtors' control have placed significant stress on the Debtors' liquidity. The Debtors estimate that as of the Petition Date, their cash on

8

hand will be insufficient to pay for the Debtors' costs, let alone facilitate the sale process of one or more of the Satellites, during the first months of its chapter 11 cases. Given the substantial additional costs associated with administering chapter 11 cases, the Credit Parties have an immediate need to obtain the Maximum Interim Borrowing (as defined below) and use of Cash Collateral (as defined below) to finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, pay employees, satisfy other working capital and operational needs and administer and preserve the value of their estates as well as to permit the orderly sale of PS I's assets (the "Assets"), including the PS I Satellite. The Credit Parties' access to Cash Collateral, incurrence of new indebtedness and other financial accommodations are vital to the preservation and maintenance of the going concern values of the Credit Parties and to maximizing the value of the Assets.[2]

## Efforts to Obtain Postpetition Financing

18.     The Credit Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Credit Parties are also unable to obtain secured credit under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Documents within the time frame required by the Credit Parties' needs to

---

[2]     The Debtors are also seeking, by separate motion filed contemporaneously herewith (the "PS II DIP Motion"), to enter into that certain senior secured superpriority debtor in possession multiple draw term loan agreement (the "PS II DIP Credit Agreement"), among ProtoStar and PS II, as borrowers, PSS, PSD, PSA and ProtoStar Asia Services Ltd., as guarantors (collectively, the "PS II DIP Credit Parties"), the lenders from time to time parties thereto, Credit Suisse, Singapore Branch, as collateral agent and Credit Suisse Cayman Islands Branch, as administrative agent. Pursuant to the PS II DIP Credit Agreement, the Debtors seek to borrow additional amounts to fund the costs of the operations of the PS II DIP Credit Parties (primarily as they pertain to the PS II Satellite and the business incident thereto), maintain business relationships with vendors, suppliers and customers, pay employees, satisfy other working capital and operational needs and administer and preserve the value of their estates as well as to permit the orderly sale of PS II's assets, including the PS II Satellite, all as set forth more fully in the PS II DIP Motion.

avoid immediate and irreparable harm. Financing in the amount and under the terms provided by the DIP Documents is not available without the Credit Parties granting to the Agent and the DIP Lenders, subject to the Carve-Out (as defined below) and the ProtoStar II Financing Liens (as defined in the Interim Order) subject to the terms of the DIP Intercreditor Agreement (as defined below) provided for herein, all such liens and security interests granted to the Agent, for its benefit and for the benefit of the DIP Lenders pursuant to the Interim Order and the DIP Documents (the "DIP Liens") and an administrative expense claim having priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claim") under the terms and conditions set forth in the DIP Documents.

19.     Prior to the Petition Date, the Credit Parties surveyed various sources of postpetition financing, including, through its financial advisor, UBS, seeking offers from lenders other than the Pre-Petition Lenders. In exploring those options, the Credit Parties recognized that the obligations owed to the Pre-Petition Lenders under the Existing Credit Facilities are secured by the PS I Collateral, such that either (i) the liens of the Pre-Petition Lenders would have to be primed to obtain postpetition financing, or (ii) the Credit Parties would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Pre-Petition Lenders. Because the Credit Parties were unable to find funding on an unsecured or junior basis, and the Pre-Petition Lenders advised the Credit Parties that they would not consent to the priming of their liens and security interests, borrowing from another postpetition lender or lending group that required security interests senior to the Pre-Petition Lenders likely could not have been accomplished at all and, in any event, would have required the Credit Parties to prove,

10

through an extended, contested hearing, that the requirements of section 364(d) of the Bankruptcy Code had been satisfied.

20.     Ultimately, the Credit Parties concluded that the Financing from the DIP Lenders is the best financing option available to the Credit Parties because, among other things, the Financing permits the Credit Parties to secure the postpetition financing required for the Credit Parties' ongoing working capital requirements as well as to maximize the value of the Credit Parties' estates, including the Assets. Further, the Financing is the only financing available that would not require the Credit Parties to seek to prime the Pre-Petition Lenders' liens on a nonconsensual basis in what would likely have been an extended, contested hearing.

21.     Consequently, the Credit Parties have determined that the Financing with the DIP Lenders is both necessary and appropriate under the circumstances, addresses the Credit Parties' working capital and liquidity needs and should be approved.

22.     Pursuant to the PS II DIP Financing Motion, the Debtors also seek approval of financing for the PS II DIP Credit Parties pursuant to the PS II DIP Credit Agreement (the "PS II DIP Financing"). In connection with the Financing and the PS II DIP Financing, that certain Limited Subordination and Intercreditor Agreement, dated as of July 28, 2009, entered into among (the "DIP Intercreditor Agreement"), was executed by Credit Suisse, Cayman Islands Branch, as PSII DIP Agent and PS II DIP Collateral Agent (each as defined therein), Credit Suisse Singapore Branch, as PSII First Lien Agent and PSII First Lien Security Agent (each as defined therein) for the PSII First Lien Lenders (as defined therein), the Agent, and the Borrower. The Debtors seek approval of the DIP Intercreditor Agreement pursuant to the PS II DIP Financing Motion.

## Highlight Of Provisions Pursuant To Local Rule 4001-2

23.    The Debtors believe that Rule 4001-2 of the Local Rules of Bankruptcy
Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as
amended, the "Local Rules") requires the highlight of the following provisions of the DIP Credit
Agreement:

(a)    **Binding Estate to Validity, Perfection, or Amount of Secured Debt.** Although certain stipulations by the Debtors relate to the validity, amount and perfection of the prepetition liens, the Interim Order reserves for a period of 60 days from the appointment of the Committee or 75 days from the Petition Date, whichever occurs latest, the right of the Committee (or any other party in interest with the requisite standing, including a subsequently appointed chapter 7 trustee, but other than the Debtors) to challenge the validity or perfection of the liens securing the obligations under the Existing Credit Facilities. (Interim Order at ¶ 19(c))

(b)    **Waiver of Rights Under Section 506(c).** The Debtors will waive the estates' rights under section 506(c) of the Bankruptcy Code at the Final Hearing. (Interim Order at ¶ 30)

(c)    **Liens on Proceeds of Avoidance Actions.** Upon entry of the Final Order, Agent and the DIP Lenders shall have a DIP Lien on any proceeds or property recovered or otherwise the subject of successful causes of action under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law. (Interim Order at ¶ 7)

(d)    **Paydown of Prepetition Debt.** The Credit Parties intend to use a portion of the proceeds of the Financing to repay all amounts outstanding under the WC Facility; provided, however, that the Credit Parties do not seek, and will not be authorized, to make such repayment prior to entry of the Final Order. (Interim Order at ¶ 1)

24.    The foregoing provisions are often found in debtor in possession financing
agreements of this nature, and the DIP Lenders have asserted that they would not provide
financing to the Credit Parties absent such provisions. Moreover, these provisions were

thoroughly negotiated and are necessary for the Credit Parties to procure the Financing in a sufficient amount and on a timely basis.

## Material Terms Of DIP Facility[3]

25. The Credit Parties and the DIP Lenders engaged in extensive, arm's length negotiations with respect to the terms and conditions of the proposed Financing. These lengthy negotiations culminated in agreement upon the Financing, including the form of the Interim Order and the DIP Documents.

