**Exhibit A**

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of July 31, 2009

by and among

**PROTOSTAR LTD.,**
as Borrower

**PROTOSTAR I LTD.,**
as Guarantor

The Financial Institutions From Time to Time Party Hereto,
as Lenders

and

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent

# TABLE OF CONTENTS

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance Agreement |
| Exhibit B | Form of Note |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of ProtoStar I Interim Order |
| Exhibit E | Budgets |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Designated Account |
| Schedule 1.1(a)(i) | Initial Term Loan Commitments |
| Schedule 1.1(a)(ii) | Final Term Loan Commitments |
| Schedule 4.2 | Executive Offices; Collateral Locations; FEIN; Organizational Information |
| Schedule 4.11 | Transactions with Affiliates |
| Schedule 4.14 | Litigation |
| Schedule 4.15 | Insurance |
| Schedule 4.26(a) | Contracts |
| Schedule 4.26(b) | Leases |
| Schedule 4.26(c) | Existing Defaults |
| Schedule 5.4 | Properties, Licenses and Permits |
| Schedule 5.7 | Corporate Existence |
| Schedule 5.19 | Post-Closing Items |
| Schedule 7.1 | Indebtedness |
| Schedule 7.7 | Liens |
| Schedule 9.1(l) | Key Employees |

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of July 31, 2009, is made by and among **PROTOSTAR LTD.**, an exempted company incorporated under the laws of Bermuda with limited liability ("**Borrower**") and a debtor and a debtor-in-possession in a case pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in Section 1.1), **PROTOSTAR I LTD.**, an exempted company incorporated under the laws of Bermuda with limited liability ("**ProtoStar I**" and together with Borrower, each a "**Debtor**" and collectively, the "**Debtors**") and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of Borrower and ProtoStar I, each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**"), the financial institutions from time to time party hereto as lenders (collectively with their successors and assigns, the "**Lenders**", and each of them, a "**Lender**"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("**Wells Fargo**"), in its capacity as administrative agent for the Lenders (with its successors and assigns in such capacity, the "**Administrative Agent**").

## RECITALS

WHEREAS, unless otherwise defined, capitalized terms used in these Recitals shall be as set forth in Section 1.1;

WHEREAS, on July 29, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions with the Bankruptcy Court initiating the Chapter 11 Cases and have continued in the possession of their respective assets and in the management of their respective businesses pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for Debtors to obtain additional funds in order to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, Debtors have requested that the Lenders extend post-petition financing to Borrower;

WHEREAS, the Lenders are willing to make the Term Loans to Borrower upon the terms and conditions set forth herein;

WHEREAS, all of Borrower's obligations under the Term Loans will be guaranteed by Guarantor;

WHEREAS, Borrower and Guarantor have agreed to secure all of their Obligations under this Agreement and the other Loan Documents by granting to Administrative Agent, for the benefit of Administrative Agent and the Lenders, a security interest in and Lien upon all of the Collateral with the order of priority set forth in Section 2.15;

WHEREAS, Borrower and Guarantor have agreed that Administrative Agent, for the benefit of Administrative Agent and the Lenders, shall be entitled to a Superpriority Claim, with the order of priority set forth in Section 2.15, to provide for the repayment of the Obligations; and

WHEREAS, all Schedules, Exhibits and other attachments hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto agree as follows:

63.

## DEFINITIONS

Definitions.

Capitalized terms used herein shall have the following respective meanings:

"**Act**" has the meaning set forth in <u>Section 12.15</u>.

"**Additional Documents**" has the meaning set forth in <u>Section 5.13</u>.

"**Administrative Agent**" has the meaning set forth in the introductory paragraph hereto.

"**Administrative Agent's Account**" means a deposit account of Administrative Agent designated from time to time by Administrative Agent in a notice to each Lender, Borrower or any other Person.

"**Administrative Agent Fee Letter**" means that certain letter agreement regarding fees by and between Borrower and Administrative Agent dated as of July 31, 2009.

"**Affected Lender**" has the meaning set forth in <u>Section 2.11</u>.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "**control**", as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided, that, beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Affiliate Transaction**" has the meaning set forth in <u>Section 7.6</u>.

"**Agent-Related Persons**" means Administrative Agent, together with its respective Affiliates, Related Funds, officers, directors, employees, attorneys, and agents.

"**Agreement**" means this Credit Agreement dated as of the date hereof, as the same may be amended, restated, modified, supplemented or otherwise modified from time to time, together with all exhibits and schedules from time to time attached hereto as well as any attachments from time to time attached thereto, in each case, as amended, restated, modified, supplemented or otherwise modified from time to time.

"**Anti-Money Laundering Laws**" has the meaning set forth in Section 4.29.

"**Anti-Terrorism Laws**" has the meaning set forth in Section 4.28.

"**Asset Sale**" means the sale, lease, sub-lease, sale and leaseback, assignment, conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) by either Debtor of (a) any Capital Stock of its Subsidiaries or (b) any other assets of either Debtor (for the avoidance of doubt, excluding assets of ProtoStar II and its Subsidiaries); provided that the sales of inventory, worn out or surplus property in the ordinary course of business shall not be an "Asset Sale" for any purpose hereunder.

"**Assignee**" has the meaning set forth in Section 10.1(a).

"**Assignment and Acceptance**" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A.

"**Avoidance Actions**" means claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or other applicable law.

