prepayments as set forth in Section 2.3, shall be applied in the following order (in each case subject to the Carve-Out):

first, to pay (i) any Lender Group Expenses then due to Administrative Agent under the Loan Documents and (ii) any fees then due to Administrative Agent (for its separate account, after giving effect to any agreements between Administrative Agent and individual Lenders) under the Loan Documents until paid in full;

second, to pay (i) any Lender Group Expenses then due to the Lenders under the Loan Documents and (ii) any fees then due to any of the Lenders under the Loan Documents, in each case, until paid in full;

third, to pay all accrued and uncapitalized interest (other than at the Default Rate) as of the date of the repayment until such interest has been paid in full;

fourth, to pay accrued interest at the Default Rate until paid in full;

fifth, to pay the outstanding principal of all Term Loans until paid in full;

sixth, to pay all other Obligations due to Administrative Agent or the Lenders until paid in full;

seventh, to pay all obligations outstanding under the Pre-Petition Credit Facilities; provided, however, that so long as (x) (A) no Event of Default has occurred under Section 9.1(a) and/or (B) following an Event of Default under Sections 9.1(b) through (p) Borrower has not received a notice from Administrative Agent declaring all or any portion of the Obligations immediately due and payable and, in each of the foregoing clauses (A) or (B), Administrative Agent and the Lenders have not exercised remedies in connection therewith, (y) ProtoStar I's Chapter 11 Case has not been converted to a case under chapter 7 of the Bankruptcy Code prior to consummation of the ProtoStar I Sale and (z) the ProtoStar I Sale has been consummated, amounts equal to the sum of (I) all accrued and unpaid administrative expenses provided for in the ProtoStar I Budget through the effective date of a Reorganization Plan, (II) $150,000 on account of accrued and unpaid priority claims required under the Bankruptcy Code to be paid in cash upon the effective date of a Reorganization Plan and (III) subject to the terms and conditions of the PS I Incentive Plan, any accrued and unpaid cash amounts due under the PS I Incentive Plan, in each case, shall be carved out from the proceeds of the ProtoStar I Sale and, in each case, shall be retained by the estate before any distributions are made to the Pre-Petition Lenders; provided, further, however, (x) all amounts reserved from the ProtoStar I Sale with respect to the PS I Incentive Plan shall be held by the estate solely for the benefit of the beneficiaries of the PS I Incentive Plan approved by the Bankruptcy Court and (y) all amounts reserved from proceeds of the ProtoStar I Sale with respect to clauses (I), (II) and (III) above, shall be deposited in the Designated Account solely for the purpose of satisfying such amounts and, prior to the satisfaction thereof or to the extent that such amounts are not required to be paid, such amounts shall constitute the Pre-Petition Lenders' cash collateral.

eighth, pursuant to a Reorganization Plan in accordance with the priorities set forth therein.

Subject to the Orders, any proceeds of ProtoStar I Junior Collateral received by Administrative Agent (following the payment in full of the ProtoStar II DIP Facility, the ProtoStar II Pre-Petition Facilities (and any adequate protection granted in connection therewith) and the Carve-Out) shall be applied in the order set forth above.

For purposes of the foregoing in this <u>Section 2.7</u>, "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements provided for herein, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

Administrative Agent is authorized to, and at its sole election may, on behalf of Borrower, charge to the balance of the Term Loans and cause to be paid all fees, Lender Group Expenses, Charges, costs and interest and principal owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due. Any charges so made shall constitute part of the Term Loans hereunder and shall bear interest applicable to Term Loans pursuant to the terms of this Agreement.

Indemnity.

Borrower shall indemnify, defend and hold harmless Administrative Agent, each Lender and each Participant, and each of their respective Affiliates, officers, directors, employees, advisors, attorneys, agents and representatives (each, an "**Indemnified Person**"), from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Debtors' compliance with the terms of the Loan Documents, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"). The foregoing to the contrary notwithstanding, Borrower shall have no obligation to any Indemnified Person under this Section with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY

TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

Taxes.

   Any and all payments by Borrower hereunder or under any of the other Loan Documents shall be made, in accordance with this Section 2.9, free and clear of and without deduction for any and all present or future Taxes. If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Loan Document, (i) the sum payable shall be increased as much as shall be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 2.9), Administrative Agent or the Lenders, as applicable, receive an amount equal to the sum they would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. As soon as possible, but in any event within thirty (30) days, after the date of any payment of Taxes, Borrower shall furnish to Administrative Agent the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Administrative Agent. Administrative Agent and the Lenders shall not be obligated to return or refund any amounts received pursuant to this Section 2.9 unless such amounts were received in error or in overpayment, and then only to the extent of such error or overpayment.

   Each Debtor shall jointly and severally indemnify (for the avoidance of doubt, which indemnification shall survive indefinitely) and, within ten (10) days of demand therefor, pay Administrative Agent, for the benefit of the Lender Group, for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under this Section 2.9) arising in connection with the transactions contemplated by the Loan Documents and paid by an Agent or a Lender, as appropriate, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted. Each of Administrative Agent and the Lenders agrees that if it subsequently recovers, or receives a permanent net tax benefit with respect to, any amount of Taxes (i) previously paid by it and as to which it has been indemnified by or on behalf of the Debtors or (ii) previously deducted by a Debtor (including, without limitation, any Taxes deducted from any additional sums payable under clause (i) of subsection (a) above), Administrative Agent or such Lender, as the case may be, shall reimburse such Debtor to the extent of the amount of any such recovery or permanent net tax benefit (but only to the extent of indemnity payments made, or additional amounts paid, by or on behalf of such Debtor under this Section 2.9 with respect to the Taxes

giving rise to such recovery or tax benefit); provided, however, that such Debtor, upon the request of Administrative Agent or such Lender, agrees to immediately repay to Administrative Agent or such Lender, as the case may be, the amount paid over to such Debtor (together with any penalties, interest or other charges), in the event Administrative Agent or such Lender is required to repay such amount to the relevant Governmental Authority.

If a Lender claims an exemption from United States withholding tax, such Lender agrees with and in favor of Administrative Agent and Borrower, to deliver to Administrative Agent (or in the case of a Lender party to an Assignment and Acceptance not recorded in the Register, the assigning Lender):

if such Lender claims an exemption from United States withholding tax pursuant to its portfolio interest exception, (A) a verified statement of the Lender that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, or IRS Form W-8IMY, as applicable, before receiving its first payment under this Agreement and at any other time reasonably requested by Administrative Agent, Borrower or the assigning Lender, as applicable;

if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN, or IRS Form W-8IMY, as applicable, before receiving its first payment under this Agreement and at any other time reasonably requested by Administrative Agent, Borrower or the assigning Lender, as applicable;

if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested by Administrative Agent, Borrower or the assigning Lender, as applicable; or

such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Administrative Agent, Borrower or the assigning Lender, as applicable.

Such Lender agrees promptly to notify Administrative Agent, Borrower or the assigning Lender, as applicable, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

If a Lender claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender agrees with and in favor of Administrative Agent and Borrower, to deliver to Administrative Agent any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or

backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Administrative Agent or Borrower. Such Lender agrees promptly to notify Administrative Agent and Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

If any Lender claims exemption from, or reduction of, withholding tax and such Lender sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrower to such Lender, such Lender agrees to notify Administrative Agent, Borrower or the assigning Lender, as applicable, of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrower to such Lender. To the extent of such percentage amount, Administrative Agent, Borrower and the assigning Lender, as applicable, will treat such Lender's documentation provided pursuant to Sections 2.9(b) or 2.9(c) as no longer valid. With respect to such percentage amount, Lender may provide new documentation, pursuant to Sections 2.9(b) or 2.9(c), if applicable.

If any Lender is entitled to a reduction in the applicable withholding tax, Administrative Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by subsection (b) or (c) of this Section 2.9 are not delivered to Administrative Agent, then Administrative Agent may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Administrative Agent harmless for all amounts paid, directly or indirectly, by Administrative Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Administrative Agent under this Section 2.9, together with all costs and expenses (including attorneys fees and expenses). The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Administrative Agent.