26. The significant terms of the DIP Documents are as follows:

| **Borrower**<br><br>Interim Order at ¶ 1 | ProtoStar |
|---|---|
| **Guarantor**<br><br>Interim Order at ¶ 1 | ProtoStar I Ltd. |
| **Administrative Agent**<br><br>Interim Order at ¶ 1; | Wells Fargo Bank, National Association |
| **Lenders**<br><br>Interim Order at ¶ 1 | Financial institutions from time to time party thereto as lenders (including their successors and assigns) |
| **DIP Loan Facility**<br><br>Interim Order at ¶¶ 1, 6(c); Agreement at §§ 2.1, 2.15 | Upon entry of the Interim Order and satisfaction of all conditions precedent, a debtor-in-possession term loan facility (the "DIP Loan Facility") providing for term loans in an aggregate principal amount not to exceed the sum of (i) $7,000,000 plus (ii) the amount required to repay in full all outstanding obligations under the WC Agreement (including, without limitation, all accrued and unpaid interest with respect thereto) at any one time, the proceeds of which would be used (i) to fund postpetition operating expenses and other working capital and financing requirements of |

---

[3] This summary of the DIP Documents is provided for the benefit of the Court and other parties in interest. To the extent there are any conflicts between this summary and the DIP Documents, the terms of the DIP Documents shall govern. Capitalized terms used but not otherwise defined in this summary shall have the same meanings as ascribed to them in the DIP Documents.

|  | the Borrower and the Guarantor as set forth in the PS I Budget (as defined below) (including payment of all administrative expenses necessary to be satisfied in cash upon consummation of a plan of reorganization to the extent not funded from the proceeds of sales of the Assets), and (ii) after entry of the Final Order, to satisfy in full the total outstanding indebtedness of the Credit Parties owed to the WC Lenders under the WC Agreement. Up to $2,000,000 of the DIP Loan Facility shall be available upon the entry of the Interim Order with the balance available upon the entry of the Final Order.

Notwithstanding the foregoing, no portion of the DIP Loan Facility is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the agent and collateral agent under the Pre-Petition Facilities, the Pre-Petition Lenders, the Agent or the Lenders; provided, however, that, in the event an official committee of unsecured creditors is appointed in the Cases (the "Committee"), the Committee shall be permitted to use $25,000 of the proceeds of the DIP Loan Facility to investigate validity, perfection, priority, extent or enforceability of the Pre-Petition Facilities, or the liens or security interests securing the Pre-Petition Facilities but no such amounts shall be used to challenge any such liens or security interests. |
| **Availability**<br><br>Interim Order at ¶ 5(a);<br>Agreement at §§ 2.1, 3.1 | The term loan under the DIP Loan Facility will be available to be drawn by the Borrower in two installments, one, in an amount not to exceed $2 million, on the date of the execution and delivery of definitive loan documents for the DIP Loan Facility and satisfaction of all conditions precedent to the initial funding of the DIP Loan Facility (the "Initial Funding Date") and the balance on the Final Funding Date (as defined below), other than $2 million of commitments that shall remain available after the Final Finding Date (the "Remaining Term Loan Commitment"); provided that the Remaining Term Loan Commitment shall not be drawn unless otherwise agreed by the Lenders and Borrower.

Drawings under the DIP Loan Facility will be subject to compliance with the credit documents governing the DIP Loan Facility (the "Credit Documents"). Amounts drawn under the DIP Loan Facility and repaid may not be reborrowed. |
| **DIP Budget**<br><br>Interim Order at ¶ 14(a)(iv);<br>Agreement at §§ 3.1, 5.2 | On or before the Initial Funding Date, the Credit Parties shall deliver to the Agent and Lenders (i) a pro forma rolling seventeen week cash flow budget for Borrower and its subsidiaries on a consolidating basis, which budget shall (i) be reasonably |

satisfactory in all respects to Lenders whose aggregate Pro Rata Shares equal or exceed 66-2/3% of the outstanding Term Loans and Term Loan Commitments (the "Supermajority Lenders") and (ii) reflect separately those direct expenses of the Guarantor and the expenses of Borrower allocated to the Guarantor (the "PS I Budget") and those direct expenses of PS II and the expenses of Borrower allocated to PS II (the "PS II Budget") (the first such budget delivered, the "Initial Cash Flow Budget", and each such budget, a "Cash Flow Budget"), and which shall (a) be updated to reflect the Borrower and its subsidiaries' current projections and results, and (b) commencing on August 5, 2009, a reconciliation of the actual results for the immediately preceding week period to the Cash Flow Budget for such immediately preceding week period and a detailed explanation of all material variances from the Cash Flow Budget.

All payments shall be made and expenses incurred in accordance with the PS I Budget and ProtoStar shall ask the financial advisor or technical consultant for the Lenders to obtain the consent of Supermajority Lenders prior to any expenditure or incurrence (individually or in the aggregate) on any line in excess of 10% of the weekly budgeted amount listed in such PS I Budget for the relevant week; provided however, the Credit Parties shall be deemed to be in compliance with the PS I Budget if the only budgeted line item or items that is not otherwise in compliance therewith is/are the Lenders' Professionals; provided further however, that for any line item expense, the Credit Parties shall be deemed to be in compliance thereof to the extent the expenditure or incurrence is not in excess of (i) the amount of such line item for the relevant week set forth in the PS I Budget plus (ii) the aggregate of all amounts budgeted for such line item for the prior three week period but only to the extent such budgeted amounts have not been paid or used by the Credit Parties; provided, further, that in the event that management determines that it is necessary to take any action or make any payment in an emergent situation and obtaining the consent of the Supermajority Lenders with respect to such action or payment is not practicable under the circumstances then management shall be authorized to seek authorization to take such action or make such payment from the financial advisor or technical consultant for each of the Supermajority Lenders, each of whom shall be authorized to consent to any such emergency action or payment on behalf of the Supermajority Lenders.

| | |
|---|---|
| **Maturity Date**<br><br>Agreement at § 2.2 | The DIP Loan Facility will terminate and all amounts outstanding thereunder shall be due and payable on the earliest to occur of (a) thirty (30) days after the Petition Date if the Final Order has |

72668-001\DOCS_DE:151332.1

| | |
|---|---|
| | not been entered; (b) the effective date of the Chapter 11 plan for ProtoStar; (c) the consummation of the sale of all or substantially all of the assets of ProtoStar (other than the capital stock of PS II and the other subsidiaries of Borrower other than the Guarantor) pursuant to Section 363 of the Bankruptcy Code (as determined by the Agent in its reasonable discretion) (the "Sale"); (d) ninety (90) days after the Petition Date, subject to an automatic extension of up to one hundred twenty (120) days after the Petition Date (without additional charge to accommodate any required regulatory approvals for the Sale), if all conditions to closing the Sale (other than the receipt of ITAR approval and the payment of the purchase price) shall have been satisfied or waived and so long as the Agent and Lenders receive a satisfactory updated PS I Budget reflecting such extension period; and (e) the date that all Term Loans shall become due and payable in full under the DIP Loan Facility, whether by acceleration or otherwise (the "Maturity Date"). |
| **Interest Rates**<br><br>Agreement at § 2.4 | Calculated on a 360-day basis:<br><br>A rate equal to 18.0% per annum (the "Current Rate").<br><br>Default Rate: 3.0% in addition to the Current Rate.<br><br>Interest at the Current Rate shall accrue and be added and capitalized to the outstanding principal balance of the DIP Loan Facility in arrears on a monthly basis. Interest at the Default Rate shall accrue and be added and capitalized to the outstanding principal balance of the DIP Loan Facility in arrears, following a demand by the Agent upon the occurrence and continuance of an Event of Default under the definitive documentation evidencing the DIP Loan Facility. |
| **Facility Fee**<br><br>Agreement at § 2.5(a) | A facility fee (the "Facility Fee") of 3.0% of the total Term Loan Commitment (excluding the Remaining Term Loan Commitment, so long as undrawn) under the DIP Loan Facility shall be earned by the Lenders on the Initial Funding Date and such amount shall be paid in kind, capitalized and added to the outstanding principal balance of the DIP Loan Facility. |
| **Administration Fee**<br><br>Agreement at § 2.5(b) | The Credit Parties shall pay the fees of the Agent in such amounts and on such terms as reasonably agreed to by the Credit Parties and the Agent prior to the Initial Funding Date consisting of an Acceptance Fee of $7,500 and Annual Administration Fee of $25,000. |