"**Bankruptcy Code**" means the provisions of Title 11 of the United States Bankruptcy Code (11 U.S.C. §§101 et seq.), as amended, and any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Base LIBOR Rate**" means, as of any date of determination, the rate per annum (i) offered for deposits in United States dollars from Bloomberg Financial Markets Commodities News that appears on Moneyline Telerate Page 3750 (as defined in the International Swaps and Derivatives Association, Inc. 1991 Interest Rate and Currency Exchange Definitions) (or such other page as may replace that page, or such page or replacement therefore on any successor service) as the London interbank offered rate as of 11:00 a.m., London time, on such date, and (ii) if no such rate appears as the London interbank offered rate on such Bloomberg page (or such other page as may replace that page, or such page or replacement therefore on any successor service) as described above, LIBOR for the applicable period will be determined on the basis of the rates at which deposits in United States dollars are offered by the principal London office of the Administrative Agent at approximately 11:00 a.m., London time, on such date to prime banks in the London interbank market for a one-month period. All percentages resulting from any calculations or determinations referred to in this definition will be rounded upwards to the nearest multiple of 1/100 of 1% and all U.S. dollar amounts used in or resulting

from such calculations will be rounded to the nearest cent (with one-half cent or more being rounded upwards).

"**Bermuda Law Event**" has the meaning set forth in <u>Section 12.21</u>.

"**Board of Directors**" means (i) with respect to a corporation or company, the board of directors of the corporation or company, as the case may be, or any committee thereof duly authorized to act on behalf of such board; (ii) with respect to a partnership, the board of directors of the general partner of the partnership; (iii) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and (iv) with respect to any other Person, the board or committee of such Person serving a similar function.

"**Borrower**" has the meaning set forth in the introductory paragraph hereto.

"**Borrowing**" means a borrowing hereunder consisting of Term Loans made on the same day by the Lenders (or Administrative Agent on behalf thereof) to Borrower.

"**Borrowing Request**" has the meaning set forth in <u>Section 2.1(c)</u>.

"**BSA**" has the meaning set forth in <u>Section 4.29(a)(i)</u>.

"**Business Day**" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York or the State of California and on which the New York Stock Exchange is not closed.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP.

"**Capital Stock**" means (i) in the case of a corporation, corporate stock; (ii) in the case of a company, common shares; (iii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (iv) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and (v) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Carve-Out**" has the meaning set forth in <u>Section 2.15(c)</u>.

"**Carve-Out Notice**" has the meaning set forth in <u>Section 2.15(c)(i)</u>.

"**Cash Equivalents**" means (i) Dollars; (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (<u>provided</u>, that the full faith and credit of the United States is pledged

in support of those securities) having maturities of not more than six months from the date of acquisition; (iii) certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus in excess of $500,000,000 and a Thompson Bank Watch Rating of "B" or better; (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in clause (iii) above; (v) commercial paper having one of the two highest ratings obtainable from Moody's or Standard & Poor's, in each case, maturing within six months after the date of acquisition; and (vi) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (v) of this definition.

"**Cash Flow Budget**" has the meaning set forth in Section 5.2.

"**Change of Control**" means the consummation of the first transaction (other than the ProtoStar I Sale) the result of which is that Borrower ceases to own, directly or indirectly, 100% of the Capital Stock of ProtoStar I.

"**Chapter 11 Cases**" has the meaning set forth in the Preamble.

"**Charges**" means all federal, state, county, city, municipal, local, foreign or other taxes of a Governmental Authority, levies, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Debtor, (d) any Debtor's ownership or use of any properties or other assets, or (e) any other aspect of such Debtor's business.

"**Closing Date**" means the Initial Funding Date.

"**Code**" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to Administrative Agent's Liens on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "**Code**" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**Collateral**" has the meaning set forth in Section 2.15(b)(iii) and in the Orders.

"**Collections**" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"**Committee**" has the meaning set forth in Section 2.15(c)(i).

"**Control Agreement**" means a control agreement, in form and substance satisfactory to Administrative Agent, executed and delivered by Borrower and Administrative Agent on behalf of the Lender Group and the applicable bank.

"**CRO**" has the meaning set forth in Section 5.12(a).

"**Daily Balance**" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"**Debtors**" has the meaning set forth in the Preamble.

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"**Default Rate**" has the meaning set forth in Section 2.4(b).

"**Defaulting Lender**" means any Lender that fails to make any Term Loan (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"**Defaulting Lender Rate**" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base LIBOR Rate, and (b) thereafter, the interest rate then applicable to the Term Loans.

"**Designated Account**" means the deposit account of Borrower identified on Schedule 1.1(a).

"**Designated Person**" has the meaning set forth in Section 4.28(b).

"**Disclosure Statement**" has the meaning set forth in Section 5.18(e).

"**Dollars**" or "**$**" means lawful currency of the United States of America.

"**Eligible Transferee**" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans having (together with its Affiliates and Related Funds) total assets (including assets under management) in excess of $250,000,000, (d) any Lender or any Affiliate (other than individuals) of any Lender or any Related Fund of any Lender and (e) any other Person approved by Administrative Agent; provided, however, that neither Borrower nor any of its Affiliates shall be an Eligible Transferee.

"**Employee Benefit Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan).

"**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of Hazardous Materials into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the IRC or, solely for purposes of Section 302 of ERISA and Section 412 of the IRC, is treated as a single employer under Section 414 of the IRC.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the IRC or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the IRC or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Event of Default**" has the meaning set forth in Section 9.1.

"**Event of Loss**" means any in-orbit failure relating to the ProtoStar I Satellite.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

*DIP Credit Agreement*

"**Existing Credit Agreement**" means the existing Credit Agreement, dated as of March 28, 2007, by and among ProtoStar I Ltd., as borrower, ProtoStar Ltd., as guarantor, the Working Capital Lenders and the Working Capital Agents.

"**Existing Intercreditor Agreement**" means the existing Intercreditor Agreement, dated as of September 28, 2006, among Borrower, Guarantor and the Pre-Petition Agents.