Increased Costs; Illegality; Capital Adequacy.

If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof), or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date and relating generally to the making of loans of the type contemplated by this Agreement, there shall be any increase in the cost to Administrative Agent or to a Lender of agreeing to make or making, funding or maintaining the Term Loans, then Borrower shall, upon demand by Administrative Agent, on its behalf or on behalf of such Lender, as the case may be, pay to Administrative Agent, for its account or for such Lender's

account, as the case may be, additional amounts sufficient to compensate Administrative Agent or such Lender for such increased cost. A statement as to the amount of such increased cost setting forth in reasonable detail Administrative Agent's or such Lender's calculation thereof and the assumptions upon which such calculation was based, submitted to Borrower by Administrative Agent or such Lender, shall be presumptive evidence of such costs, absent manifest error. In determining such amount, Administrative Agent or such Lender may use any reasonable averaging and attribution methods.

If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies or other entities, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Term Loan Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Borrower and Administrative Agent thereof. Following receipt of such notice, Borrower agrees to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined by Lender. A statement of the amount of such Lender's reduction of return of capital setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based, submitted to Borrower and Administrative Agent by such Lender, shall be presumptive evidence of such costs, absent manifest error. In determining such amount, such Lender may use any reasonable averaging and attribution methods.

Mitigation.

Each Lender agrees that, as promptly as practicable after it becomes aware of any circumstances which would result in any (i) Taxes referred to in Section 2.09 above or (ii) increased costs referred to in Section 2.10 above, such Lender (in each case, the "**Affected Lender**") shall, to the extent not inconsistent with such Lender's internal policies of general application or legal or regulatory restrictions, use commercially reasonable efforts available to it (and not, in such Lender's reasonable judgment, otherwise materially disadvantageous to such Lender) to minimize costs and expenses incurred by it and payable to it by Borrower pursuant to Section 2.9 or Section 2.10, as applicable. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Affected Lender in connection with any such minimalization.

[Reserved].

*Pro Rata* Treatment.

Except to the extent otherwise provided herein, each Term Loan shall be made by the Lenders in accordance with their respective *Pro Rata* Shares, and (a) each payment or

prepayment by Borrower of principal, (b) each payment by Borrower of interest, and (c) each payment by Borrower of any fees and expenses payable to Lenders (and not to Administrative Agent or a Lender alone) shall be made to the Lenders *pro rata* in accordance with their respective *Pro Rata* Shares.

Single Loan.

All Term Loans to Borrower and all of the other Obligations of the Debtors arising under this Agreement and the other Loan Documents shall constitute one joint and several obligation of the Debtors secured by all of the Collateral.

Superpriority Nature of Obligations and Lenders' Liens.

The priority of Administrative Agent's and the ProtoStar II DIP Agent's Liens on the Collateral shall be as set forth in the Orders.

Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), all Obligations will be:

with respect to the Guarantor, entitled to a Superpriority Claim, junior only to the Carve-Out;

with respect to Borrower, entitled to a Superpriority Claim, junior to the Carve-Out and to the ProtoStar II Superpriority Claim; and

secured by (v) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on all Collateral that is property of the Guarantor that is otherwise not encumbered by a valid perfected and non-avoidable Lien as of the Petition Date or a valid and perfected Lien in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, in the amount of, and to the extent that, the proceeds of the Term Loans are received by the Guarantor, (w) a priming first priority perfected security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code in substantially all presently owned and hereafter acquired assets of Guarantor, including, without limitation, accounts, instruments, documents, inventory, general intangibles, intellectual property, equipment, real estate and other fixed assets, (x) a priming first priority perfected security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code in (A) 100% of the Capital Stock of Guarantor owned by Borrower and any proceeds thereof received by Borrower and (B) the Designated Account and all cash contained therein, (y) a junior Lien and perfected security interest pursuant to § 364(c) of the Bankruptcy Code in substantially all presently owned and hereafter acquired assets of Borrower (other than with respect to 100% of the Capital Stock of Guarantor owned by Borrower and with respect to the Designated Account and all cash contained therein, which in each case, shall be subject to the first priority priming Liens in favor of Administrative Agent as set forth above), including without limitation, accounts (other than with respect to the Designated Account and all cash contained therein, which shall be subject to first priority priming Liens in favor of Administrative Agent as set forth above), instruments, documents, inventory, general intangibles, intellectual property, equipment, real estate, other fixed assets (but not the assets of any Subsidiaries of Borrower, other than

*DIP Credit Agreement*

Guarantor), and 100% of the Capital Stock of ProtoStar II and all other Subsidiaries of Borrower (other than Guarantor, which shall be subject to first priority priming Liens in favor of Administrative Agent as set forth above), and any proceeds thereof and (z) (A) with respect to Guarantor, a first priority perfected security interest pursuant to § 364(c) and § 364(d) of the Bankruptcy Code and (B) with respect to Borrower, a junior security interest pursuant to § 364(c)(2) and § 364(d) of the Bankruptcy Code, in each case, in the proceeds of any Avoidance Actions (the assets listed in (w), (x) and (z)(A) above, the "**ProtoStar I Senior Collateral**", the assets listed in (y) and (z)(B) above, the "**ProtoStar I Junior Collateral**", and collectively, the "**Collateral**").

Administrative Agent's and the Lenders' Liens on the Collateral owned by the Debtors and their administrative claim under Sections 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject and subordinate only to a carve-out for the following (herein after referred to as the "**Carve-Out**"):

prior to occurrence of an Event of Default and delivery of a notice of such Event of Default to the Debtors, up to the amounts as set forth in the ProtoStar I Budget (subject to Section 5.2(c)) that are necessary to pay (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (B) fees and expenses incurred by the Debtors in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to the Debtors' professionals (whether or not allowed prior to the occurrence of an Event of Default) and (C) fees and expenses incurred by any statutory committee appointed in Borrower's Chapter 11 Cases (each, a "**Committee**"), in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court to the Debtors' or any Committee's professionals (the "**Professionals**") or to the members of any Committee for reasonable expenses incurred in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members), in each case incurred (whether or not paid or allowed by the Bankruptcy Court) prior to the delivery of the notice of the occurrence of an Event of Default (the "**Carve-Out Notice**");

after the delivery of a Carve-Out Notice, an amount not exceeding $125,000, to pay 50% of the total fees or expenses incurred following the delivery of such Carve-Out Notice by the Debtors, any Committee and their respective Professionals, in respect of compensation for services rendered or reimbursement of expenses allowed by the Bankruptcy Court; provided, however, that the dollar amount in this clause (ii) shall not be reduced by payments made pursuant to clause (i).

No proceeds from the Term Loans or cash collateral (as that term is defined in 11 U.S.C. 363(a)) is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Lenders, Administrative Agent, the Pre-Petition Lenders or the Pre-Petition Agents, and/or challenging or raising any defenses to the Obligations, the pre-petition obligations under the Pre-Petition Facilities, or the Liens of Administrative Agent, the Lenders, the Pre-Petition Agents or the Pre-Petition Lenders.

Notwithstanding anything herein to the contrary, the Committee, to the extent appointed in the Chapter 11 Cases, shall be permitted to use $25,000 of the proceeds of the Term Loans to investigate the validity, perfection, priority, extent, or enforceability of the Pre-Petition Facilities, or the Liens or security interests securing the Pre-Petition Facilities but no such amounts shall be used to challenge any such Liens or security interests.

In the event of a conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, the Supermajority Lenders consent to the charging against the ProtoStar I Assets of any amounts of the Carve-Out that have accrued through the date of any such conversion; provided, however, that in no event shall any of the Carve-Out include any fees or expenses incurred after the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (other than as permitted under clauses (i), (ii) and (iii) above).

Except as set forth herein or in the Orders, no other claim having a priority superior to or *pari passu* with that granted to Lenders by the Orders shall be granted or approved while any Obligations under this Agreement remain outstanding.