| | |
|---|---|
| **Security**<br><br>Interim Order at ¶ 7;<br>Agreement at § 2.15 | The Pre-Petition Agents and Pre-Petition Lenders have not objected to the relief sought by the Interim Order and have not requested adequate protection other than as set forth therein.<br><br>All Obligations will be:<br><br>(i)   with respect to the Guarantor, entitled to a Superpriority Claim, junior only to the Carve-Out;<br><br>(ii)   with respect to Borrower, entitled to a Superpriority Claim, junior the Carve-Out and to the ProtoStar II Superpriority Claim; and<br><br>(iii)   secured by (v) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on all Collateral that is property of the Guarantor that is otherwise not encumbered by a valid perfected and non-avoidable Lien as of the Petition Date or a valid and perfected Lien in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, in the amount of, and to the extent that, the proceeds of the Term Loans are received by the Guarantor, (w) a priming first priority perfected security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code in substantially all presently owned and hereafter acquired assets of Guarantor, including, without limitation, accounts, instruments, documents, inventory, general intangibles, intellectual property, equipment, real estate and other fixed assets, (x) a priming first priority perfected security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code in (A) 100% of the Capital Stock of Guarantor owned by Borrower and any proceeds thereof received by Borrower and (B) the Designated Account and all cash contained therein, (y) a junior Lien and perfected security interest pursuant to § 364(c) of the Bankruptcy Code in substantially all presently owned and hereafter acquired assets of Borrower (other than with respect to 100% of the Capital Stock of Guarantor owned by Borrower and with respect to the Designated Account and all cash contained therein, which in each case, shall be subject to the first priority priming Liens in favor of Agent as set forth above), including without limitation, accounts (other than with respect to the Designated Account and all cash contained therein, which shall be subject to first priority priming Liens in favor of Agent as set forth above), instruments, documents, inventory, general intangibles, intellectual property, equipment, real estate, other fixed assets (but not the assets of any Subsidiaries of Borrower, other than Guarantor), and 100% of the Capital Stock of PS II and all other Subsidiaries of Borrower (other than Guarantor, which |

| | |
|---|---|
| | shall be subject to first priority priming Liens in favor of Agent as set forth above), and any proceeds thereof and (z) (A) with respect to Guarantor, a first priority perfected security interest pursuant to § 364(c) and § 364(d) of the Bankruptcy Code and (B) with respect to Borrower, a junior security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code, in each case, in the proceeds of any Avoidance Actions (the assets listed in (w), (x) and (z)(A) above, the "ProtoStar I Senior Collateral", the assets listed in (y) and (z)(B) above, the "ProtoStar I Junior Collateral", and collectively, the "Collateral"). |
| | The priority of Agent's and the ProtoStar II DIP Agent's Liens on the Collateral shall be as set forth in the Orders |
| **Carve-Out**<br><br>Interim Order at ¶ 6(c); Agreement at § 2.15(c) | Agent's and the Lenders' Liens on the Collateral owned by ProtoStar and their administrative claim under sections 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject and subordinate only to a carve-out for the following (the "Carve-Out"):<br><br>(a) prior to occurrence of an Event of Default and delivery of a notice of such Event of Default to the Credit Parties, up to the amounts as set forth in the PS I Budget that are necessary to pay (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (B) fees and expenses incurred by the Credit Parties in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to Credit Parties' professionals (whether or not allowed prior to the occurrence of an Event of Default) and (C) fees and expenses incurred by any statutory Committee in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to the Debtors' or any Committee's professionals or to the members of any Committee for reasonable expenses incurred in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members), in each case incurred (whether or not paid or allowed by the Bankruptcy Court) prior to the delivery of the notice of the occurrence of an Event of Default (the "Carve-Out Notice"); and<br><br>(b) after the delivery of a Carve-Out Notice, an amount not exceeding $125,000, to pay 50% of the total fees or expenses incurred following the delivery of such Carve-Out Notice by ProtoStar and any Committee and their respective Professionals in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court; provided, however, |

| | |
|---|---|
| | that the dollar amount in this clause (ii) shall not be reduced by payments made pursuant to clause (i). |
| | No proceeds from the Term Loans or cash collateral (as that is defined in 11 U.S.C. 363(a)) is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Agents, the Pre-Petition Lenders, Agent or the Lenders, and/or challenging or raising any defenses to the prepetition obligations under the Pre-Petition Facilities, the Obligations or the Liens of the Pre-Petition Agents, the Pre-Petition Lenders, Agent or the Lenders. Notwithstanding anything herein to the contrary, the Committee, to the extent appointed in the Chapter 11 Cases, shall be permitted to use $25,000 of the proceeds of the Term Loans to investigate the validity, perfection, priority, extent, or enforceability of the Pre-Petition Facilities, or the Liens or security interests securing the Pre-Petition Facilities but no such amounts shall be used to challenge any such Liens or security interests. |
| **Adequate Protection**  Interim Order at ¶ 14; Agreement at § 2.15 | Subject to the terms of the Orders, the 12.5% Noteholders, and until such time as the WC Facility shall be paid in full, the WC Lenders, shall each receive as adequate protection for, and to the extent of, any diminution of value of the 12.5% Noteholders' respective interests in their "Collateral" (as such term is defined in the Indenture) and any diminution of value of the WC Lenders' "Collateral" (as such term is defined in the WC Facility), in each case, whether resulting from the imposition of the automatic stay, the priming set forth above, the use of the 12.5% Noteholders' and/or the WC Lenders' cash collateral or the use, sale, lease, depreciation, decline in market price or other diminution in value of the "Collateral" (as such term is defined in the Indenture and the WC Facility, as applicable): (i) a replacement Lien on the ProtoStar I Senior Collateral having a priority immediately junior to the priming and other Liens granted in favor of Agent and the Lenders under the DIP Credit Agreement and under the other Loan Documents and the Orders, in each case, subject to the Carve-Out; (ii) the payment on a current basis of the reasonable fees and expenses (including, but not limited to, the reasonable fees and disbursements of counsel or financial advisors or third-party consultants incurred by the Pre-Petition Agents and the Pre-Petition Lenders (including any unpaid prepetition fees and expenses)); (iii) a Superpriority Claim against the Guarantor junior only to the Carve-Out and to the Superpriority Claim against the Guarantor granted to Agent and the Lenders; (iv) a Superpriority Claim against Borrower junior only to the Carve-Out and to (A) the ProtoStar II Superpriority Claim and (B) the |