"**Facility Maturity Date**" means the earliest to occur of the following: (a) August 29, 2009 if the Final Order has not been entered on or prior to such date, (b) the effective date of a Reorganization Plan, (c) the consummation of the ProtoStar I Sale, (d) the ninetieth (90th) day after the Petition Date, subject to an automatic extension to the one hundred twentieth (120th) day after the Petition Date (without additional charge to accommodate any required regulatory approvals for the ProtoStar I Sale, if all conditions to closing the ProtoStar I Sale (other than the receipt of ITAR approval and payment of the purchase price) shall have been satisfied or waived, and so long as Administrative Agent and the Lenders receive a satisfactory updated ProtoStar I Budget reflecting such extension period and (e) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Facility Termination Date**" means the earliest to occur of (a) the date that the Term Loan Commitments have been permanently reduced to zero after giving effect to the funding in full of each Lender's Term Loan Commitment, (b) the Facility Maturity Date and (c) the date that the Term Loan Commitments have been terminated pursuant to Section 9.2.

"**Final Funding Date**" means the date on which the conditions set forth in Section 3.2 shall have been satisfied and the Lenders shall have made the second installment of Term Loans available to Borrower.

"**Final Maximum Amount**" means the sum of (i) $5,000,000, *plus*, (ii) the amount required to repay in full all outstanding obligations under the Existing Credit Agreement (including, without limitation, all accrued and unpaid interest with respect thereto), in each case as such amount may be reduced pursuant to Section 2.1.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases of the Debtors after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, together with all extension, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent and Required Lenders in their discretion, and which contains the provisions present in the Interim Order (including without limitation, the granting of the superpriority status and Liens referred to herein, the automatic perfection of all Liens referred to herein, the payment of all fees referred to herein, the first priority Lien referred to herein, and the payment in full of the Working Capital Facility as provided for herein) and additional provisions allowing for the Borrowing of the full amount of Term Loans hereunder and prohibiting any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code (except as provided in the Carve-Out and agreed to by Required Lenders).

"**Financial Statements**" means the income statements, statements of cash flows and balance sheets of the Debtors (consolidated as applicable) delivered pursuant to Section 5.1.

"**Funding Date**" means, as applicable, (a) the Initial Funding Date and (b) the Final Funding Date.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"**Governing Documents**" means, with respect to any Person, the certificate of formation, articles of incorporation, charter, bye-laws, limited liability company agreement, limited partnership agreement or other organizational documents of such Person.

"**Governmental Authority**" means any nation or government, any state, municipality, province or other political subdivision thereof, any applicable tribal government and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, whether now or hereafter in existence, or any officer or official thereof.

"**Guarantee**" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"**Guaranty Agreement**" means that certain Guaranty Agreement, dated as of the date hereof, by and between Guarantor and Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Guarantor**" means ProtoStar I, together with its respective successors and assigns.

"**Hazardous Material**" means all or any of the following: (a) substances, materials, compounds, wastes, products, emissions and vapors that are defined or listed in, regulated by, or otherwise classified pursuant to, any applicable laws or regulations, including any so defined, listed, regulated or classified as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," "pollutants," "contaminants," or any other formulation intended to regulate, define, list or classify substances by reason of deleterious, harmful or dangerous properties, including ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity"; (b) waste oil, oil, petroleum or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or

geothermal resources; (c) any flammable substances or explosives or any radioactive materials; (d) asbestos in any form; (e) electrical or hydraulic equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls; (f) radon; or (g) urea formaldehyde.

"**Hedging Obligations**" means, with respect to any specified Person, the obligations of such Person under (i) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements; (ii) other agreements or arrangements designed to manage interest rates or interest rate risk; and (iii) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent: (i) in respect of borrowed money; (ii) evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); (iii) in respect of banker's acceptances; (iv) representing Capital Lease Obligations; (v) representing the balance deferred and unpaid of the purchase price of any property or services due more than six (6) months after such property is acquired or such services are completed; or (vi) representing any Hedging Obligations; if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

"**Indemnified Liabilities**" has the meaning set forth in <u>Section 2.8</u>.

"**Indemnified Person**" has the meaning set forth in <u>Section 2.8</u>.

"**Indenture**" means that certain Indenture dated as of September 28, 2006 between ProtoStar I, as issuer, and The Bank of New York Mellon, as trustee (the "**Indenture Trustee**"), as amended, restated, supplemented or otherwise modified from time to time.

"**Indenture Agents**" means The Bank of New York Mellon, in its capacity as trustee and collateral agent for the Indenture Noteholders, together with its successors and assigns in such capacities.

"**Indenture Noteholders**" means the holders of the Indenture Notes from time to time.

"**Indenture Notes**" means the 12.5% Senior Secured Convertible Notes due 2012 issued pursuant to the Indenture.

"**Initial Cash Flow Budget**" has the meaning set forth in <u>Section 5.2</u>.

"**Initial CRO**" has the meaning set forth in Section 5.12(a).

"**Initial Funding Date**" means the date on which the conditions set forth in Section 3.1 shall have been satisfied and the Term Lenders shall have made the initial installment of Term Loans available to Borrower.

"**Initial Maximum Amount**" means on and after the Initial Funding Date, and prior to the Final Funding Date, $2,000,000, as such amount may be reduced from time to time pursuant to Section 2.1.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property Rights**" has the meaning set forth in Section 4.18(a).

"**Intercreditor Agreement**" means that certain Limited Subordination and Intercreditor Agreement, dated as of the date hereof, among the Administrative Agent, the ProtoStar II DIP Agent, the ProtoStar II Pre-Petition Facility Agent and Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Interest Payment Date**" means the monthly anniversary of the Closing Date of each calendar month until the Facility Maturity Date or, if any such day is not a Business Day, the first Business Day thereafter. In addition to the foregoing, the Facility Maturity Date shall be deemed to be an Interest Payment Date with respect to any unpaid interest on the Term Loans.