Subject to the priorities set forth in subsection (a) above and to the Carve-Out, as to all Collateral, including, without limitation, all real property the title to which is held by the Debtors, or the possession of which is held by any Debtor pursuant to a leasehold interest, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Administrative Agent, on behalf of the Lenders, all of the right, title and interest of the Debtors in all of such Collateral, including without limitation, all owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Debtors in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. Each Debtor acknowledges that, pursuant to the Orders, the Liens granted in favor of Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. Notwithstanding subsections (a), (b) and (c) of this Section 2.15, or any failure on the part of any Debtor and Administrative Agent to take any further act to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder, the Orders (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral. Each Debtor further agrees that (i) Administrative Agent shall have rights and remedies set forth in Section 9.2 in respect of the Collateral and (ii) if requested by Administrative Agent, the Debtors shall enter into separate security agreements, Control Agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to counsel to Administrative Agent and counsel to Lenders.

Each Lender acknowledges and agrees that, subject to the terms of the Orders, the Indenture Noteholders, and until such time as the Working Capital Facility shall be paid in full, the Working Capital Lenders, shall each receive as adequate protection for, and to the extent of, any diminution of value of the Indenture Noteholders' respective interests in their "Collateral" (as such term is defined in the Indenture) and any diminution of value of the Working Capital Lenders' "Collateral" (as such term is defined in the Working Capital Facility),

in each case, whether resulting from the imposition of the automatic stay, the priming set forth in Section 2.15(b) above, the use of the Indenture Noteholders' and/or the Working Capital Lenders' cash collateral or the use, sale, lease, depreciation, decline in market price or other diminution in value of the "Collateral" (as such term is defined in the Indenture and the Working Capital Facility, as applicable): (i) a replacement Lien on the ProtoStar I Senior Collateral having a priority immediately junior to the priming and other Liens granted in favor of Administrative Agent and the Lenders hereunder and under the other Loan Documents and the Orders, in each case, subject to the Carve-Out; (ii) the payment on a current basis of the reasonable fees and expenses (including, but not limited to, the reasonable fees and disbursements of counsel or financial advisors or third-party consultants incurred by the Pre-Petition Agents and the Pre-Petition Lenders (including any unpaid prepetition fees and expenses)); (iii) a Superpriority Claim against the Guarantor junior only to the Carve-Out and to the Superpriority Claim against the Guarantor granted to Administrative Agent and the Lenders; (iv) a Superpriority Claim against Borrower junior only to the Carve-Out and to (A) the ProtoStar II Superpriority Claim and (B) the Superpriority Claim against Borrower granted to Administrative Agent and the Lenders; (v) a prohibition against any involuntary priming by any post-petition credit facility (other than the Term Loans made hereunder); (vi) financial and other reporting information in accordance with this Agreement and the Orders; (vii) payment upon closing of the ProtoStar I Sale of all Net Asset Sale Proceeds thereof, after application to the payment of all of the Obligations as set forth in Section 2.7(a); and (viii) such other adequate protection as may be set forth in the Orders. The priority of the Indenture Noteholders' right to adequate protection and the Working Capital Lenders' right to adequate protection, respectively, (i) shall be on the same terms, manner and priority of each Pre-Petition Lenders' Liens in the "Collateral" (as such term is defined in the Indenture and the Working Capital Facility, as applicable) as set forth in the Existing Intercreditor Agreement and (ii) shall be as set forth in the Orders.

65.

## CONDITIONS PRECEDENT

Conditions to the Initial Term Loans upon Entry of the Interim Order.

The obligation of the Lenders to make the initial Term Loan in an amount not to exceed the Initial Maximum Amount on the Initial Funding Date, or to take, fulfill or perform any other action hereunder, is subject to the satisfaction or waiver, in a manner satisfactory to Administrative Agent and the Lenders, of the following conditions:

Chapter 11 Cases. The Debtors shall have commenced the Chapter 11 Cases.

Credit Agreement; Other Loan Documents.

This Agreement, the Guaranty Agreement and the Security Agreement and the counterparts thereof shall have been duly executed by Borrower, Guarantor, Administrative Agent and each Lender party hereto as of the date hereof, and delivered to Administrative Agent,

together with all schedules and exhibits hereto (other than Schedule 1.1(a)(ii), which shall be delivered on the Final Funding Date).

The Intercreditor Agreement and the counterparts thereof shall have been duly executed by Borrower, Administrative Agent, the ProtoStar II DIP Agent and the ProtoStar II Pre-Petition Facility Agent, and delivered to Administrative Agent, together with all exhibits thereto.

Registration of Security Agreement. Administrative Agent shall have received (i) the Security Agreement to be registered with the Bermuda Registrar of Companies, and (ii) a letter of undertaking dated as of the date hereof from Borrower and Guarantor undertaking to register the Security Agreement with the Bermuda Registrar of Companies.

Certificates of Incorporation and Compliance. Administrative Agent shall have received, with respect to each of Borrower and Guarantor, certificates of compliance from the Bermuda Registrar of Companies dated a recent date prior to the Closing Date and certified copies of the certificates of incorporation and certificates of tax exemption from the Bermuda Registrar of Companies and the Bermuda Minister of Finance respectively, with respect to each of Borrower and Guarantor certified accordingly by the company secretary of Borrower and Guarantor dated a recent date prior to the Closing Date.

Organizational Certificate. Administrative Agent shall have received from each Debtor a certificate duly executed by a Responsible Officer of Borrower, on its behalf and on behalf and as manager of each other Debtor, in form and substance satisfactory to Administrative Agent, attaching: (i) copies of such Debtor's Governing Documents, and certifying that such documents are true, correct and complete copies thereof and are and will be in full force and effect as of the Closing Date after giving effect to the transactions contemplated by this Agreement, (ii) resolutions of such Debtor's Board of Directors in form and substance satisfactory to Administrative Agent, approving and authorizing the execution and delivery of this Agreement and the other Loan Documents to which such Debtor is a party and the performance by such Debtor of its obligations hereunder and thereunder, and certifying that such resolutions are in full force and effect as of the Closing Date and are the only resolutions pertaining to the subject thereof, and (iii) the signatures of each officer, manager or other authorized signatory of such Debtor, and certifying that such signatories are authorized to execute and deliver the Loan Documents and that the signatures opposite the names of such signatories are true and correct signatures.

Officer's Certificate. Administrative Agent shall have received from each Debtor a certificate duly executed by a Responsible Officer of Borrower, on its behalf and on behalf and as manager of each other Debtor, certifying that, as of the Closing Date: (i) each representation by or warranty of such Debtor contained herein and in each other Loan Document is true and correct in all material respects as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case such certificate shall certify that such representation or warranty was true and correct in all material respects as of such earlier date; and (ii) after giving effect to the Term Loans made on the Initial Funding Date, the execution and delivery of all of the Loan Documents, and the payment of all fees, costs and

expenses associated with all of the foregoing, no Default or Event of Default has occurred and is continuing.

Opinion of Counsel. Administrative Agent and Lenders shall have received a legal opinion duly executed as of the Closing Date by (i) Milbank, Tweed, Hadley & McCloy LLP, counsel to the Debtors and (ii) Appleby Hunter Bailhache, in its capacity as special Bermuda counsel to the Debtors, which legal opinion in each case, shall address such matters as Administrative Agent may reasonably request and otherwise be in form and substance reasonably satisfactory to counsel to Administrative Agent and counsel to Lenders. Such opinions shall be addressed to Administrative Agent and the Lenders and their respective successors and assigns and shall include an express statement to the effect that Administrative Agent and the Lenders and their respective successors and assigns are authorized to rely on such opinions.

Borrowing Notice. Administrative Agent shall have received a duly executed Borrowing Notice from Borrower.

[Reserved].

Payment of Fees and Expenses. Administrative Agent and the Lenders shall have received all of the legal fees and other fees, costs and other Lender Group Expenses incurred by Administrative Agent or any Lender that are reimbursable by Borrower pursuant to Section 12.5 or otherwise pursuant to the Loan Documents as of the Closing Date.