| | |
|---|---|
| | Superiority Claim against Borrower granted to Agent and the Lenders; (v) a prohibition against any involuntary priming by any post-petition credit facility (other than the Term Loans made under the DIP Credit Agreement); (vi) financial and other reporting information in accordance with the DIP Credit Agreement and the Orders; (vii) payment upon closing of the ProtoStar I Sale of all Net Asset Sale Proceeds thereof, after application to the payment of all of the Obligations as set forth in the DIP Credit Agreement; and (viii) such other adequate protection as may be set forth in the Orders. The priority of the 12.5% Noteholders' right to adequate protection and the WC Lenders' right to adequate protection, respectively, (i) shall be on the same terms, manner and priority of each Pre-Petition Lenders' Liens in the "Collateral" (as such term is defined in the Indenture and the WC Facility, as applicable) as set forth in the Existing Intercreditor Agreement and (ii) shall be as set forth in the Orders. |
| **Mandatory Prepayments**<br><br>Agreement at § 2.3(b) | The Borrower shall make the following mandatory prepayments:<br><br>Asset Sales:  The aggregate cash proceeds received by the Borrower and/or Guarantor from sales and other dispositions by Borrower or Guarantor of (a) any Capital Stock of its Subsidiaries or (b) any other assets of either Borrower or Guarantor (for the avoidance of doubt, excluding assets of PS II and its Subsidiaries) net of (i) the direct costs relating to such asset sale, including, without limitation, legal, accounting and investment banking fees, sales commissions, relocation expenses incurred as a result of the asset sale, and taxes paid or payable as a result of the asset sale after taking into account any available tax credits or deductions and any tax sharing arrangements; (ii) amounts required to be applied to the repayment of Indebtedness, other than the Obligations under the DIP Documents, secured by a Lien on the asset or assets that were the subject of such asset sale; and (iii) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.<br><br>Insurance Proceeds:  Prepayments of (a) any cash proceeds received by the Borrower solely from in-orbit insurance on the ProtoStar I Satellite or any other ProtoStar I Assets and of (b) any cash payments or proceeds received by Guarantor (i) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, (ii) pursuant to an Event of Loss, or (iii) as a result of the taking of any assets of Guarantor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (b)(i) any actual and reasonable costs incurred by |

| | |
|---|---|
| | Guarantor in connection with the adjustment or settlement of any claims of Guarantor in respect thereof, and (ii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (a)(ii) of this definition to the extent paid or payable to non-Affiliates, including income taxes payable as a result of any gain recognized in connection therewith. |
| **Prepayment Application**<br><br>Agreement at § 2.7 | Optional and mandatory prepayments of the DIP Loan Facility shall be applied in the following order: Subject to the Orders, all payments by Borrower or for Borrower's account, and all proceeds received by Agent in respect of voluntary and mandatory prepayments as set forth in Section 2.3, shall be applied in the following order (in each case subject to the Carve-Out):<br><br>first, to pay (i) any Lender Group Expenses then due to Agent under the Loan Documents and (ii) any fees then due to Agent (for its separate account, after giving effect to any agreements between Agent and individual Lenders) under the Loan Documents until paid in full;<br><br>second, to pay (i) any Lender Group Expenses then due to the Lenders under the Loan Documents and (ii) any fees then due to any of the Lenders under the Loan Documents, in each case, until paid in full;<br><br>third, to pay all accrued and uncapitalized interest (other than at the Default Rate) as of the date of the repayment until such interest has been paid in full;<br><br>fourth, to pay accrued interest at the Default Rate until paid in full;<br><br>fifth, to pay the outstanding principal of all Term Loans until paid in full;<br><br>sixth, to pay all other Obligations due to Agent or the Lenders until paid in full;<br><br>seventh, to pay the Pre-Petition Lenders; provided, however, that so long as (x) (A) no payment Event of Default has occurred and/or (B) following an other Event of Default Borrower has not received a notice from Agent declaring all or any portion of the Obligations immediately due and payable and, in each of the foregoing clauses (A) or (B), Agent and the Lenders have not exercised remedies in connection therewith, (y) ProtoStar I's Chapter 11 Case has not been converted to a case under chapter 7 of the Bankruptcy Code prior to consummation of the ProtoStar I |

72668-001\DOCS_DE:151332.1

| | |
|---|---|
| | Sale and (z) the ProtoStar I Sale has been consummated, amounts equal to the sum of (I) all accrued and unpaid administrative expenses provided for in the ProtoStar I Budget through the effective date of a Reorganization Plan, (II) $150,000 on account of accrued and unpaid priority claims required under the Bankruptcy Code to be paid in cash upon the effective date of a Reorganization Plan and (III) subject to the terms and conditions of the PS I Incentive Plan, any accrued and unpaid cash amounts due under the PS I Incentive Plan, in each case, shall be carved out from the proceeds of the ProtoStar I Sale and, in each case, shall be retained by the estate before any distributions are made to the Pre-Petition Lenders; provided, further, however, (x) all amounts reserved from the ProtoStar I Sale with respect to the PS I Incentive Plan shall be held by the estate solely for the benefit of the beneficiaries of the PS I Incentive Plan approved by the Bankruptcy Court and (y) all amounts reserved from proceeds of the ProtoStar I Sale with respect to clauses (I), (II) and (III) above, shall be deposited in the Designated Account solely for the purpose of satisfying such amounts and, prior to the satisfaction thereof or to the extent that such amounts are not required to be paid, such amounts shall constitute the Pre-Petition Lenders' cash collateral; <br><br> eighth, pursuant to a Reorganization Plan in accordance with the priorities set forth therein. |
| **Conditions Precedent to Initial Funding Date** <br><br> Agreement at § 3.1 | The DIP Credit Agreement contains usual and customary conditions precedent to initial funding for transactions of this type. |
| **Conditions to Final Funding Date** <br><br> Agreement at § 3.2 | The DIP Credit Agreement contains usual and customary conditions to subsequent funding for transactions of this type, including, without limitation: (i) no continuing default or continuing event of default shall exist; (ii) the representations and warranties shall be true and correct in all material respects as of the date of each extension of credit except to the extent that such representations and warranties expressly relate to a prior date, in which case they shall be true and correct in all material respects as of such earlier date; (iii) the Final Order shall have been entered, which order shall not have been reversed, modified, amended or stayed, and shall otherwise be in full force and effect within thirty (30) days following the Petition Date; (iv) a final order shall have been entered, which order shall not have been reversed, modified, amended or stayed, and shall otherwise be in full force and effect within thirty (30) days following the Petition Date approving the ProtoStar II DIP Facility; (v) there shall have |

| | |
|---|---|
| | been no changes to the PS II Budget in a manner that is materially adverse to the Lenders; and (vi) receipt of a notice of borrowing from the Borrower. As used herein, "<u>Final Funding Date</u>" means the date on which the conditions set forth above are satisfied and the second funding is made. |
| **Milestones**<br><br>Agreement at § 5.18 | Borrower and Guarantor shall comply with the following and produce and deliver the following documents (with a level of completeness, clarity and detail that is satisfactory to Required Lenders) on or prior to the date indicated for each such material action or document below (each a "<u>Milestone</u>" and collectively, the "<u>Milestones</u>"):<br><br>(a) On or prior to the fifth (5th) day of the Chapter 11 Cases, Borrower shall file with the Bankruptcy Court a motion, in form and substance reasonably acceptable to counsel for the Lenders, on shortened notice, seeking authority to conduct the ProtoStar I Sale and approval of sale procedures in connection therewith (the "<u>ProtoStar I Sale Procedures Motion</u>").<br><br>(b) On or prior to the fifth (5th) day of the Chapter 11 Cases, the Bankruptcy Court shall have entered the Interim Order and the ProtoStar II Interim Order in form and substance acceptable to counsel to the Lenders.<br><br>(c) On or prior to the twenty-fifth (25th) day of the Chapter 11 Case, the Bankruptcy Court shall have entered an order, in form and substance acceptable to counsel for the Lenders, approving the ProtoStar I Sale Procedures Motion.<br><br>(d) On or prior to the thirtieth (30th) day of the Chapter 11 Cases, the Bankruptcy Court shall have entered the Final Order and the ProtoStar II Final Order in form and substance acceptable to counsel to the Lenders.<br><br>(e) On or prior to the fiftieth (50th) day of the Chapter 11 Cases, Borrower shall file a motion seeking approval of a disclosure statement (the "<u>Disclosure Statement</u>") for the Reorganization Plan and procedures for soliciting votes with respect to the Reorganization Plan (the "<u>Solicitation Motion</u>").<br><br>(f) On or prior to the sixtieth (60th) day of the Chapter 11 Cases, Borrower and PS I shall have conducted an auction for the ProtoStar I Sale.<br><br>(g) On or prior to the sixty-fifth (65th) day of the Chapter 11 Cases, (A) the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to counsel for the |