"**Interim Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases of the Debtors after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications, and amendments thereto, in form and substance satisfactory to counsel to Administrative Agent and counsel to the Lenders in their discretion, and substantially in the form of Exhibit D.

"**Investments**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended, any successor legislation thereto and all regulations promulgated thereunder.

"**IRC**" means the Internal Revenue Code of 1986, as amended, any successor legislation thereto and all regulations promulgated thereunder.

"**IRS**" means the Internal Revenue Service, or any successor thereto.

"**ITAR**" has the meaning set forth in Section 5.17(a).

"**Lease**" has the meaning set forth in Section 4.26(b).

"**Lender Group**" means, collectively, Administrative Agent and the Lenders.

"**Lender Group Expenses**" has the meaning set forth in Section 12.5(a).

"**Lenders**" and "**Lender**" have the meanings set forth in the introductory paragraph hereto.

"**Lenders' Professionals**" means one U.S. legal counsel, one local bankruptcy counsel, one regulatory counsel and one law firm in Bermuda and one financial advisor to the Lender Group.

"**Lien**" means any mortgage or deed of trust, pledge, hypothecation, collateral assignment, assignment, deposit arrangement, Lien, charge, claim, security interest, easement or encumbrance, preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"**Lists**" has the meaning set forth in Section 4.28(a).

"**Loan Documents**" means this Agreement, the Notes, the Guaranty Agreement, the Security Agreement, each other Security Document and all other agreements, instruments, certificates and other documents executed by or on behalf of Borrower, Guarantor or any of their respective Affiliates and delivered to, or in favor of, Administrative Agent and any other agreement, instrument or document entered into, by or on behalf of Borrower, Guarantor or any of their respective Affiliates in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or in any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such other Loan Document as the same may be in effect at any and all times such reference becomes operative.

"**Material Adverse Effect**" means a material adverse effect, in each case as determined in the reasonable judgment of Administrative Agent in good faith, on (a) business, properties, assets, operations, results of operations or financial condition of Borrower and Guarantor (taken as a whole) since the Petition Date, (b) Borrower's and Guarantor's ability to pay and perform the Obligations in accordance with the terms of this Agreement and the other Loan Documents, (c) Administrative Agent's Liens on the Collateral or the priority of such Liens, or (d) Administrative Agent's or any Lender's rights and remedies under this Agreement or under any of the other Loan Documents.

"**Material Contracts**" has the meaning set forth in <u>Section 4.26(c)</u>.

"**Material Contract Default**" has the meaning set forth in Section <u>5.1(j)</u>.

"**Maximum Lawful Rate**" has the meaning set forth in <u>Section 2.4(e)</u>.

"**Moody's**" means Moody's Investors Services, Inc. and its successors.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

"**Net Asset Sale Proceeds**" means the aggregate cash proceeds received by Borrower and/or Guarantor in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of (i) the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fees, sales commissions, relocation expenses incurred as a result of the Asset Sale, and taxes paid or payable as a result of the Asset Sale after taking into account any available tax credits or deductions and any tax sharing arrangements; (ii) amounts required to be applied to the repayment of Indebtedness, other than the Obligations under the Loan Documents, secured by a Lien on the asset or assets that were the subject of such Asset Sale; and (iii) any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (a) any cash payments or proceeds received by Guarantor (i) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, (ii) pursuant to an Event of Loss, or (iii) as a result of the taking of any assets of Guarantor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (b)(i) any actual and reasonable costs incurred by Guarantor in connection with the adjustment or settlement of any claims of Guarantor in respect thereof, and (ii) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (a)(ii) of this definition to the extent paid or payable to non-Affiliates, including income taxes payable as a result of any gain recognized in connection therewith.

"**Notes**" means one or more promissory notes payable to the Lenders evidencing Borrower's Obligations to repay the Term Loans made to Borrower, substantially in the form and substance of <u>Exhibit B</u> attached hereto, in each case as the same may be amended, restated, replaced, supplemented, substituted or otherwise modified from time to time.

"**Obligations**" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable), owing by Borrower to Administrative Agent, the Lenders or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, in each case arising under this Agreement or any of the other Loan Documents. This term includes all principal, interest

(including all interest which accrues after the commencement of any case or proceeding by or against Borrower in bankruptcy whether or not allowed in such case or proceeding), fees, expenses, Charges, indemnities, attorneys' fees and any other sum chargeable to Borrower under this Agreement or any of the other Loan Documents.

"**OFAC**" has the meaning set forth in <u>Section 4.28(a)</u>.

"**Officer**" means, with respect to any Person, the Chair of the Board, the Vice Chair of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"**Officer's Certificate**" means, with respect to any Person, a certificate signed on behalf of such Person by two Officers of such Person, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the such Person, that meets the requirements of <u>Section 12.16</u> hereof.

"**Orders**" means collectively, the Interim Order and the Final Order.

"**Originating Lender**" has the meaning set forth in <u>Section 10.1(e)</u>.

"**Other Lists**" has the meaning set forth in <u>Section 4.28(a)</u>.

"**Participant**" has the meaning set forth in <u>Section 10.1(e)</u>.

"**Payment Default**" has the meaning set forth in Section 9.1(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Business**" means the business in which Borrower and its Subsidiaries are engaged on the Closing Date.

"**Permitted Debt**" has the meaning set forth in <u>Section 7.1</u>.

"**Permitted Liens**" has the meaning set forth in <u>Section 7.7</u>.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Petition Date**" has the meaning set forth in the Recitals.

"**Plan**" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the IRC or Section 302 of

ERISA, and in respect of which Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Pre-Petition Agents**" means, collectively, the Indenture Agents and the Working Capital Agents.

"**Pre-Petition Facilities**" means, collectively, the Indenture and the Existing Credit Agreement, together with all other agreements and documents entered into in connection therewith.