Budgets. Administrative Agent shall have received the Initial Cash Flow Budget, which Initial Cash Flow Budget shall be in form and substance satisfactory to Administrative Agent and the Lenders and such Initial Cash Flow Budget shall set forth the ProtoStar I Budget and the ProtoStar II Budget.

Interim Order.

The Bankruptcy Court shall have entered the Interim Order, which among other things, shall approve the terms and conditions of this Agreement, the transactions contemplated hereby and grant a perfected security interest in the Collateral with the priority described in Section 2.15 and find that the Lenders are extending credit to Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

The Interim Order shall (a) approve, the Debtors' waiver of any and all claims and causes of action against the Pre-Petition Lenders, including, but not limited to, claims for preference, fraudulent conveyance or other claims arising under Title 11 of the United States Code, and claims regarding the validity, priority, perfection or avoidability of the secured claims of the Pre-Petition Lenders, subject to any official committee's rights to pursue such claims, (b) establish a deadline of the later of (x) seventy-five (75) days from the filing of the Chapter 11 Case and (y) sixty days (60) days from the appointment of any Committee or any trustee to bring any causes of action against the Pre-Petition Lenders based on the Pre-Petition Facilities or any acts or omissions of the Pre-Petition Lenders that occurred prior to the filing of the Chapter 11

Cases and (c) preclude any priming of any Lien of the Lenders, other than pursuant to this Agreement and the other Loan Documents.

The Interim Order (a) shall be in form and substance satisfactory to Administrative Agent and the Lenders in their sole discretion, (b) shall have been entered upon an application of the Loan Parties reasonably satisfactory in form and substance to the Lenders, (c) shall be in full force and effect and (d) shall not have been reversed, modified, amended or stayed (without the Lenders' prior written consent, which consent shall be in their sole discretion) and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Term Loans nor the performance by the Debtors of any of their respective Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

Motions and Other Pleadings. Prior to filing or submission to the Bankruptcy Court, counsel to the Lenders shall have received the motions and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with this Agreement and the other Loan Documents and the approval thereof, and such motions, orders, pleadings and related documents shall be reasonably satisfactory in all respects to such counsel.

First Day Orders. Prior to filing or submission to the Bankruptcy Court, counsel to the Lenders shall have received all first day and related orders to be filed with the Bankruptcy Court in the Chapter 11 Cases, including without limitation any and all cash collateral orders and related orders, and such orders shall be satisfactory in all respects to such counsel. Counsel to the Lenders shall have received all court orders from Bermuda (particularly an order of the Supreme Court of Bermuda staying proceedings in Bermuda and appointing the Provisional Liquidator).

ProtoStar II Cases. Borrower and ProtoStar II shall have commenced the ProtoStar II Cases.

ProtoStar II Interim Order. The Bankruptcy Court shall have entered the ProtoStar II Interim Order and the ProtoStar II Interim Order shall not have been reversed, modified, amended or stayed (without the ProtoStar II DIP Facility Lenders' prior written consent).

Priority of Claims. Upon the entry of the Interim Order, the Superpriority Claim status and Liens of Lenders and Administrative Agent shall be as set forth in Section 2.15.

Consent/Non-Objection of Provisional Liquidator. The Provisional Liquidator shall communicate his consent or non-objection to the transaction embodied in this Agreement in a form satisfactory to the Lenders.

Representations and Warranties. Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the Closing Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

*DIP Credit Agreement*

No Default.  No Default or Event of Default shall have occurred and be continuing on the Closing Date, and no event or condition shall have occurred or be existing which would reasonably be expected to result in a Default or an Event of Default after giving effect to the initial Term Loan made on the Initial Funding Date.

Conditions to the Subsequent Term Loan.

The obligation of the Lenders to make the second installment of Term Loans in an amount not to exceed the Final Maximum Amount on the Final Funding Date or its portion of the Remaining Term Loan Commitments on a subsequent date, or to take, fulfill or perform any other action hereunder, is subject to the satisfaction or waiver, in a manner satisfactory to Administrative Agent and Required Lenders, of the following conditions:

Final Order.  The Bankruptcy Court shall have entered the Final Order, which shall not have been reversed, modified, amended or stayed, and shall otherwise be in full force and effect within (30) days following the Petition Date.

Final Term Loan Commitments.  Schedule 1.1(a)(ii) shall be delivered to Administrative Agent setting forth the final Term Loan Commitments after giving effect to the repayment of all obligations outstanding under the Existing Credit Agreement (including, without limitation, all accrued and unpaid interest) on the Final Funding Date.

ProtoStar II Final Order.  The Bankruptcy Court shall have entered the ProtoStar II Final Order, which shall not have been reversed, modified, amended or stayed, and shall otherwise be in full force and effect within thirty (30) days following the petition date with respect to the ProtoStar II Cases.

Representations and Warranties. Each of the representations and warranties set forth in this Agreement and in each other Loan Document shall be true and correct in all material respects on the applicable date of the Borrowing, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct in all material respects as of such earlier date.

No Default.  No Default or Event of Default shall have occurred and be continuing on the applicable date of the Borrowing, and no event or condition shall have occurred or be existing which would reasonably be expected to result in a Default or an Event of Default after giving effect to the subsequent Term Loan made on the applicable date of the Borrowing.

ProtoStar II Budget.  There shall have been no changes to the ProtoStar II Budget in any manner that is materially adverse to the Lenders.

Borrowing Notice.  Administrative Agent shall have received a duly executed Borrowing Notice from Borrower.

Certification by Borrower.

The acceptance by Borrower of the proceeds of any Tem Loan shall be deemed to constitute, as of the date of such acceptance, (i) a representation by and warranty of Borrower that the conditions in this <u>ARTICLE III</u> have been satisfied, and (ii) a reaffirmation of Borrower of the granting and continuance of Administrative Agent's Liens pursuant to the Security Documents and the Orders.

66.

## REPRESENTATIONS AND WARRANTIES

To induce Administrative Agent and the Lenders to provide the financing arrangements contemplated by this Agreement and to undertake their respective obligations hereunder and under the other Loan Documents, each Debtor makes the following representations and warranties to Administrative Agent and the Lenders, subject to entry by the Bankruptcy Court of the Orders, where applicable, and each and all of which representations and warranties shall survive the execution and delivery of this Agreement:

Organization and Qualification.

Each of Borrower and Guarantor is an entity duly organized and validly existing in good standing under the laws of Bermuda (except as a result of Borrower's failure to hold its annual general meeting), and has the requisite organizational power and authorization to own or lease its properties and to carry on its business as now being conducted. Each of Borrower and Guarantor is duly qualified as a foreign entity to do business and is in good standing in every jurisdiction (other than the jurisdiction of its organization) in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect. As of the date hereof, Guarantor has no Subsidiaries, and Borrower has no Subsidiaries other than ProtoStar I, ProtoStar Satellite Systems, Inc., ProtoStar Development Ltd, ProtoStar II, ProtoStar III Ltd. and ProtoStar Asia Pte. Ltd. Neither Borrower nor Guarantor (i) has or holds, either directly or indirectly, any capital or any other equity securities or interest in, or control (whether by the ownership or control or direction of any securities or any other voting or participating interest or by contract) of, any other person or entity (except Guarantor holds a 75% interest in ProtoStar Kiskadee (Bermuda) Ltd.) or (ii) is obligated to make or be bound by any written, oral or other agreement, contract or understanding of any nature under which it may become obligated to make any future investment in, or capital contribution to, any other person or entity.

Executive Offices; Collateral Locations; FEIN; Organizational Information.

<u>Schedule 4.2</u> sets forth the current location of each Debtor's chief executive office, principal place of business, the locations at which any Collateral is stored or located, and the location of each Debtor's books and records concerning such Collateral. In addition, <u>Schedule 4.2</u> sets forth (a) each Debtor's federal employer identification number, (b) the

organizational identification number issued by the Governmental Authority of the jurisdiction of organization of each Debtor, as applicable, (c) the exact legal name of each Debtor, and (d) any other corporate, fictitious or trade names used by such Debtor currently or at any time prior to the date of this Agreement.