| | Lenders, approving the ProtoStar I Sale to the person or entity selected as the highest and best bidder at the auction and approved the asset purchase agreement in connection therewith, which shall be in form and substance reasonably acceptable to Supermajority Lenders and (B) ProtoStar shall have filed an amendment to the Disclosure Statement as necessary to comply with Section 1125 of the Bankruptcy Code with respect to the results of the auction. |
| | |
| | (h) On or prior to the eightieth (80th) day of the Chapter 11 Cases, the Bankruptcy Court shall have entered an order approving the Solicitation Motion. |
| | |
| | (i) On or prior to the ninetieth (90th) day of the Chapter 11 Cases, all conditions to closing the ProtoStar I Sale shall have been satisfied or waived (other than regulatory approvals), subject to an automatic extension to the one hundred twentieth (120th) day of the Chapter 11 Cases, if all conditions to the ProtoStar I Sale (other than receipt of ITAR approval and payment of the purchase price) shall have been satisfied or waived. |
| | |
| | (j) On or prior to the one hundred twentieth (120th) day of the Chapter 11 Cases, the Bankruptcy Court shall enter an order confirming the Reorganization Plan. |
| **Events of Default**<br><br>Agreement at § 9.1 | The DIP Credit Agreement contains events of default that are usual and customary for transactions of this type. |
| **Indemnification; Expenses**<br><br>Agreement at § 2.8 | Customary and appropriate provisions relating to indemnity, expense reimbursement and related matters in a form reasonably satisfactory to the Agent and the Lenders. |

27.     The terms of the Financing are subject to the DIP Intercreditor Agreement[4], which provides, among other things, to:

      a.      <u>Limited Subordination of the Superpriority Claim of the DIP Lenders.</u>

            (i)      The Superpriority Claim of the DIP Lenders shall be subordinate and junior in right of payment, priority, collection and in all other respects to all obligations owed to the creditors under the

---

[4] This summary of the DIP Intercreditor Agreement is provided for the benefit of the Court and other parties in interest. To the extent there are any conflicts between this summary and the DIP Intercreditor Agreement, the terms of the DIP Intercreditor Agreement shall govern.

ProtoStar II DIP Facility and the Existing ProtoStar II Facility (collectively, the "<u>PSII Obligations</u>"), in each case, <u>except (a) for the accrual of interest in respect of the Superpriroity Claims and (b) to the extent that such Superpriority Claims may be paid out of any proceeds of any Senior Collateral</u>; and

(ii)    unless and until the PSII Obligations have been paid in full, (x) neither the DIP Agent nor any DIP Lender will ask, demand, accelerate, sue for, take or receive from the Borrower directly or indirectly, all or any part of the Superpriority Claims, or otherwise enforce any of its rights or remedies in connection with the Superpriority Claims, including without limitation with respect to any Junior Collateral or other security or guaranty therefor, in each case, other than any action made or taken solely against the Senior Collateral or in connection with the exercise of remedies by the DIP Agent against the Borrower or Guarantor solely with respect to the Senior Collateral.

b.    <u>Limited Subordination of PS II Superpriority Claims to the extent of the Senior Collateral</u>.

(i)    The ProtoStar II Superpriority Claims, solely to the extent that such ProtoStar II Superpriority Claims would be satisfied using the proceeds of any Senior Collateral, shall be subordinate and junior in right of payment, priority, collection and in all other respects to the Superpriority Claims of the DIP Lenders and the claims of the Pre-Petition Lenders under the Pre-Petition Facilities (collectively, the "<u>PSI Obligations</u>"); and

(ii)    no payment of, or security for, all or any part of the ProtoStar II Superpriority Claims, whether in cash or other property, by set-off, exercise of remedies (including sale, foreclosure or similar proceedings), directly or indirectly, and whether pursuant to a plan or reorganization, liquidation, any similar proceeding or otherwise, shall be made, given or received from the proceeds of any Senior Collateral unless and until the PSI Obligations have been paid in full.

## **Relief Requested**

28.    The Credit Parties have an urgent and immediate need for cash to continue to operate. Currently, the Credit Parties do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit

25

and utilize cash collateral, as requested, on an interim basis pending a final hearing on this Motion, the Credit Parties will be immediately and irreparably harmed. The availability of interim loans under the DIP Credit Agreement will provide necessary assurance to the Credit Parties' vendors and employees, among others, of their ability to meet their near-term obligations, including providing adequate assurance to utilities and adequate protection payments to secured creditors as contemplated by the PS I Budget. Failure to meet these obligations and to provide these assurances likely would have both a short-term and a long-term negative impact on the value of the Credit Parties' businesses, to the detriment of all parties in interest.

29.     By this Motion, the Debtors seek entry of the Interim Order, substantially in the form attached hereto, and the Final Order, granting the following relief, without limitation:

    a.    authorization for ProtoStar to obtain postpetition debtor-in-possession financing and for PS I to guaranty the obligations in connection with the Financing, up to an aggregate principal amount of $16,000,000;

    b.    authorization for the Credit Parties to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

    c.    (i) authorization for the Credit Parties to use cash collateral in which the Pre-Petition Lenders have an interest and (ii) granting of adequate protection to the Pre-Petition Lenders' Liens for the ratable benefit of the WC Lenders and the Secured Noteholders with respect to, among other things, use of cash collateral and all use and diminution in the value of the Pre-Petition Lenders' interest in the Credit Parties' interest in the PS I Collateral including ) and (iii) granting of additional adequate protection including payment of the reasonable monthly fees and expenses, without the necessity of any further application to the Court for approval or payment, of (x) the Trustee and its legal counsel and (y) United States legal counsel, local bankruptcy counsel and Bermuda legal counsel, employed by Pre-Petition Holders and WC Facility Lenders and (A) approval of the indemnity provided by the Credit Parties to Chanin Capital Partners LLC ("Chanin") under that certain letter agreement (the "Chanin Agreement"), dated as of May 7, 2009, and the payments contemplated thereunder as adequate protection payments on account of the claims of the Pre-

Petition Holders, and (B) payment of compensation to Chanin, in each case, without the necessity of any further application to the Court for approval, in accordance with the Chanin Agreement;

d.  granting of superpriority administrative expense claims to the Agent and the DIP Lenders payable from the Borrower's estate, subject only to the Carve-Out, the Superpriority Claim against Borrower granted with respect to the ProtoStar II DIP Facility and the Existing ProtoStar II Facility (and together with the ProtoStar II Pre-Petition Facility, the "ProtoStar II Superpriority Claim") and the terms of the DIP Intercreditor Agreement;

e.  granting of superpriority administrative expense claims to the Agent and the DIP Lenders payable from the Guarantor's estate, subject only to the Carve-Out;

f.  granting of first priority and/or priming liens with respect to the Senior Priority DIP Collateral (as defined in the Interim Order) and the granting of junior priority liens with respect to the Junior Priority DIP Collateral (as defined in the Interim Order, and together with the Senior Priority DIP Collateral, the "DIP Collateral") for the benefit of the Agent and the DIP Lenders;

g.  the limitation of the Credit Parties' and their estates' right to surcharge against the DIP Collateral and Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code;

h.  pursuant to Bankruptcy Rule 4001, that an interim hearing on the Motion to consider entry of the proposed Interim Order (i) authorizing the Borrower, on an interim basis, forthwith, to borrow in a single drawing under the DIP Documents up to an aggregate principal or face amount not to exceed $2,000,000, subject to any limitations of credit extensions under the DIP Documents (the "Maximum Interim Borrowing"), (ii) granting the DIP Liens and the Superpriority Claim to the Agent and DIP Lenders, (iii) authorizing the Credit Parties' use of cash collateral of the Pre-Petition Lenders and (d) granting the adequate protection described herein; and

i.  scheduling the Final Hearing to be held within fifteen (15) days of the entry of this Interim Order to consider entry of the Final Order authorizing, inter alia, (i) the balance of the borrowings under the DIP Documents on a final basis and (b) the refinancing of the WC Facility, as set forth herein and the DIP Documents.