"**Pre-Petition Lenders**" means, collectively, the Indenture Noteholders and the Working Capital Lenders.

"**Process Agent**" has the meaning set forth in Section 12.11(c).

"**Professionals**" has the meaning set forth in Section 2.15(c)(i).

"***Pro Rata* Share**" means, with respect to any Lender as of the date of determination, with respect to a Lender's obligation to make Term Loans and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto or any other matter, (a) prior to the Term Loan Commitments being terminated or reduced to zero, the percentage obtained by dividing (i) the sum of (x) such Lender's Term Loan Commitment plus (y) the aggregate outstanding principal amount of such Lender's Term Loans, by (ii) the sum of (x) the aggregate Term Loan Commitments of all Lenders plus (y) the aggregate outstanding principal amount of all Term Loans, and (b) from and after the time that the Term Loan Commitments have been terminated or reduced to zero, the percentage obtained by dividing (i) the aggregate outstanding principal amount of such Lender's Term Loans by (ii) the aggregate outstanding principal amount of all Term Loans.

"**ProtoStar I Assets**" means all of the assets of the Debtors that comprise the ProtoStar I Senior Collateral.

"**ProtoStar I Budget**" has the meaning set forth in Section 5.2.

"**ProtoStar I Investment Banker**" has the meaning set forth in Section 5.15.

"**ProtoStar I Junior Collateral**" has the meaning set forth in Section 2.15(b)(ii).

"**ProtoStar I Sale**" means the sale, conveyance or other disposition of the ProtoStar I Assets pursuant to Section 363 of the Bankruptcy Code or otherwise and on terms and provisions satisfactory to Supermajority Lenders.

"**ProtoStar I Sale Procedures Motion**" has the meaning set forth in Section 5.18(a).

"**ProtoStar I Satellite**" means that certain geostationary communications satellite purchased by Borrower in accordance with that certain Purchase Agreement dated as of September 27, 2005, between Borrower and China National Postal and Telecommunications Appliances Company and China Telecommunications Broadcast Satellite Corporation (such parties, together, "**Seller**"), pursuant to which Borrower purchased the Seller's right, title and interest to that certain Amended and Restated Satellite Contract, Contract No. 97QFKE/41D1901US, dated as of February 6, 2005, between Seller and Space Systems/Loral, Inc., which right, title and interest was assigned by Borrower to ProtoStar I as a capital contribution pursuant to an Assignment Agreement dated December 29, 2006, and which satellite is referred to as the "Satellite" in that certain Amended and Restated Contract between Borrower and Space Systems/Loral, Inc. for the ProtoStar-1 Satellite Program dated as of September 8, 2006.

"**ProtoStar I Senior Collateral**" has the meaning set forth in Section 2.15(b)(iii).

"**ProtoStar II**" means ProtoStar II, Ltd., an exempted company incorporated under the laws of Bermuda with limited liability.

"**ProtoStar II Budget**" has the meaning set forth in Section 5.2.

"**ProtoStar II Cases**" means those certain Chapter 11 cases pending and filed by Borrower, ProtoStar II and Borrower's Subsidiaries (other than ProtoStar I).

"**ProtoStar II DIP Agent**" means Credit Suisse, Cayman Islands Branch, as administrative agent and Credit Suisse, Singapore Branch, as collateral agent.

"**ProtoStar II DIP Facility**" means that certain debtor-in-possession facility entered into in connection with the ProtoStar II Cases by and among Borrower, as borrower, ProtoStar II, as a guarantor, the other guarantors named therein, and the ProtoStar II DIP Facility Lenders.

"**ProtoStar II DIP Facility Lenders**" means the "Lenders" as defined in the ProtoStar II DIP Facility.

"**ProtoStar II Final Order**" means, the final order of the Bankruptcy Court entered in the ProtoStar II Cases approving the ProtoStar II DIP Facility on a final basis.

"**ProtoStar II Interim Order**" means the interim order of the Bankruptcy Court entered in the ProtoStar II Cases approving the ProtoStar II DIP Facility on an interim basis.

"**ProtoStar II Orders**" means collectively, the ProtoStar II Interim Order and the ProtoStar II Final Order.

"**ProtoStar II Pre-Petition Facility**" means the Facility Agreement, dated as of March 19, 2008, among ProtoStar Ltd., as borrower, Credit Suisse, Singapore Branch, as agent and security agent, and the lenders from time to time party thereto.

"**ProtoStar II Pre-Petition Facility Agent**" means Credit Suisse, Singapore Branch, as agent and security agent, under the ProtoStar II Pre-Petition Facility.

"**ProtoStar II Pre-Petition Lenders**" means the lenders under the ProtoStar II Pre-Petition Facilities.

"**ProtoStar II Satellite**" means that certain satellite owned and operated by ProtoStar II.

"**ProtoStar II Superpriority Claim**" means the Superpriority Claim against Borrower granted with respect to the ProtoStar II DIP Facility and the ProtoStar II Pre-Petition Facility.

"**PS I Incentive Plan**" means a management incentive performance plan that (i) is in form and substance satisfactory to Supermajority Lenders, (ii) is solely for the benefit of those participants set forth on Schedule 9.1(l) (the "Key Employees") and (iii) provides for the Key Employees to receive 2% of the net proceeds of the ProtoStar I Sale, after payment in full in cash of all administrative and priority expenses of the Chapter 11 Cases; provided, however, that, in the event the Lenders credit bid in the ProtoStar I Sale, amounts sufficient to fund the PS I Incentive Plan shall be paid in cash to the estate at closing of the ProtoStar I Sale for distribution in accordance with the PS I Incentive Plan; provided further that, notwithstanding the foregoing proviso, in the event (x) no cash bid for the ProtoStar I Assets in excess of $100,000,000 was received from any party and (y) the Lenders successfully credit bid for the ProtoStar I Assets in the ProtoStar I Sale, then amounts due under the PS I Incentive Plan shall be satisfied by payment of the same type of consideration received by the Indenture Noteholders (whether debt, equity or otherwise) in such amount that the proportion of such consideration received by the Key Employees equals 2% of the amount of consideration received by the Indenture Noteholders.