Authorization; Enforcement; Validity.

Each of Borrower and Guarantor (to the extent that they are parties to the following Loan Documents) has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Guaranty Agreement and the Security Agreement and each of the other Loan Documents to which it is a party. The execution and delivery of the Loan Documents by each of Borrower and Guarantor (as applicable) and the consummation by Borrower and Guarantor (as applicable) of the transactions contemplated hereby and thereby, including, without limitation, the incurrence of the Obligations and any guarantee thereof and the granting of a security interest in the Collateral under the Loan Document, have been duly authorized by the Board of Directors of Borrower and Guarantor (as applicable); and

Each of Borrower and Guarantor have duly executed and delivered each of this Agreement and the other Loan Documents to which it is a party. This Agreement and each such other Loan Document constitutes the legal, valid and binding obligations of Borrower and Guarantor (as applicable), enforceable against Borrower and Guarantor (as applicable) in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

No Conflicts.

The execution, delivery and performance by each of Borrower and Guarantor (as applicable) of the Loan Documents to which it is a party and the consummation by Borrower and Guarantor of the transactions contemplated hereby and thereby (including, without limitation, the granting of security interests in the Collateral under the Security Agreement) will not (a) result in a violation of the memorandum of association, certificate of designation, Bye-Laws or any other organizational documents of Borrower or Guarantor, (b) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, mortgage, deed of trust, loan agreement or instrument to which Borrower or Guarantor is a party or by which any property or asset of Borrower or Guarantor is bound, or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to Borrower or Guarantor or by which any property or asset of Borrower or Guarantor is bound.

No Default.

Except to the extent any such default would not have a Material Adverse Effect, neither Borrower nor Guarantor is in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default in the due performance or observance of any material term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, except as would not reasonably be expected to have a Material Adverse Effect and, in each case, any defaults occurring as a result of the filing of the Chapter 11 Cases.

Consents.

Neither Borrower nor Guarantor is required to obtain any consent, approval, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person or other Governmental Authority in order for it to execute, deliver or perform any of its obligations hereunder or under the Loan Documents, in each case in accordance with the terms hereof or thereof. All consents, approvals, authorizations, orders, filings and registrations, which Borrower or Guarantor is required to obtain prior to the Closing Date will have been obtained or effected on or prior to the Closing Date, and neither Borrower nor Guarantor is aware of any facts or circumstances which might prevent Borrower or Guarantor from obtaining or effecting any of the registration, application, approvals or filings pursuant to the preceding sentence.

[Reserved].

[Reserved].

Conduct of Business; Regulatory Permits.

Neither Borrower nor Guarantor is in violation of any term of or in default under its memorandum of association, certificate of designation, Bye-Laws or other organizational document other than any violations or defaults occurring as a result of the filing of the Chapter 11 Cases. Except to the extent any such violation would not have a Material Adverse Effect, neither Borrower nor Guarantor is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to Borrower or Guarantor, and neither Borrower nor Guarantor will conduct its business in violation of any of the foregoing. Except to the extent any such failure to possess the same would not have a Material Adverse Effect, Borrower and Guarantor possess all certificates, authorizations and permits issued by the appropriate regulatory authorities necessary to conduct their respective businesses, and neither Borrower nor Guarantor has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

Foreign Corrupt Practices.

None of Borrower, Guarantor, any of their respective directors and officers or, to the knowledge of Borrower or Guarantor, any agent, employee or other Person acting on behalf

*DIP Credit Agreement*

of Borrower or Guarantor, has, in the course of its actions for, or on behalf of, Borrower or Guarantor (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

Transactions With Affiliates.

Except as set forth on Schedule 4.11, since December 31, 2008, the Debtors have not entered into any Affiliate Transactions.

Equity Capitalization.

Borrower owns 100% of all of the issued and outstanding Capital Stock of its Subsidiaries.

Permitted Debt; Permitted Liens.

Each of Borrower and Guarantor has no outstanding Indebtedness, other than Permitted Debt.

There are no Liens or financing statements securing Indebtedness of Borrower and Guarantor, except for Permitted Liens.

Litigation.

Except as set forth on Schedule 4.14 and except for the Chapter 11 Cases, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the best knowledge of the Debtors, threatened against any other Debtor or any of the officers or directors of any of the Debtors in their capacities, as such in each case which could reasonably be expected to have a Material Adverse Effect.

Insurance.

Each of Borrower and Guarantor is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of Borrower believes to be prudent and customary in the businesses in which Borrower and Guarantor currently are engaged, in each case as set forth on Schedule 4.15; it being understood that Borrower and Guarantor shall be required to maintain in-orbit insurance in an amount not less than the amount that is in place on the Petition Date. Neither Borrower nor Guarantor has been refused any insurance coverage for which it applied that is material to the business of Borrower or Guarantor, and neither Borrower nor Guarantor has received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue applicable insurance coverage, and neither Borrower nor Guarantor

has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business.

Employee Relations.

Neither Borrower nor Guarantor is a party to any collective bargaining agreement or, to their knowledge, employs any member of a union. Each of Borrower and Guarantor are in compliance with all federal, state, provincial, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except to the extent any non-compliance therewith would not have a Material Adverse Effect. No strike, work stoppage or material work slowdown by employees of Borrower and Guarantor exists or, to the best knowledge of Borrower or Guarantor, is contemplated or threatened.

Title.

Each of Borrower and Guarantor has good and marketable title to all real property and personal property owned by it that is material to the respective businesses of such Persons, in each case free and clear of all Liens, encumbrances and defects except Permitted Liens. All personal property and real property and facilities held under lease by Borrower and Guarantor are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made or proposed to be made of such property and buildings by Borrower or Guarantor.

Intellectual Property Rights.

Each of Borrower and Guarantor owns or possesses, or when required will own or possess, adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, trade secrets and other intellectual property rights material in terms of value or to the conduct of its businesses as now and as proposed to be conducted (collectively, the "**Intellectual Property Rights**") free and clear of all Liens other than Permitted Liens. There is no claim, action or proceeding pending, or to the knowledge of Borrower or Guarantor, being threatened, against Borrower or Guarantor regarding the Intellectual Property Rights. Neither Borrower nor Guarantor have any knowledge of any material infringement by Borrower or Guarantor of intellectual property rights of others that would reasonably be expected to form the basis of a claim, action or proceeding against Borrower or Guarantor. Each of Borrower and Guarantor has taken all actions reasonable and appropriate to maintain and protect the Intellectual Property Rights owned or purported to be owned by Borrower or Guarantor, including all reasonable precautions to protect the secrecy, confidentiality, and value of its trade secrets.

All written licenses relating to the Intellectual Property Rights under which Borrower or Guarantor is a licensor or licensee are valid, subsisting, in full force and effect and binding upon Borrower and/or Guarantor, as the case may be, and the other parties thereto in accordance with their terms, except to the extent that any failure of the forgoing would not have

a Material Adverse Effect. Neither Borrower nor Guarantor is a party to any unwritten licenses relating to any material Intellectual Property Rights.

Environmental Laws.

Borrower and Guarantor (a) are in compliance with any and all Environmental Laws, (b) have received all permits, licenses or other approvals currently required of them under applicable Environmental Laws to conduct their respective businesses and (c) are in compliance with all terms and conditions of any such permit, license or approval, except where failure to comply or obtain such permits, licenses or other approvals would not reasonably be expected to have a Material Adverse Effect. Borrower and Guarantor are not aware of any claims or potential claims against Borrower or Guarantor arising under Environmental Laws (including any potential claims by any governmental agency or third-parties for clean-up of properties).

Tax Status.