## Basis For Relief

30.     The continued viability of the Credit Parties' businesses, the success of the Credit Parties' reorganization efforts and their ability to preserve the value of the Assets until they can be sold hinge upon obtaining immediate access to Financing. Without the Financing, the Credit Parties cannot continue as viable companies and the value of the Assets will quickly erode -- to the detriment of all. As explained below, the Credit Parties believe they have satisfied the requirements for postpetition financing on a priming secured basis pursuant to section 364(d) of the Bankruptcy Code.

**A.     Financing Should Be Authorized Under Section 364 Of Bankruptcy Code**

31.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c)[5]; Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

---

[5]     Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

72668-001\DOCS_DE:151332.1

32.     As a condition to entering into the Financing and obtaining the Credit

Parties' needed liquidity, the Credit Parties must obtain authorization pursuant to subsection

364(d) of the Bankruptcy Code, which permits a debtor to grant, in return for postpetition

financing, liens on its property senior in priority to existing liens (i.e., "priming" liens).

Specifically, section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the
> obtaining of credit or the incurring of debt secured by a senior
> or equal lien on property of the estate that is subject to a lien
> only if --
>
> (A)  the trustee is unable to obtain such credit otherwise; and
>
> (B)  there is adequate protection of the interest of the holder of
> the lien on the property of the estate on which such senior or
> equal lien is proposed to be granted.

11 U.S.C. §364(d).

33.     Provided that an agreement to obtain secured credit is consistent with the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

deference in acting in accordance with its reasonable business judgment in obtaining such credit.

In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently

reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on

grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the

financing agreement doe not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); see also In

re Barbara K. Enters., Inc., No. No. 08-11474 (MG), 2008 WL 2439649, at *10 (Bankr.

S.D.N.Y. June 16, 2008) ("The Court is aware that its normal function in reviewing request for

postpetition financing is to defer to a debtor's own business judgment so long as a request for

29

financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."). The focus of a bankruptcy court's approval of a financing agreement on a priming secured basis is whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. As one court has noted:

> [o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

34.     In furtherance of this approach, courts consider a number of factors, including: (a) whether alternative financing is available on any other basis (e.g. whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors. See Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); In re Barbara K. Enters., Inc., 2008 WL 2439649, at *10; see also 3 Collier on Bankruptcy ¶364.04[1] (15th ed. Rev. 2008). For the reasons set forth below, the Credit Parties satisfy these factors.

30

## 1. Credit Parties Could Not Obtain Financing Without Providing Priming Liens

35. The Credit Parties meet the standards of section 364(d)(1) of the Bankruptcy Code. With respect to the first requirement, the Credit Parties can and will demonstrate that they are unable to obtain debtor-in-possession financing without providing senior priming liens. As set forth above and in the Pelini Declaration, the Credit Parties have made all reasonable efforts to obtain financing on the best terms available in light of market circumstances. Despite their efforts, the Credit Parties have not been able to obtain postpetition financing or other financing accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions that those for which approval is sought herein. Section 364(d) of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. Bray v. Shenanodah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financing institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender."); In re Aqua Assocs., 123 B.R. at 195 ("Section 364(d)(1)(A) seemingly requires only a showing that the Debtor has attempted unsuccessfully to obtain credit on better terms from other sources."); In re Ames Dep't Stores, Inc., 115 B.R. at 37; In re Dunes Casino Hotel, 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior

31

liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien).

36.    The Credit Parties, through their financial and legal advisors, engaged in an extensive and exhaustive effort to obtain postpetition financing in the months leading up to the Petition Date. This process was conducted in an exceedingly difficult financial climate, and no potential lender was willing to provide postpetition financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents. Specifically, the Credit Parties were unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense and was unable to obtain secured credit under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Documents within the time frame required by the Credit Parties to avoid immediate and irreparable harm. A loan facility in the amount and under the terms provided by the DIP Documents is not available without the Credit Parties granting to the Agent and the DIP Lenders, subject to the Carve-Out, the ProtoStar II Financing Liens, the DIP Liens and the Superpriority Claim under the terms and conditions set forth in the DIP Documents.

### 2.    Financing Is Necessary To Preserve The Assets Of The Credit Parties' Estates

37.    As debtors-in-possession, the Credit Parties have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). As described above, it is essential that the Credit Parties immediately obtain access to financing in order to continue operating their businesses in the ordinary course and to maintain and preserve going concern values and maximize the value of the Assets. Without immediate access to the liquidity provided through the Financing, the going

concern value of the Credit Parties' assets, including the Assets, would be jeopardized, to the detriment of all creditors and other parties in interest.

### 3. The Credit Parties Exercised Proper Business Judgment

38.     Based on the facts and circumstances present in these cases, it is clear that the proposed Financing and the use of Cash Collateral are fair and reasonable, reflect the Credit Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. See In re Ames Dep't Stores, Inc., 115 B.R. at 40 (courts should approve borrowings pursuant to section 364(d) and 364(d) of the Bankruptcy Code if the debtor was within its business judgment); see also In re Utah 7000, L.L.C., 2008 WL 2654919, *2 ((Bankr. D. Utah 2008); In re Mid-State Raceway, Inc., 323 B.R. 40, 58-59 (Banrk. N.D.N.Y. 2005) (same); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditor"). Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor in possession deference in acting in accordance therewith. See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.")

39.     In general, a bankruptcy court defers to a debtor's business judgment regarding the need for and the proposed use of funds "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." See In re Ames Dep't Stores, Inc., 115 B.R. at 40. Courts generally will not second-guess a debtor's business decisions when those decisions involve a "business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). There is no dispute that the business judgment standard applies to approval of the terms of Financing proposed in this case.

40.     To determine whether the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Helm, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

41.     Here, the Credit Parties have exercised sound business judgment in determining that the Financing is appropriate and have satisfied the legal prerequisites to obtain the proposed Financing. As set forth in the Pelini Declaration, the matter was extensively and diligently considered by the Debtors' management and submitted to the Board of Director's approval. The Credit Parties' decision to agree to the Financing is reasonable under the circumstances, where no financing was available on different terms and where the need for liquidity was immediate. Accordingly, the Credit Parties have demonstrated sound business judgment and should be granted authority to enter into the Financing and borrow funds from the DIP Lenders on the terms described herein and take the other actions contemplated by the DIP Credit Agreement and as requested herein.

4. **Financing Terms Are Fair And Reasonable**

42. The terms and conditions of the DIP Credit Agreement are fair, reasonable and adequate and were negotiated by the parties in good faith and at arm's-length. Moreover, the provisions set forth in the DIP Credit Agreement are commonly found in debtor in possession financing agreement of this nature and, in light of the unprecedented state of the credit markets, the DIP Lenders would not have agreed to provide financing to the Credit Parties absent these provisions. As required by Bankruptcy Rule 4001 and Local Rule 4001-2, a summary of the material terms and conditions of the proposed Financing are presented at the outset of this Motion.