"**Register**" has the meaning set forth in Section 10.2(a).

"**Related Fund**" means, with respect to any fund or account that invests in loans, any other fund or account that invests in loans and that is administered, advised or managed by the same investment manager or advisor as such first fund or account or by an entity that is an Affiliate of such first fund or account's investment manager or advisor.

"**Remaining Term Loan Commitments**" has the meaning set forth in Section 2.1(a)(ii).

"**Reorganization Plan**" means a plan of reorganization or liquidation filed by the Debtors in any of the Chapter 11 Cases.

"**Report**" and "**Reports**" have the meanings set forth in Section 11.15.

"**Required Lenders**" means Lenders whose aggregate *Pro Rata* Shares exceeds 50%.

"**Responsible Officer**" means, with respect to any Person, any executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Person and any other Officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Restricted Payment**" has the meaning set forth in Section 7.4.

"**SDB List**" has the meaning set forth in Section 4.28(a).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Agreement**" means that certain Security Agreement, dated as of the date hereof, by and among Borrower, Guarantor and Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, the Control Agreement (if required) with respect to the Designated Account, the Orders, the Intercreditor Agreement and all other agreements granting a Lien upon property as security for payment of the Obligations, in each case as the same shall be amended, restated, supplemented or otherwise modified from time to time.

"**Solicitation Motion**" has the meaning set forth in Section 5.18(e).

"**Standard & Poor's**" means Standard & Poor's Corporation and its successors.

"**Subsidiary**" means, with respect to any specified Person: (a) any corporation, company, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' or shareholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, company, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and (b) any partnership (i) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (ii) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof). Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Borrower.

"**Supermajority Lenders**" means Lenders whose aggregate *Pro Rata* Shares equal or exceed 66 2/3%.

"**Superpriority Claim**" means an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"**Taxes**" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, <u>excluding</u> (i) taxes imposed on or measured by the net income of Administrative Agent or any Lender (or any assignee of any Lender), or (ii) franchise taxes and similar fees or charges of any such Person, in each case imposed by the jurisdictions under the laws of which such Person is organized or conducts business or any political subdivision thereof.

"**Term Loan**" a Term Loan made by a Lender pursuant to <u>Section 2.1</u> and in an aggregate principal amount not to exceed the sum of (i) the Initial Maximum Amount *plus* (ii) the Final Maximum Amount, as such amount may be increased from time to time by the capitalization of interest and fees to the principal amount of the Term Loans.

"**Term Loan Commitment**" means the commitment of each Lender to make its *Pro Rata* Share of the Term Loans to Borrower in an aggregate principal amount at any one time outstanding not to exceed sum of (i) the amount set forth opposite such Lender's name on <u>Schedule 1.1(a)(i)</u> and <u>Schedule 1.1(a)(ii)</u> attached hereto *plus* (ii) the Remaining Term Loan Commitments.

"**United States**" means the United States of America.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as amended.

"**Voidable Transfer**" has the meaning set forth in <u>Section 12.17</u>.

"**Voting Stock**" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Working Capital Agents**" means The Bank of New York Mellon, as collateral agent, and Canyon Capital Advisors LLC, as administrative agent, in each case, under the Existing Credit Agreement.

"**Working Capital Lenders**" means the lenders from time to time party to the Existing Credit Agreement.

Construction.

Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein, <u>provided</u>, <u>however</u>, that to the extent that the Code is used to define any term herein and such term is defined differently in

different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

All accounting terms not otherwise defined herein, unless the context indicates otherwise, shall have the meaning given to such terms under GAAP to the same extent used or defined therein.

Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting and shall be deemed to be followed with the phrase "without limitation", and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or". The words "hereof", "herein", "hereby", "hereunder", and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, subclause, schedule, appendix and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or cash collateralization in accordance with the terms hereof) of all Obligations. Any reference herein to any Person shall be construed to include such Person's successors and assigns, or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.

All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

64.

## LOAN AND TERMS OF PAYMENT

Term Loan.

Term Loan. Subject to the terms and conditions of this Agreement,

each Lender agrees (severally, not jointly or jointly and severally) to make a Term Loan to Borrower on the Initial Funding Date in an amount not to exceed such Lender's Term Loan Commitment as set forth on Schedule 1.1(a)(i) and in an aggregate amount not to exceed the Initial Maximum Amount; and

each Lender agrees (severally, not jointly or jointly and severally) to make a Term Loan to Borrower on the Final Funding Date in an amount not to exceed such Lender's

*DIP Credit Agreement*

Term Loan Commitment as set forth on <u>Schedule 1.1(a)(ii)</u> and in an aggregate amount not to exceed the Final Maximum Amount; <u>provided</u>, <u>however</u>, that after giving effect to the Term Loans borrowed on the Final Funding Date there shall be a minimum of $2,000,000 of Term Loan Commitments remaining and unfunded (the "**Remaining Term Loan Commitments**"), which Remaining Term Loan Commitments shall not be available to Borrower unless any Lender funds its *Pro Rata* Share of the Remaining Term Loan Commitments as and when agreed to between Borrower and such Lender.