Except to the extent any failure to take any of the following actions would not have a Material Adverse Effect, each of Borrower and Guarantor (a) has made or filed all material foreign, federal, state, local and provincial income and all other tax returns, reports and declarations required to be made or filed by it by any jurisdiction to which it is subject, (b) has paid all taxes and other governmental assessments and charges that are due (whether or not shown as due) and payable by it on such returns, reports and declarations, except those being contested in good faith for which adequate reserves have been accrued on Guarantor's latest consolidated balance sheet in accordance with GAAP and (c) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply and which such taxes are not yet due and payable. To the knowledge of each of Borrower and Guarantor, there are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction. To the knowledge of each Borrower and Guarantor, there are no Liens with respect to any taxes upon any of the assets or properties of Borrower or Guarantor other than for taxes that are not yet due and payable. There are no tax returns of Borrower or Guarantor that are currently being audited by any state, local, federal or foreign tax authorities or agencies.

Investment Company.

None of Borrower, Guarantor or any entity which either Borrower or Guarantor "controls" (as defined by the Investment Company Act) is, or, after giving effect to any transaction contemplated hereby or by the other Loan Documents, including the making of any Term Loans or and the application of the proceeds thereof, will be, required to seek an order permitting registration, under the Investment Company Act. No entity that is organized under any "State" (as defined in the Investment Company Act) and that is "controlled" (as defined by the Investment Company Act) by Borrower or Guarantor is required to register under the Investment Company Act.

Disclosure of Information.

All factual information furnished by or on behalf of Borrower or Guarantor in writing to Administrative Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information hereafter furnished by or on behalf of Borrower or Guarantor in writing to Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified, does not contain as of the date hereof, when taken as a whole, any untrue statement of a material fact, and as of such date did not omit, and does not omit as of the date hereof, to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

The unaudited Financial Statements of Borrower and Guarantor delivered to Administrative Agent or any Lender on or prior to the Closing Date present fairly the financial position, results of operations and cash flows of Borrower as of the respective dates and for the respective periods to which they apply and have been prepared in accordance with GAAP and the requirements of Regulation S-X of the Securities Act; provided, however, that such unaudited Financial Statements are subject to normal recurring year-end audit adjustments and other adjustments and qualifications as may be necessary as a consequence of the Chapter 11 Cases, and do not contain all footnotes required under GAAP. The financial data delivered to Administrative Agent or any Lender on or prior to the Closing Date has been prepared on a basis consistent with that of the Financial Statements referred to above in this Section 4.22(b) and present fairly the financial position and results of operations of Borrower and Guarantor as of the respective dates and for the respective periods indicated. All other financial, statistical, and market and industry-related data delivered to Administrative Agent or any Lender on or prior to the Closing Date are fairly presented and are based on or derived from sources that Borrower believes to be reliable and accurate.

Borrower or Guarantor has delivered to Administrative Agent and each of the Lenders the Initial Cash Flow Budget (including the ProtoStar I Budget and the ProtoStar II Budget), dated as of the Closing Date. The Initial Cash Flow Budget has been prepared in good faith based upon assumptions which Borrower and Guarantor believe to be reasonable assumptions.

Employment Benefit Plans.

Neither Borrower nor Guarantor has ever maintained or contributed to, or had any obligation to contribute to (or borne any liability with respect to) any Employee Benefit Plan, and neither Borrower nor Guarantor has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfactory liability (including, without limitation, any indirect, contingent or secondary liability) of Borrower or Guarantor under Title IV of ERISA or Section 412 of the IRC or Section 302 of ERISA arising in connection with any employee benefit plan covered or previously covered by Title IV of ERISA or such sections of the Code or ERISA.

Margin Rules.

Neither the making of any Term Loan under this Agreement nor the application of the proceeds thereof nor the consummation of any other transaction contemplated hereby or by any of the other Loan Documents will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

[Reserved].

Contracts.

Other than (i) the Loan Documents and (ii) as set forth in <u>Schedule 4.26(a)</u>, neither Borrower nor Guarantor is a party to or bound by any contract, agreement, commitment, understanding or instrument which is material to the business of any Debtor or the termination of which could reasonably be expected to result in a Material Adverse Effect.

Set forth on <u>Schedule 4.26(b)</u> are descriptions of all of the leases or similar agreements (whether pertaining to real property or personal property) with respect to which each of Borrower and Guarantor is a party as of the Closing Date (each, a "<u>Lease</u>"), together with, with respect to each real property lease, the address of the property subject thereof, the name and address of the landlord under such lease, and a description of all Collateral located on the premises subject to such lease. Each of Borrower and Guarantor enjoys peaceful and undisturbed possession under all Leases material to its business and to which it is a party or under which it is operating and all of such material leases are valid and subsisting and no material default by Borrower or Guarantor exists under any of them other than violations occurring as a result of the filing of the Chapter 11 Cases and enforcement of which are stayed by virtue of the filing of the Chapter 11 Cases.

Except as set forth on <u>Schedule 4.26(c)</u>, each of Borrower and Guarantor is in compliance in all material respects with each of the contracts, commitments, understandings, instruments, Leases and other agreements set forth on <u>Schedules 4.26(a)</u> and <u>4.26(b)</u> (collectively, the "**Material Contracts**") and has not received written or other notice that any party intends to cancel, breach, or terminate any Material Contract or materially reduce such party's relationship with Borrower or Guarantor, in each case, other than violations occurring as a result of the filing of the Chapter 11 Cases and enforcement of which are stayed by virtue of the filing of the Chapter 11 Cases. All of the Material Contracts are in full force and effect and constitute the legal, valid, and binding obligation of the Debtor(s) party thereto, and to the knowledge of each of Borrower and Guarantor, each other party thereto (except as enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditor's rights in general and by general principles of equity). There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate, in any manner that is materially adverse to any Debtor, any amounts paid to or payable by any Debtor under a Material Contract with any Person, and no Person has made any written demand for such renegotiation. Borrower and Guarantor have delivered to the Lenders a true, correct and complete copy of each Material Contract requested by the Lenders.

Government Regulations.

Neither Borrower nor Guarantor is subject to any federal, state, or local law, rule, regulation or order issued by any Governmental Authority that restricts or limits Borrower's or Guarantor's ability to incur Indebtedness or to perform its obligations hereunder. The performance by Borrower, Guarantor, Administrative Agent and the Lenders of their respective obligations under the Loan Documents will not, to the knowledge of Borrower or Guarantor, violate any provision of any federal, state, or local law, rule, regulation or order issued by any Governmental Authority.

Compliance with Anti-Terrorism Laws and Regulations.

Neither Borrower nor Guarantor nor any Person that owns any Capital Stock or other Equity Interest in, or ownership of any similar interests or securities of, Borrower or Guarantor is:

identified and included on the Specially Designated Nationals and Blocked Persons List (the "**SDB List**") maintained by the United States Office of Foreign Assets Control ("**OFAC**") and the United States Treasury Department and/or any other similar list (the "**Other Lists**" and, collectively with the SDB List, the "**Lists**") maintained by OFAC or any other United States federal government agency or authority pursuant to any authorizing United States statute, rule, regulation or Executive Order of the President of the United States (collectively, the "**Anti-Terrorism Laws**"); or

a designated Person (a "**Designated Person**") with whom a citizen or entity of the United States is prohibited to engage in transactions according to any economic sanction, trade embargo or other prohibition pursuant to any Anti-Terrorism Law.

Compliance with Anti-Money Laundering Laws and Regulations.

Neither Borrower nor Guarantor nor any Person that owns any Capital Stock or other equity interest in, or ownership of any similar interests or securities of, such Debtor:

is under investigation by any United States governmental authority or agency or has been charged with or convicted of money laundering, drug trafficking, terrorist-related activities, any other money laundering predicate crimes or any violation of the Bank Secrecy Act, as amended by the USA PATRIOT Act (the "**BSA**"), or any other applicable United States federal law, rule or regulation governing BSA compliance and the prevention of money laundering violations (collectively with the BSA, "**Anti-Money Laundering Laws**");

has been assessed civil penalties under any Anti-Money Laundering Laws; or

has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

Each of Borrower and Guarantor has taken reasonable measures appropriate to the circumstances (and in any event required by law), with respect to any Person that owns any membership or other equity interest in, or ownership of any similar interests or securities of, Borrower or Guarantor, to assure that funds invested by such Person in Borrower or Guarantor are derived from lawful and legal sources.