43. <u>Carve-Out</u>. The proposed Financing subjects the security interests of the DIP Lenders to the Carve-Out described above. Such "carve outs" for professional fees have been found to be not only reasonable but necessary to ensure that debtors' estates -- and where applicable official committees -- will be assured of the assistance of counsel and other bankruptcy professionals. See <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. at 38. Indeed, the Financing does not directly or indirectly deprive the Credit Parties' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. <u>Id.</u> (observing that courts insist on carve-outs for professionals representing parties in interest because "absent such protection, the collective rights and expectation of all parties in interest are solely prejudiced.").

44. <u>DIP Lenders' Fees</u>. The various fees and charges to be paid to the DIP Lenders under the DIP Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. See <u>In re Defender Drug Stores, Inc.</u>, 145 B.R.

312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee"). Accordingly, the Credit Parties submit the terms of the DIP Credit Agreement are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor in possession financing) and are in the best interests of the Credit Parties' estates.

45. <u>Payment of Pre-Petition Secured Debt</u>. As a condition to providing the Credit Parties the funding they desperately need to operate their businesses and preserve going concern value for the benefit of all parties in interest, the DIP Lenders insisted that a commitment of such postpetition financing would be unavailable absent the possibility of a refinancing of the WC Facility.

46. Understanding the concerns of creditors that may be expressed in connection with the Financing, the Credit Parties carefully considered the terms of the proposed refinancing and the scope and validity of the Pre-Petition Lenders' secured claim (and any associated causes of action). Based on that analysis, the Credit Parties determined that the refinancing is appropriate under the circumstances. Indeed, notwithstanding that the Credit Parties have no alternatives available, the Credit Parties worked to independently verify and determine the secured nature of the Pre-Petition Lenders' claims in considering the appropriateness of the refinancing.

47. Ultimately, the Credit Parties believe that, in light of the fact that no other financing option is available, and that they believe the obligations under the WC Facility are oversecured, paying down all of the WC Facility will have little adverse affect on their unsecured creditors and will provide them with the only opportunity available to continue their business operations. As reflected in the budget attached to the DIP Credit Agreement, the Credit Parties believe that after payment of all outstanding amounts due under the WC Facility, the Financing

will provide it with sufficient liquidity for working capital and general corporate purposes and fund operations as a going concern to permit the orderly sale of the Assets. Moreover, the Credit Parties do not believe that payment of the WC Facility will unduly restrict their restructuring options, including sale of the Assets, going forward in these chapter 11 cases.

**B.     The Credit Parties Will Provide Sufficient Adequate Protection**

48.     The second prong of section 364(d) of the Bankruptcy Code requires the debtor to show that the interests of the holder of an existing lien on the property are adequately protected. The Bankruptcy Code does not define "adequate protection" but rather sets forth three nonexclusive examples:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by --
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as well result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. In the context of section 364(d), collateral only requires adequate protection to the extent that a priming lien will result in a decrease in the value of such entity's interest in the subject property. See In re 495 Central Park Ave. Corp., 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of the its interest during the Chapter 11 reorganization."); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D.

37

Pa. 2003) (quoting In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (citing In re 495 Central Park Ave. Corp.).

49.     What constitutes adequate protection is decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Becker Indus. Corp., 58 B.R. 725, 236 (Bankr. S.D.N.Y. 1986).

50.     The Credit Parties believe the Pre-Petition Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, as set forth herein.

51.     As adequate protection, the Pre-Petition Lenders shall be granted, among other things, the Adequate Protection Liens, the Section 507(b) Claim, the Adequate Protection Interest (each as defined below) and, upon entry of the Final Order, the Credit Parties shall be authorized to repay all Existing WC Obligations in full (collectively, the "Adequate Protection Obligations"), in each case subject to the Carve-Out; provided, however that (i) (A) there has been no Event of Default under Section 9.1(a) of the DIP Credit Agreement and/or (B) following an Event of Default under Section 9.1(b) through (o) of the DIP Credit Agreement neither Credit Party has received a notice from the Agent declaring all or any portion of the DIP Obligations immediately due and payable and, in each of the foregoing clauses (A) or (B), the Agent and the DIP Lenders have not exercised remedies in connection therewith, (ii) the Guarantor's Case has not been converted to a case under chapter 7 prior to consummation of one or more sales (including one or more credit bids) of all or substantially all of the assets of the Guarantor or the

equity of the Guarantor (the "ProtoStar I Sale") and (iii) the ProtoStar I Sale has been consummated, then amounts (the "PS I Sale Carve-Out") equal to the sum of (I) all accrued and unpaid administrative expenses provided for in the ProtoStar I Budget through the effective date (the "Effective Date") of any chapter 11 plan of one or more of the Credit Parties (the "Plan"), (II) $150,000 on account of accrued and unpaid priority claims required under the Bankruptcy Code to be paid in cash upon the Effective Date and (III) subject to the terms and conditions of the PSI Incentive Plan (as defined in the DIP Credit Agreement) any accrued and unpaid cash amounts due under the PSI Incentive Plan, in each case, shall be carved out from the proceeds of the ProtoStar I Sale and, in each case, shall be retained by the estate before any further distributions are made as set forth below; provided, further, however, that all amounts reserved from proceeds of the ProtoStar I Sale with respect to the PS I Incentive Plan, shall be held by the estate solely for the benefit of the beneficiaries of the PS I Incentive Plan approved by the Court; provided further that all amounts reserved from proceeds of the ProtoStar I Sale with respect to clauses (I), (II) and (III) above shall be held by the estate in the Designated Account (as defined in the DIP Credit Agreement) solely for the purpose of satisfying such amounts and, prior to the satisfaction thereof, or to the extent such amounts are not required to be paid, such amounts shall constitute the Pre-Petition Lenders' cash collateral; provided, further, however, that, in the event the Pre-Petition Holders credit bid in the ProtoStar I Sale, amounts sufficient to fund the PS I Incentive Plan shall be paid in cash to the estate at closing of the ProtoStar I Sale for distribution in accordance with the PS I Incentive Plan; provided further that, notwithstanding the foregoing proviso, in the event (x) no cash bid for the ProtoStar I Assets (as defined in the DIP Credit Agreement) in excess of $100,000,000 was received from any party and (y) the Pre-Petition Holders successfully credit bid in the ProtoStar I Sale, then amounts due under the PS I Incentive Plan shall be satisfied by payment of the same type of consideration received by the Pre-Petition

39

Holders (whether debt, equity or otherwise) in such amount that the proportion of such consideration received by the PS I Incentive Plan participants equals 2% of the amount of consideration received by the Pre-Petition Holders. If any portion of the consideration received by the Pre-Petition Holders in connection with a credit bid by some or all of the Pre-Petition Holders is in the form of equity interests in a corporation, limited liability company or similar entity ("NewCo"), the PS I Incentive Plan participants and the Pre-Petition Holders shall enter into an agreement, effective as of the issuance of such interests, which provides for (i) preemptive rights to the extent provided to other shareholders of NewCo, (ii) "tag-along" rights; and (iii) registration rights to the extent provided to other shareholders of NewCo subject to reduction or modification as required by the underwriters provided, however, that, the PS I Incentive Plan may only be satisfied, in whole or in part, with equity of NewCo if such interests shall have been distributed first to the DIP Lenders in a proportion no greater than the quotient of (x) the total amount of obligations outstanding under PS I DIP Financing as of the closing of the ProtoStar I Sale divided by (y) the total dollar amount of the Pre-Petition Holders' credit bid for the ProtoStar I Assets:

(a) **Adequate Protection Liens.** The Pre-Petition Lenders shall be granted (effective and perfected by operation of law and without the necessity of the execution by the Credit Parties of mortgages, security agreements, pledge agreements, financing statements or other agreements to the full extent as otherwise provided herein respecting the DIP Liens) replacement and additional security interests in and liens (the "Adequate Protection Liens") upon the Senior Priority DIP Collateral as adequate protection for any diminution in the value of their valid and perfected security interests and liens in the Pre-Petition Collateral as of the Petition Date. The Adequate Protection Liens shall not be subject or subordinate to any liens other than (i) the DIP Liens, (ii) the Carve-Out and (iii) upon occurrence of the ProtoStar I Sale, the PS I

40

Sale Carve-Out; provided, however, that in accordance with the Existing Intercreditor Agreement the Adequate Protection Liens granted hereunder in favor of the Pre-Petition Holders shall be junior to the Adequate Protection Liens granted hereunder in favor of the WC Facility Lenders. The Debtors agree that they will not prime or seek to prime the Adequate Protection Liens except as expressly provided herein.