Any amount borrowed under <u>Section 2.1(a)</u> and subsequently repaid or prepaid may not be reborrowed. Subject to <u>Section 2.3</u>, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Facility Maturity Date. Each Lender's Term Loan Commitment shall (x) be reduced on the Initial Funding Date by such Lender's *Pro Rata* Share of the Initial Maximum Amount after giving effect to the funding of such Lender's Term Loan on the Initial Funding Date; (y) be reduced on the Final Funding Date by such Lender's *Pro Rata* Share of the Final Maximum Amount after giving effect to the funding of such Lender's Term Loan on the Final Funding Date; and (z) terminate immediately and shall be permanently reduced to zero without further action on the Facility Termination Date. All Term Loans and all other amounts owed hereunder with respect to the Term Loans and the Term Loan Commitments shall be paid in full no later than the Facility Maturity Date.

<u>Procedure for Borrowing</u>. When Borrower desires to request a Borrowing under <u>Section 2.1(a)</u>, Borrower shall deliver to Administrative Agent a written notice substantially in the form attached hereto as <u>Exhibit C</u> (each such notice, a "**Borrowing Request**") signed by a Responsible Officer of Borrower, requesting such Borrowing no later than 10:00 a.m. (New York time) at least two (2) Business Days in advance of the proposed Funding Date for such Borrowing (and any Borrowing Request received after 10:00 a.m. (New York time) shall be deemed to have been received the following Business Day), or such earlier date as Administrative Agent may otherwise agree. Any such Borrowing Request delivered to Administrative Agent shall be irrevocable.

<u>Making of Term Loans</u>.

Administrative Agent shall notify the Lenders, not later than 1:00 p.m. (New York time) on the Business Day immediately preceding each applicable Funding Date, by telecopy, telephone, electronic mail or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's *Pro Rata* Share of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent's Account, not later than 10:00 a.m. (New York time) on the Funding Date applicable thereto. After Administrative Agent's receipt of the proceeds of such Term Loans, Administrative Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Administrative Agent to Borrower's Designated Account (for the avoidance of doubt, Administrative Agent shall not be required to advance funds to the extent not received from the Lenders); <u>provided</u>, <u>however</u>, that Administrative Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Term Loan if Administrative Agent shall have actual knowledge that one or more of the applicable conditions precedent set forth in

ARTICLE III will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived.

Unless Administrative Agent receives notice from a Lender prior to 9:00 a.m. (New York time) on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Administrative Agent for the account of Borrower the amount of that Lender's *Pro Rata* Share of such Borrowing, Administrative Agent may assume that each Lender has made or will make such amount available to Administrative Agent in immediately available funds on the Funding Date and Administrative Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower on such date a corresponding amount. If and to the extent any Lender shall not have made the full amount of its *Pro Rata* Share of any requested Borrowing available to Administrative Agent in immediately available funds and Administrative Agent in such circumstances has made available to Borrower such amount, that Lender shall on the Business Day following such Funding Date make such amount available to Administrative Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by Administrative Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error. If such amount is so made available, such payment to Administrative Agent shall constitute such Lender's Term Loan on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to Administrative Agent on the Business Day following the Funding Date, Administrative Agent will notify Borrower of such failure to fund and, upon demand by Administrative Agent, Borrower shall pay such amount to Administrative Agent for Administrative Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Term Loan composing such Borrowing. The failure of any Lender to make any Term Loan on any Funding Date shall not relieve any other Lender of any obligation hereunder to make a Term Loan on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Term Loan to be made by such other Lender on any Funding Date.

Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrower to Administrative Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Administrative Agent shall transfer any such payments to each other non-Defaulting Lender member of the Lender Group ratably in accordance with their Term Loan Commitments (but only to the extent that such Defaulting Lender's Term Loan was funded by the other members of the Lender Group) or, if so directed by Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Term Loan was not funded by the other members of the Lender Group), retain same to be re-advanced to Borrower as if such Defaulting Lender had made a Term Loan to Borrower. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Term Loan Commitment shall be deemed to be zero. This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Administrative Agent, and Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its *Pro Rata* Share of the applicable Term Loan and pays to Administrative Agent all amounts owing by Defaulting Lender in respect

thereof. The operation of this Section shall not be construed to increase or otherwise affect the Term Loan Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to Administrative Agent, any other Agent or to the Lenders other than such Defaulting Lender. Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrower at its option, upon written notice to Administrative Agent, to arrange for a substitute Lender to assume the Term Loan Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Administrative Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever; provided, however, that any such assumption of the Term Loan Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the rights or remedies of the Lender Group or Borrower against any such Defaulting Lender arising out of or in relation to such failure to fund.

Reliance by Agents and the Lenders. Administrative Agent and the Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notices or other information provided by or on behalf of Borrower in connection with a Borrowing Request and believed by them to be genuine. Administrative Agent and the Lenders may assume that each Person executing and delivering any document or notice in accordance herewith was duly authorized.

Notation. Administrative Agent shall record on its books the principal amount of the Term Loans owing to each Lender, and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

Lenders' Failure to Perform. All Term Loans shall be made by the Lenders contemporaneously and in accordance with their *Pro Rata* Shares. The parties hereto agree that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Term Loan (or other extension of credit) hereunder, nor shall any Term Loan Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

Maturity.

The aggregate outstanding principal balance of all Term Loans made hereunder shall be due and payable in full, together with all interest thereon as described in Section 2.4 and all other sums due hereunder, in immediately available funds, on the Facility Maturity Date, via electronic funds transfer to Administrative Agent's Account for the account of the Lender Group.

Prepayments.

Voluntary Partial Prepayments.  At any time, Borrower may upon at least two (2) Business Days' prior written notice to Administrative Agent, prepay the outstanding aggregate principal amount of the Term Loans prior to the Facility Maturity Date, in an amount greater than or equal to $100,000 in each instance.  Any prepayments made pursuant to this Section 2.3(a) shall be applied in accordance with Section 2.7(a).

Mandatory Prepayments.

Asset Sales.  No later than the first Business Day following the date of receipt by any Debtor of any Net Asset Sale Proceeds, Borrower shall prepay the Term Loans as set forth in Section 2.7(a) .