67.

## AFFIRMATIVE COVENANTS

Each of Borrower and Guarantor agrees that until termination of all of the Term Loan Commitments and payment in full of the Obligations:

Financial Statements, Reports, Certificates, Etc.

Borrower and Guarantor shall deliver, or shall cause to be delivered, to Administrative Agent and each Lender (or to an Affiliate of Administrative Agent or any Lender, if Administrative Agent or such Lender, as the case may be, shall designate in writing) Financial Statements, notices, and other information as follows:

*Balance Sheet*.  As soon as possible, and in any event when the Debtors' statement of financial affairs and schedules of assets and liabilities are required to be filed with the Bankruptcy Court (but no later than thirty (30) days after the Petition Date or such later date as approved by the Bankruptcy Court), a consolidated pro forma balance sheet of the Debtors' financial condition as of the Petition Date

*Certain Filings*.  Copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of the Debtors to any official committee appointed in the Chapter 11 Cases.

*Certain Financial Statements*.  Each Debtor shall supply to Administrative Agent in sufficient copies for all the Lenders (a) as soon as the same become available, but in any event within one hundred twenty (120) days after the end of each of its fiscal year, its audited consolidated financial statements for that fiscal year; (b) as soon as the same become available, but in any event within sixty (60) days after the end of the first half of each of its fiscal year, its consolidated financial statements for that half financial year; (c) as soon as the same become available, but in any event within forty-five (45) days after the end of each quarter of its fiscal year, its management accounts for that quarter; and (d) promptly following a request by Administrative Agent, the latest financial statements of Borrower, ProtoStar II and ProtoStar I. In addition, the Debtors shall hold, within six (6) Business Days following the delivery of the financial statements and management accounts as referred to above in clauses (a) through (c), a conference call with Administrative Agent and the Lenders to discuss such statements and accounts, with an opportunity for the Administrative Agent and the Lenders to ask questions of management.

[Reserved].

Default Notices. Borrower shall, so long as any of the Obligations are outstanding or any of the Term Loan Commitments shall exist, promptly deliver to Administrative Agent, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action Borrower is taking or proposes to take with respect thereto.

Management Letters. Within five (5) Business Days after receipt thereof, Borrower or Guarantor shall deliver to Administrative Agent copies of any management letters, exception reports or similar letters or reports, if any, received by Borrower or Guarantor from its independent certified public accountant.

Litigation. Promptly upon learning thereof, but in any event within five (5) days after the service of process with respect thereto on Borrower or Guarantor, Borrower shall deliver to Administrative Agent written notice of any action, suit, or proceeding brought by or against Borrower or Guarantor before any Governmental Authority which if successful reasonably could be expected to have a Material Adverse Effect that (i) seeks damages in excess of $200,000 (or which could reasonably be expected to exceed $200,000) from any Debtor, (ii) seeks injunctive relief against any Debtor, or (iii) alleges criminal misconduct by any Debtor.

Insurance Notices. Promptly upon learning thereof, Borrower shall provide to Administrative Agent disclosure of any Event of Loss or any losses or casualties required to be covered by insurance in accordance with Section 5.11 of this Agreement and which losses or casualties are in excess of $200,000 in the aggregate.

Governmental Authority Notices. Promptly upon receipt thereof by any Debtor, Borrower shall deliver to Administrative Agent (i) copies of any and all notices, letters, demands or other correspondence received from a Governmental Authority outside of the ordinary course of business, and (ii) written notice of any oral communications between any manager, officer, employee or agent of an Debtor and any Governmental Authority, which communication could reasonably be expected to have, either at the moment or with the passage of time, a Material Adverse Effect.

Material Contract Default Notices. Other than with respect to those defaults that have occurred as a result of the filing of the Chapter 11 Cases, as soon as practicable, and in any event within five (5) Business Days after any Responsible Officer of Borrower or Guarantor has actual knowledge of the existence of any default under any Material Contract (a "**Material Contract Default**") or under any lease with respect to real property where any Collateral is located or stored, Borrower or Guarantor shall provide to Administrative Agent telephonic, electronic mail or telecopied notice specifying the nature of such default, including the anticipated effect thereof, which notice, if given telephonically, shall be promptly confirmed in writing on the next Business Day.

Other Documents. Each of Borrower and Guarantor shall furnish to Administrative Agent, such other financial and other information respecting Borrower's and Guarantor's business or financial condition as Administrative Agent or any Lender shall from

time to time reasonably request, including without limitation, financial reports in form and substance reasonably satisfactory to Administrative Agent or such Lender.

ProtoStar II DIP Facility. Borrower shall provide Administrative Agent with copies of all material information that it delivers to ProtoStar II DIP Agent in connection with the ProtoStar II DIP Facility.

Budgets.

On or before the Initial Funding Date, the Debtors shall deliver to Administrative Agent and Lenders a pro forma rolling seventeen week cash flow budget for Borrower and its Subsidiaries on a consolidating basis, which budget shall (x) be reasonably satisfactory in all respects to the Supermajority Lenders, (y) reflect separately those direct expenses of Guarantor and the expenses of Borrower allocated to Guarantor (the "**ProtoStar I Budget**") and those direct expenses of ProtoStar II and the expenses of Borrower allocated to ProtoStar II (the "**ProtoStar II Budget**") and (z) be substantially in the form of Exhibit E (the first such budget delivered, the "**Initial Cash Flow Budget**", and each such budget, a "**Cash Flow Budget**").

Each Cash Flow Budget shall (a) be updated to reflect Borrower and its Subsidiaries' current projections and results, and (b) commencing on August 5, 2009, a reconciliation of the actual results for the immediately preceding week period to the Cash Flow Budget for such immediately preceding week period and a detailed explanation of all material variances from the Cash Flow Budget.

All payments shall be made and expenses incurred in accordance with such ProtoStar I Budget and the Debtors shall ask the financial advisor or technical consultant for the Lenders to obtain the consent of Supermajority Lenders prior to any expenditure or incurrence (individually or in the aggregate) on any line item in excess of 10% of the weekly budgeted amount listed in such budget for the relevant week.

Access.

Borrower and Guarantor shall (a) upon one (1) Business Day's prior notice, provide access to Administrative Agent or any Lender, any Affiliate of Administrative Agent or such Lender, and any of their respective officers, employees and agents, to visit the offices of such Debtor at such reasonable times and intervals as Administrative Agent or any such Lender may designate, and inspect, audit and make extracts from the financial and accounting records, books, journals, orders, receipts, correspondence (other than privileged correspondence with legal counsel) of such Debtor and other data concerning the business of such Debtor, and (b) upon three (3) Business Day's prior notice, provide such access to such Persons at the times set forth in clause (a) above to discuss the affairs, finances and business of such Debtor with the officers, managers and/or independent public accountants of such Debtor. If a Default or Event of Default has occurred and is continuing, such Debtor shall provide such access at all times and without advance notice. Borrower and Guarantor shall promptly make available originals or copies of all books and records which Administrative Agent or any Lender may request. Borrower and Guarantor shall deliver any document or instrument necessary for Administrative

Agent or any Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for such Debtor, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Debtor.

Maintenance of Properties, Licenses and Permits.

Except as set forth on Schedule 5.4, Borrower and Guarantor shall: (a) maintain and preserve all of their properties which are necessary or useful in the proper conduct to their business in good working order and condition, ordinary wear, tear, and casualty excepted, in each case, except where the failure to do so could not be expected to result in a Material Adverse Effect, and (b) maintain and preserve in full force and effect all licenses, franchises, permits and approvals now held or hereafter acquired by such Debtor which, in each case, are necessary or useful in the operation of its business, except where the failure to do so could not be expected to result in a Material Adverse Effect.

Material Contracts.