(b)     **Section 507(b) Claim.** The Pre-Petition Lenders shall be granted a superpriority claim as provided for in section 507(b) of the Bankruptcy Code (the "Section 507(b) Claim") in an amount equal to the aggregate diminution in value of their interest in the Credit Parties' interest in the Pre-Petition Collateral resulting from the sale, lease or use by the Credit Parties of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Lenders' security interests and liens in the Pre-Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and any foreclosure or other disposition by the DIP Lenders of the Pre-Petition Collateral. The priority of the Section 507(b) Claim shall only be junior to the Superpriority Claim, the Carve-Out, upon occurrence of the ProtoStar I Sale, the PS I Sale Carve-Out and, with respect to the Borrower only, the ProtoStar II Superpriority Claim; provided, however, that in accordance with the Existing Intercreditor Agreement the Section 507(b) Claim granted hereunder in favor of the Pre-Petition Holders shall be junior to the Section 507(b) Claim granted hereunder in favor of the WC Facility Lenders.

(c)     **Additional Adequate Protection.** As additional adequate protection, (A) the Credit Parties, in respect of the Existing Credit Facilities shall promptly pay the reasonable monthly fees and expenses, without the necessity of any further application to the Court for approval or payment, of (x) the Trustee and its legal counsel and (y) United States legal counsel, local bankruptcy counsel and Bermuda legal counsel, employed by Pre-Petition Holders

41

and WC Facility Lenders, in each case regardless of whether such amounts accrued prior to or after the Petition Date and (B) for the benefit of the Pre-Petition Holders, (x) the indemnity provided by the Credit Parties to Chanin Capital Partners LLC ("Chanin") under that certain letter agreement (the "Chanin Agreement"), dated as of May 7, 2009, and the payments contemplated thereunder are approved and (y) Chanin shall receive compensation and be paid, in each case, without the necessity of any further application to the Court for approval, in accordance with the Chanin Agreement.

(d) **Adequate Protection Interest.** Until the indefeasible payment in full, in cash, of the Existing WC Obligations, interest (the "Adequate Protection Interest") on the Existing WC Obligations shall accrue at the default rate of interest of 18% as provided for in the WC Facility.

(e) **Reporting.** The Credit Parties shall provide all information to the Pre-Petition Lenders as contemplated by the DIP Credit Agreement.

(f) **Asset Sale Proceeds.** Upon closing of the ProtoStar I Sale the Net Asset Sale Proceeds (as defined in the DIP Credit Agreement), payable to the Pre-Petition Lenders shall be distributed as set forth in Section 2.7 of the DIP Credit Agreement.

52. The WC Facility Lenders and over 66 2/3% of the Pre-Petition Holders have consented to the adequate protection provided herein.

## C. Financing Should Be Accorded Protections Of Bankruptcy Code Section 364(e)

53. Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred

or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." See 11 U.S.C. § 364(e).

54.     As explained in detail herein, the terms of the DIP Credit Agreement were negotiated in good faith and at arm's length among the Credit Parties, the Agent and the DIP Lenders. All of the Credit Parties' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including, but not limited to, (i) all loans made to the Credit Parties pursuant to the DIP Documents and (ii) all Obligations (as defined in the DIP Credit Agreement) incurred (collectively, the "DIP Obligations"), have been extended by the Agent, the DIP Lenders and their respective advisors and affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The Agent and the DIP Lenders should be entitled to the full protection of section 364(e) in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D.      Use Of Cash Collateral Should Be Authorized**

55.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 362(c)(2). The Credit Parties require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Credit Parties' businesses would be brought to an immediate halt, with damaging consequences for the Credit Parties and their estates and creditors. The interests of the Pre-Petition Lenders in the Cash Collateral will be protected by the adequate protection provisions set forth above. The Pre-Petition Lenders and the lenders party to the PS II DIP Credit Agreement, subject to the terms of the DIP Intercreditor Agreement, have consented to the use of the Cash Collateral on the terms set forth herein, the

43

Interim Order and the DIP Intercreditor Agreement. Accordingly, the Credit Parties request to use Cash Collateral in the operation of their businesses and administration of the chapter 11 cases should be approved.

## E.    Automatic Stay Should Be Modified On A Limited Basis

56.    The relief requested herein contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after five (5) business days' written notice thereof, all rights and remedies under the DIP Documents, subject to the terms of the DIP Intercreditor Agreement. Stay modifications of this kind are ordinary and standard features of postpetition debtor in possession financing facilities and, in the Credit Parties' business judgment, are reasonable and fair under the present circumstances.

## F.    Interim Approval Of DIP Credit Agreement Should Be Granted

57.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or to obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. See also Del. Bankr. L.R. 4002-1(b).

58.    Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4002-1(b), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Credit Parties to enter into the DIP Credit Agreement and use Cash Collateral on an interim basis to (i) maintain and finance the ongoing operations of the Credit Parties (ii) avoid immediate and irreparable harm and prejudice to the Credit Parties' estates and all parties in interest and (b) schedule a hearing to consider entry of the Final Order.

44

59.     The Credit Parties have an urgent and immediate need for cash to continue to operate.  Currently, the Credit Parties do not have sufficient funds with which to operate their businesses on an ongoing basis.  Absent authorization from the Court to use Cash Collateral and obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Credit Parties will be immediately and irreparably harmed.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Credit Parties, facilitating their reorganization efforts and maximizing value of the Assets.

## Waiver Of Bankruptcy Rules 6004(a) And (h)

60.     To implement the foregoing successfully, the Debtors seek a waiver of the requirement that, pursuant to Bankruptcy Rule 6004(a), 20-days notice be given of a proposed use, sale or lease of property, other than cash collateral, not in the ordinary course of business as well as the ten-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h), to the extent applicable.

## No Previous Request

61.     No previous request for the relief sought herein has been made to this or any other court.

## Notice

62.     Notice of this Motion has been provided to the following parties or their legal counsel (if known): (i) the Office of the United States Trustee for the District of Delaware, (ii) the agents for the Debtors' prepetition secured lenders, (iii) the indenture trustee for the Debtors' prepetition secured noteholders (iv) the agents for the Debtors' proposed debtor-in-possession lenders and (v) all known lien holders.  The Debtors submit that, in light of the relief requested, no other or further notice need be provided.

45

**WHEREFORE,** the Debtors respectfully request the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: July 29, 2009

PACHULSKI STANG ZIEHL & JONES LLP

*James E. O'Neil*

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
        ljones@pszjlaw.com
        joneill@pszjlaw.com
        kmakowski@pszjlaw.com

-and-

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Matthew S. Barr
Glenn S. Gerstell
Peter K. Newman
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
        mbarr@milbank.com
        ggerstell@milbank.com
        pnewman@milbank.com

*Proposed Attorneys for ProtoStar Ltd., et al.*

72668-001\DOCS_DE:151332.1