Insurance/Condemnation Proceeds.  Notwithstanding any party other than Administrative Agent being named as "additional insured" or "loss payee" (or in any similar capacity), no later than the first Business Day following the date of receipt by Borrower (solely as it relates to any proceeds that Borrower may receive from in-orbit insurance on the ProtoStar I Satellite or any other ProtoStar I Assets) and Guarantor of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Term Loans as set forth in Section 2.7(a).

Interest.

Except as provided in clause (b) below, all Obligations (including outstanding Term Loans) that have been charged to Administrative Agent's Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to eighteen percent (18.00%).

Default Rate.  Upon the occurrence and during the continuation of an Event of Default (and following a demand by Administrative Agent), all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to three percentage points (3.00%) above the rate of interest otherwise applicable hereunder (the "**Default Rate**").  Interest at the Default Rate shall accrue from the initial date of such Event of Default until the same is cured or waived and shall be paid-in-kind in accordance with clause (c) below.

Payment of Interest.  All interest payments on the Term Loans made pursuant to this Section 2.4 (including interest payable at the Default Rate) shall accrue and be paid on a paid-in-kind or accretion basis (but not in cash) on each Interest Payment Date (other than the Facility Maturity Date) and shall be capitalized and added to the outstanding principal amount of the Term Loans of the applicable Lenders in arrears on such date. All interest payments that are capitalized and added to the outstanding principal amount of Term Loans pursuant to this Section 2.4(c) shall thereafter be deemed as, and treated in all respects as, Term Loans hereunder and such increased principal amounts shall thereafter bear interest at the interest rate accruing on the principal amount of the Term Loans as provided in this Section 2.4.  Administrative Agent's determination of the principal amount of the Term Loans outstanding at any time shall be conclusive and binding on the Debtors, absent manifest error.  Notwithstanding anything to the contrary herein, all interest shall be payable by Borrower in cash on the Facility Maturity Date.

Computation. All computations of interest shall be made by Administrative Agent, or its designee, on the basis of a three hundred sixty (360) day year, in each case for the actual number of days elapsed in the period for which such interest is payable.

Maximum Lawful Rate. Notwithstanding anything to the contrary set forth in this Section 2.4, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder with respect to all or any part of the Obligations exceeds the highest rate of interest permissible under law (the "**Maximum Lawful Rate**"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder with respect to such Obligations shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder with respect to such Obligations is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Administrative Agent in respect of such Obligations is equal to the total interest which would have been received had the interest rate payable hereunder with respect to such Obligations been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, all interest hereunder shall be paid at the rate(s) of interest and in the manner otherwise provided in this Section 2.4, unless and until any applicable rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again be applicable. In no event shall the total interest received by Administrative Agent pursuant to the terms hereof exceed the amount which Administrative Agent could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 2.4(e), a court of competent jurisdiction shall finally determine that Administrative Agent has received interest hereunder in excess of the Maximum Lawful Rate, Administrative Agent shall, to the extent permitted by applicable law, promptly apply such excess in the order specified in Section 2.7 and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

Fees.

Facility Fee. As additional compensation for the Lenders, Borrower shall pay to Administrative Agent, for the ratable benefit of the Lenders, a facility fee in an amount equal to 3.0% of the total Term Loan Commitment (excluding the Remaining Term Loan Commitments), which fee shall be earned and payable to the Lenders on the Closing Date; provided that such fee shall be paid on a paid-in-kind or accretion basis (but not in cash) on the Closing Date and shall be capitalized and added to the outstanding principal amount of the Term Loans of the applicable Lenders on the Closing Date.

Facility Fee. As additional compensation for the Lenders, Borrower shall pay to Administrative Agent, for the ratable benefit of the Lenders, a facility fee in an amount equal to 3.0% of the total Remaining Term Loan Commitments, which fee shall be earned and payable to each Lender on the date that such Lender makes its *Pro Rata* Share of the Remaining Term Loan Commitments available to Borrower; provided that such fee shall be paid on a paid-in-kind or

accretion basis (but not in cash) on such date and shall be capitalized and added to the outstanding principal amount of the Term Loans of the applicable Lenders.

All amounts added to the principal amount of the Term Loans pursuant to clauses (a) and (b) above shall thereafter be deemed as, and treated in all respects as, Term Loans hereunder and such increased principal amounts shall thereafter bear interest at the interest rate accruing on the principal amount of the Term Loans as provided in Section 2.4.

Administration Fee. Borrower shall pay to Administrative Agent the fees set forth in the Administrative Agent Fee Letter, as and when due and payable under the terms thereof.

Receipt of Payments.

The receipt of any payment item by Administrative Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds in Dollars made to Administrative Agent's Account for itself or for the account of the Lender Group as specified herein or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrower (or any other Person making such payment) shall be deemed not to have made such payment and interest shall be calculated accordingly. Except as otherwise expressly provided herein, Borrower shall make each payment or prepayment under this Agreement by wire transfer to Administrative Agent's Account not later than 11:00 a.m. (New York time) on the day when due, in immediately available funds, in Dollars. For purposes of computing interest and fees as of any date, all payments received in Administrative Agent's Account in immediately available funds prior to 11:00 a.m. (New York time) on a Business Day shall be deemed to have been received on such Business Day. Payments received after 11:00 a.m. (New York time) on a Business Day and payments received at any time on a day that is not a Business Day shall, in each case, be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

Unless Administrative Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, Administrative Agent may assume that Borrower has made (or will make) such payment in full to Administrative Agent on such date in immediately available funds and Administrative Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrower does not make such payment in full to Administrative Agent on the date when due, each Lender severally shall repay to Administrative Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

Application and Allocation of Payments.

Subject to the Orders, all payments by Borrower or for Borrower's account, and all proceeds received by Administrative Agent in respect of voluntary and mandatory