Each of Borrower and Guarantor shall (a) perform, observe, comply and fulfill all of its obligations, covenants and conditions contained in all Material Contracts necessary or useful for the operation its business, and (b) maintain and preserve in full force and effect all such Material Contracts (without suffering or permitting any default to exist thereunder), in each case except where the failure to do so, comply or maintain the same could not reasonably be expected to result in a Material Adverse Effect.

Compliance with Laws.

Each of Borrower and Guarantor shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to cause a Material Adverse Effect.

Corporate Existence.

Except in connection with the ProtoStar I Sale and as set forth on Schedule 5.7, Borrower and Guarantor shall cause to be done all things necessary to preserve and keep in full force and effect (i) its corporate existence in accordance with the respective organizational documents (as the same may be amended from time to time) of such Debtor and (ii) the rights (charter and statutory), licenses and franchises of such Debtor.

Use of Proceeds.

The Debtors shall utilize the proceeds of the Term Loans solely (a) to fund post-petition operating expenses and other working capital and financing requirements of Borrower and Guarantor as set forth in the ProtoStar I Budget (including payment of all administrative expenses claims necessary to be satisfied in cash upon consummation of a plan of reorganization to the extent not funded from the proceeds of the ProtoStar I Sale), and (b) after entry of the

Final Order, to satisfy in full the total outstanding Indebtedness of ProtoStar I owed to the Working Capital Lenders under the Existing Credit Agreement. Notwithstanding the foregoing, no portion of the Term Loans shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Agents, or the Pre-Petition Lenders, Administrative Agent or the Lenders; provided, however, that, in the event a Committee is appointed, the Committee shall be permitted to use $25,000 of the proceeds of the Term Loans to investigate the validity, perfection, priority, extent, or enforceability of the Pre-Petition Facilities, or the Liens or security interests securing the Pre-Petition Facilities but no such amounts shall be used to challenge any such Liens or security interests.

The Debtors shall cause of the proceeds of the Term Loans to be (i) deposited in the Designated Account and (ii) segregated from all other cash held by Borrower (including, without limitation the loans made pursuant to the ProtoStar II DIP Facility). All of the proceeds of the Term Loans shall remain in the Designated Account until such time that such proceeds are utilized as set forth in Section 5.8(a) above.

Disclosure Updates.

Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, Borrower or Guarantor shall notify Administrative Agent if any written information, exhibit, or report furnished by any Debtor to the Lender Group or any member thereof contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any other Loan Document or any of the Schedules hereto or thereto.

Taxes.

Borrower and Guarantor shall pay, prior to delinquency, all material Taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment could not reasonably be expected to cause a Material Adverse Effect.

Maintenance of Insurance.

Borrower and Guarantor shall maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses; provided, that in any event, Borrower and Guarantor shall maintain in-orbit insurance in an amount not less than the amount that is in place on the Petition Date.

Chief Restructuring Officer.

On or prior to the Petition Date, Borrower shall name Cynthia Pelini as chief restructuring officer (the "**Initial CRO**" and along with any replacement in accordance with the terms hereof, a "**CRO**") and Borrower shall at all times maintain a CRO reasonably acceptable to the Supermajority Lenders. In the event the Supermajority Lenders determine that the CRO is no longer reasonably acceptable to them, then they shall be entitled to request that Borrower replace the CRO and Borrower shall comply with such request within five (5) Business Days of the Supermajority Lenders reaching agreement on terms reasonably satisfactory to Borrower for the retention and compensation of a replacement CRO. In the event the Supermajority Lenders determine that the CRO is no longer reasonably acceptable to them to oversee the ProtoStar I Sale, then the Supermajority Lenders shall be entitled to request that Borrower appoint a different CRO solely to oversee the ProtoStar I Sale and Borrower shall comply with such request within five (5) Business Days of the Supermajority Lenders providing terms to Borrower for the retention and compensation of such CRO to oversee the ProtoStar I Sale.

The Initial CRO shall be appointed to the Boards of Directors of each of Borrower and its Affiliates and shall have the full authority to direct all of the operations of Borrower and its Subsidiaries and bind Borrower and its Subsidiaries and direct the day to day operations of Borrower and its Subsidiaries. To the extent permissible under applicable law, any subsequent CRO shall be appointed to the Boards of Directors of Borrower or Guarantor, as appropriate. The CRO shall meet telephonically or in-person (at the option of the CRO) with the Lenders' financial advisors on a weekly basis.

Philip Father shall remain on the Boards of Directors of Borrower and (if necessary) its Subsidiaries and shall remain the chief executive officer of Borrower.

All current members of the Boards of Directors of Borrower and its Subsidiaries, other than Philip Father, will voluntarily resign to be effective no later than ten (10) days following the commencement of the Chapter 11 Cases. On or prior to July 28, 2009, Borrower shall name, persons reasonably acceptable to the Supermajority Lenders to the Board of Directors.

Further Assurances.

Each of Borrower and Guarantor agrees that it will, at the expense of Borrower and Guarantor, (a) duly execute and deliver, or cause to be duly executed and delivered, to Administrative Agent such further agreements, assignments, certificates, instruments and documents, including, without limitation, (i) the certificates representing the shares of Capital Stock of Guarantor, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of Borrower, and (ii) any amendments or supplements to the Loan Documents to reflect changes in the composition or location of Collateral any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "**Additional Documents**") that Administrative Agent may request in form and substance reasonably satisfactory to counsel to Administrative Agent and counsel to Lenders to

create, perfect, and continue perfected or to better perfect Administrative Agent's Liens in all of the properties and assets of Borrower and the other Debtors (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), or to create and perfect Liens in favor of Administrative Agent in any real property or interests in real property acquired by the Debtors after the Closing Date, and (b) do and cause to be done such further acts, as may be reasonably necessary or proper in the reasonable opinion of Administrative Agent to carry out more effectively the provisions and purposes of this Agreement or any of the Loan Documents. To the maximum extent permitted by applicable law, each of Borrower and Guarantor authorizes Administrative Agent to execute any such Additional Documents in its name, as applicable, and authorizes Administrative Agent to file such executed Additional Documents in any appropriate filing office. Notwithstanding anything herein to the contrary, Administrative Agent shall have no responsibility for preparing, recording, filing, re-recording or refiling any financing statement, continuation statement or other instrument in any public office.

Anti-Terrorism and Anti-Money Laundering Policies.

Borrower and Guarantor shall comply with all existing Anti-Terrorism Laws, Anti-Money Laundering Laws and any other applicable federal or state laws, rules and regulations, if and when such Debtor is required to comply with such laws, rules and regulations. Each Debtor also agrees to implement and maintain policies, procedures and controls reasonably necessary to assure compliance with all existing Anti-Terrorism, Anti-Money Laundering Laws and any other applicable federal or state laws, if and when such Debtor is required to comply with such laws, rules and regulations. Notwithstanding anything herein or in any other Loan Document to the contrary, each Debtor shall refrain from making any direct or indirect distribution, return of capital or other payment to any Person on account of any membership or other equity interest in, or ownership of any similar interests or securities of, such Debtor at any time that such Debtor gains knowledge that such Person has failed to implement and maintain policies, procedures and controls reasonably necessary to assure compliance with all existing Anti-Terrorism, Anti-Money Laundering Laws and any other applicable federal or state laws, if and when such Person is required to comply with such laws, rules and regulations. Each Debtor further agrees, upon Administrative Agent's reasonable request from time to time during the term of this Agreement, to provide written certification that its covenants under this Section 5.14 remain true and accurate and have not been breached. Each Debtor shall immediately provide written notification to Administrative Agent if its representations and warranties under Section 4.28 or Section 4.29, or its covenants under this Section 5.14, are no longer correct and have been breached or if such Debtor has a reasonable basis to believe a representation, warranty or covenant may no longer be true or may have been breached. Should such an event occur, such Debtor shall:

comply with the pertinent Anti-Terrorism Laws, Anti-Money Laundering Laws and directives from the appropriate governmental agencies or authorities; and

provide Administrative Agent with copies of all notices, reports and other documents and communications relating to such an event.