# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
In re:                              :      Chapter 11
:
:      Case No. 09-12659 (MFW)
PROTOSTAR LTD., <u>et al.</u>,[1]      :
:      (Jointly Administered)
:
Debtors.      :
-------------------------------------------------------------x

**~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. § 1125, WITH RESPECT TO ~~FIRST~~SECOND AMENDED ~~JOINT~~ CHAPTER 11 PLAN OF PROTOSTAR I LTD. ~~AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION~~**

**~~November 11, 2009~~**
**<u>January 26, 2010</u>**

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP

Matthew S. Barr
Peter K. Newman
One Chase Manhattan Plaza
New York, NY 10005-1413

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones
James E. O'Neill
Kathleen P. Makowski
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

*Attorneys For ProtoStar Ltd. And Its*
*Affiliated Debtors And Debtors In Possession*

---

[1] The ProtoStar entities, along with the last four digits of their respective federal tax identification numbers, are as follows: ProtoStar Ltd. (4245), ProtoStar I Ltd. (1042), ProtoStar II Ltd. (1244), ProtoStar Satellite Systems, Inc. (2615), ProtoStar Development Ltd. (none) and ProtoStar Asia Pte. Ltd. (none). The mailing address for ProtoStar is 100 California Street, Suite 700, San Francisco, CA 94111.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE CHAPTER 11 PLAN ~~OF LIQUIDATION~~ (THE "PS I PLAN") OF PROTOSTAR I LTD. ("PS I," AND TOGETHER WITH ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION ~~(COLLECTIVELY~~, "PROTOSTAR") IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (THE "CHAPTER 11 CASES"). PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF PROTOSTAR AND THE CONDITION OF PROTOSTAR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL, REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR EQUITY INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PS I PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CLAIM AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PS I PLAN, BUT THE PS I PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PS I PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PS I PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING PROTOSTAR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PS I PLAN ARE AUTHORIZED BY PROTOSTAR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PS I PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PS I PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PS I PLAN IN THEIR ENTIRETY. PS I PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXECUTIVE SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PS I PLAN AND OTHER EXHIBITS ANNEXED TO THE PS I PLAN AND THIS DISCLOSURE STATEMENT. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "CERTAIN RISK FACTORS TO BE CONSIDERED" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PS I PLAN. *SEE SECTION VII, "CERTAIN RISK FACTORS TO BE CONSIDERED."*

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME

AFTER THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN. PROTOSTAR HAS NO DUTY TO UPDATE THIS DISCLOSURE STATEMENT UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT.

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PS I PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF PROTOSTAR, IF ANY, SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PS I PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PS I PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PS I PLAN, EVENTS IN THE RESTRUCTURING OF PROTOSTAR AND FINANCIAL INFORMATION. ALTHOUGH PROTOSTAR BELIEVES THAT THE PS I PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY PROTOSTAR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. PROTOSTAR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE PURPOSE OF THIS DISCLOSURE STATEMENT IS TO PROVIDE (A) RELEVANT INFORMATION REGARDING THE HISTORY OF PROTOSTAR, ITS BUSINESS, AND THESE CHAPTER 11 CASES; (B) INFORMATION CONCERNING THE PS I PLAN; (C) INFORMATION FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS REGARDING THEIR TREATMENT UNDER THE PS I PLAN AND (D) INFORMATION TO ASSIST THE BANKRUPTCY COURT IN DETERMINING WHETHER THE PS I PLAN COMPLIES WITH THE PROVISIONS OF CHAPTER 11 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PS I PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PS I PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS OR RECOMMENDATIONS OF PROTOSTAR OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, AND FOR PURPOSES OF ANY CONTESTED MATTER, ADVERSARY PROCEEDING, OR OTHER PENDING OR THREATENED ACTION, THE CONTENTS HEREOF SHALL CONSTITUTE STATEMENTS MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS AND SHALL BE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND ANY SIMILAR RULE OR STATUTE. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE CHAPTER 11 CASES) INVOLVING PROTOSTAR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PS I PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN PROTOSTAR. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PS I PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SUMMARY. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

PROTOSTAR PRESENTLY INTENDS TO CONSUMMATE THE PS I PLAN AS PROMPTLY AS POSSIBLE IN CONNECTION WITH THE CLOSING OF THE SALES. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PS I PLAN AND THE EFFECTIVE DATE OF THE PS I PLAN ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PS I PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN CERTAIN CLASSES AND THAT COULD AFFECT THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS, ARE DESCRIBED IN *SECTION V, "SUMMARY OF PS I PLAN."*

# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ......................................................................................... 1

II.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
      INTERESTS UNDER PS I PLAN ............................................................................ 43
      A.    Solicitation and Acceptance of PS I Plan .................................................... 85
      B.    Confirmation Hearing ................................................................................ 107
      C.    Overview of Chapter 11 Process.................................................................. 107

III.  HISTORICAL INFORMATION ........................................................................... 118
      A.    ProtoStar's Businesses ............................................................................... 118
      B.    Organizational Structure ............................................................................. 9
      C.    Prepetition Indebtedness .......................................................................... 1210
      CD.   Events Leading To Chapter 11 Filing......................................................... 1411

IV.   CHAPTER 11 CASES .......................................................................................... 1512
      A.    Case Administration ................................................................................. 1512
      B.    Continuation Of Business After Petition Date............................................ 1613
      C.    Bermuda Proceeding ................................................................................ 1916

V.    SUMMARY OF PS I PLAN ................................................................................. 2017
      A.    Treatment of PS I Administrative Expense Claims and Priority Tax Claims...... 2018
      B.    Treatment of Allowed Claims .................................................................... 2119
      C.    Establishment Of Liquidating Trusts ......................................................... 2419
      D.    Establishment Of Reserves ......................................................................... 21
      E.    PS I Sale-Related Incentive Plans ............................................................ 25Plan
            ..................................................................................................................... 21
      EF.   Directors And Officers Tail Insurance........................................................ 2522
      FG.   Executory Contracts And Unexpired Leases .............................................. 2522
      GH.   Conditions Precedent To Confirmation And Effective Date Of PS I Plan .......... 2622
      HI.   Release, Exculpation, Injunctive and Related Provisions............................ 2724
      IJ.   Miscellaneous Provisions .......................................................................... 2926

VI.   SUMMARY OF CERTAIN DISTRIBUTABLE ASSETS........................................... 3128
      A.    PS I Sale and Reserve Distributions ......................................................... 3128
      B.    PS II Sale Distributions ............................................................................. 32
      C.    Liquidating Trust Distributions.................................................................. 3230

VII.  CERTAIN RISK FACTORS TO BE CONSIDERED ............................................... 3431
      A.    Risk That Distributions Will Be Less Than Estimated............................... 3432
      B.    Financial Information Disclaimer .............................................................. 3532
      C.    Business Factors........................................................................................ 36
      D.    Litigation Risks ........................................................................................ 3633
      ED.   Bankruptcy Risks ..................................................................................... 3733

VIII. VOTING REQUIREMENTS ................................................................................ 3834
      A.    Voting Deadline ....................................................................................... 3935
      B.    Holders of Claims Entitled to Vote .......................................................... 3935
      C.    Vote Required For Acceptance By Class.................................................... 4036
      D.    Voting Procedures..................................................................................... 4036

IX.   CONFIRMATION OF PS I PLAN ........................................................................ 4238
      A.    Hearing On Confirmation Of PS I Plan At Confirmation Hearing................... 4238

i

# TABLE OF CONTENTS
## (continued)

B.     Deadline To Object To Confirmation .................................................................... 4238
C.     Requirements For Confirmation Of PS I Plan ..................................................... 4339
D.     Alternatives To Confirmation And Consummation Of PS I Plan....................... 4743

X.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PS I PLAN ......... 4844

A.     Certain U.S. Federal Income Tax Consequences to Protostar PS I in Connection With Implementation of the PS I Plan ............................................................. 4945

B.     Certain U.S. Federal Income Tax Consequences to U.S. Holders in Connection With Implementation of the PS I Plan ............................................................. 5046

C.     U.S. Federal Income Tax Treatment of the Liquidating Trusts and U.S. Holders Of Interests in the Liquidating Trusts ................................................................... 5147

D.     Information Reporting and Backup Withholding ............................................... 5349

XI.     CONCLUSION.................................................................................................... 5349

EXHIBITS TO DISCLOSURE STATEMENT

Exhibit 1        Chapter 11 Plan
Exhibit 2        Disclosure Statement Order
Exhibit 3        ProtoStar's Liquidation Analysis

# I.

## EXECUTIVE SUMMARY

ProtoStar Ltd. and its affiliated debtors and debtors in possession (collectively, "ProtoStar") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on July 29, 2009 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

On November 11, 2009, ProtoStar filed its First Amended Disclosure Statement (the "First Amended Disclosure Statement"), Pursuant to 11 U.S.C. § 1125, with Respect to First Amended Joint Chapter 11 Plan of ProtoStar Ltd. And Its Affiliated Debtors and Debtors in Possession (the "First Amended Plan"). Since filing of the First Amended Plan, ProtoStar has determined that it is in the best interests of its estates to seek at this time approval of this Disclosure Statement and confirmation of the PS I Plan while reserving the right to go forward and seek approval of a chapter 11 plan and related disclosure statement with respect to the other ProtoStar debtor entities (a "PS II Plan") at a later date. Accordingly, ProtoStar submits this disclosure statement (as amended from time to time, the "Disclosure Statement")[2] pursuant to section 1125 of the Bankruptcy Code to holders of claims against and equity interests in ProtoStar in connection with the solicitation of votes to accept or reject ~~its~~the chapter 11 plan of ProtoStar I Ltd. ("PS I") (as amended from time to time, the "PS I Plan" or the "Plan"), attached as Exhibit 1 to this Disclosure Statement.[3] ProtoStar expects to seek approval of a PS II Plan and associated disclosure statement in the near future.

These chapter 11 cases (the "Chapter 11 Cases") were commenced amid a potential perceived liquidity crunch resulting principally from the failure of the ProtoStar I satellite (the "PS I Satellite") to generate sufficient revenue for working capital needs and to service ProtoStar's Prepetition Secured Facilities. Prior to the Chapter 11 Cases, ProtoStar sought to raise capital through potential equity and debt investments and pursued negotiations with potential purchasers of one or both of its satellites. Following accelerations from ProtoStar's Prepetition Secured Lenders, ProtoStar sought to negotiate an arrangement whereby those lenders would provide incremental funding for the operation of ProtoStar's businesses to bridge to either a sale of one or both of its satellites or a consensual comprehensive restructuring with all of ProtoStar's stakeholders. Subsequently, ProtoStar reached an agreement with the Prepetition Secured Lenders to provide financing for the operation of ProtoStar's businesses to bridge to a sale of its satellites in one or more transactions within a chapter 11 context. Since the Petition Date, ProtoStar has maintained its operations and continued to provide satellite capacity to its customers. Since becoming operational on or about June 17, 2009, the ProtoStar II satellite (the "PS II Satellite," and together with the PS I Satellite, the "Satellites") in the Asia-Pacific

---

[2]      Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to such terms in the PS I Plan.

[3]      Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.

region has generated approximately $6 million in revenue under a capacity agreement with its anchor tenant.  ProtoStar, with the support of its ~~secured lenders~~ Prepetition Secured Lenders, is in the process of marketing and selling the Satellites and related assets pursuant to a Bankruptcy Court-approved auction process in order to maximize the value of ProtoStar's assets and estates.  ~~Accordingly, the Plan is premised upon the receipt and distribution of sales proceeds from the auctions of the Satellites.~~

On August 3, 2009, ProtoStar filed with the Bankruptcy Court a motion (the "PS I Sale ~~Motions (as defined below~~ Motion") seeking to, among other things, (a) establish bidding procedures (the "PS I Bidding Procedures" ~~and the "PS II Bidding Procedures," respectively, and together, the "Bidding Procedures") for auctions~~) for the auction (the "PS I Auction" ~~and the "PS II Auction," respectively, and together, the "Auctions"~~") to sell all or substantially all of the assets of ~~ProtoStar I Ltd. ("PS I") and ProtoStar II Ltd. ("PS II"), respectively, both of which ProtoStar intends to consummate in connection with the Plan~~ PS I, and (b) schedule ~~hearings~~ a hearing for the Bankruptcy Court to consider approval of ProtoStar's ~~sales~~ sale to the Successful Bidder~~(s)~~ (as defined in the PS I Bidding Procedures) at each of the auctions (the "PS I Sale Hearing" ~~and the "PS II Sale Hearing", respectively, and together, the "Sale Hearings"~~").  On August 24, 2009, the Bankruptcy Court entered ~~orders~~ an order approving the PS I Bidding Procedures and scheduling the ~~respective Auctions~~ PS I Auction for October 14, 2009 and the PS I Sale ~~Hearings~~ Hearing for October 22, 2009.

On October 8, 2009, ProtoStar filed notice of certain revised dates under the PS I Bidding Procedures in connection with the PS I Auction.  The PS I Auction was held on October 29, 2009, with nine Qualified Bidders in attendance (including the Noteholders, whose right to credit bid ~~had been~~ was provided for in the PS I Bidding Procedures).

As a result of the highly competitive auction process, ProtoStar announced Intelsat Subsidiary Holding Company, Ltd. ("Intelsat") as the Successful Bidder, based on a bid including $210 million in cash consideration.  On November 6, 2009, the Bankruptcy Court entered an order approving the sale of ~~all or~~ substantially all of the assets of PS I (the "PS I Sale"), including the PS I Satellite, to Intelsat or, in the event ProtoStar and Intelsat ~~do~~ did not close the contemplated sale, to Eutelsat America Corp. ("Eutelsat"), who had submitted the Next Highest Bid at the PS I Auction.  ~~Similarly, on October 26, 2009, ProtoStar filed notice of certain revised dates with respect to the PS II Auction, which is currently scheduled for December 15, 2009.  It is anticipated that ProtoStar will announce by notice any Successful Bidder and Next Highest Bidder of the PS II Auction on or before December 17, 2009.  The PS II Sale Hearing is currently scheduled for December 18, 2009, during which ProtoStar will seek approval of a sale of all or substantially all of the assets of PS II (the "PS II Sale" and with the PS I Sale, the "Sales") to such Successful Bidder.  ProtoStar will also seek the authority to close the PS II Sale with any Next Highest Bidder without further court approval in the event ProtoStar and the Successful Bidder do not close the contemplated transaction.~~ The PS I Sale to Intelsat closed on December 4, 2009, and ProtoStar returned to Eutelsat its deposit.  The proceeds from the PS I Sale, other than $5,876,738.07, which was used to repay new money borrowings under the PS I DIP Facility (as defined below), as discussed more fully below, are currently being held in a corporate trust account at Wells Fargo Bank and, pursuant to the PS I Sale Proceeds Distribution

Order, ProtoStar will not distribute such proceeds without further order of the Bankruptcy Court, including an order confirming the PS I Plan.

**FOLLOWING THE CONCLUSION OF THE PS II AUCTION AND ENTRY OF AN ORDER APPROVING THE PS II SALE AND PRIOR TO THE VOTING DEADLINE WITH RESPECT TO THE PLAN, PROTOSTAR WILL FILE AND SERVE A NOTICE (THE "PS II SALE NOTICE") SETTING FORTH THE MATERIAL TERMS OF THE PS II SALE AND THE IMPACT OF SUCH SALE ON THE RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. THE PS II SALE NOTICE WILL INCLUDE ADDITIONAL DISCLOSURE PERTAINING TO THE RESULTS OF THE PS II SALE AND WILL NOT ALTER THE DISTRIBUTION PRIORITIES OR MECHANICS OR THE TREATMENT OF CLAIMS AND EQUITY INTERESTS SET FORTH IN THE PLAN.**

The Bankruptcy Court approved a similar auction and sale process and, subsequently, a sale itself, with respect to the assets of ProtoStar II Ltd. ("PS II"), including the PS II Satellite (the "PS II Sale"). ProtoStar expects the closing of the PS II Sale to occur immediately following the receipt of certain required regulatory approvals currently anticipated in the second quarter of 2010. The Effective Date of the PS II Plan will likely occur substantially contemporaneously with the closing of the PS II Sale.

The order approving the PS II Bidding Procedures expressly provides that the CS Facility Lenders are qualified as Qualified Bidders (as defined in the PS II Bidding Procedures Order) for all purposes without the need to meet any of the qualification provisions of the PS II Bidding Procedures and preserves the CS Facility Lenders' right to credit bid for the PS II Satellite at the PS II Auction in accordance with section 363(k) of the Bankruptcy Code. Accordingly, the descriptions contained herein of the distributions with respect to proceeds from the PS II Sale and the treatment provided for the CS Facility Claims are subject to, and qualified by, the CS Facility Lenders' right to credit bid.

This solicitation is being conducted at this time in order to obtain sufficient votes to enable the PS I Plan to be confirmed by the Bankruptcy Court. The PS I Plan sets forth how Claims against and Equity Interests in ~~ProtoStar~~PS I will be treated upon consummation of the PS I Plan if it is confirmed by the Bankruptcy Court and is thereafter consummated. This Disclosure Statement describes certain aspects of the PS I Plan, ProtoStar's business operations, significant events leading up to the Chapter 11 Cases and related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the PS I Plan and certain matters related to ProtoStar's ~~business~~businesses. **FOR A COMPLETE UNDERSTANDING OF THE PS I PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PS I PLAN AND ALL RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The PS I Plan (Exhibit 1);

- Order of the Bankruptcy Court approving this Disclosure Statement and establishing procedures with respect to the solicitation of votes on the PS I Plan (the "Disclosure Statement Order"; Exhibit 2); and

- ProtoStar's liquidation analysis (the "Liquidation Analysis"; Exhibit 3).

**PROTOSTAR BELIEVES THAT THE PS I PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE IT TO SUCCESSFULLY ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PS I PLAN IS IN THE BEST INTERESTS OF PROTOSTAR, ITS ESTATES, ITS CREDITORS AND ITS INTEREST HOLDERS.**

On ~~November~~February [ ], ~~2009,~~2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of ~~ProtoStar~~PS I's creditors and equity holders to make informed judgments whether to accept or reject the PS I Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the PS I Plan.

The Disclosure Statement Order sets forth in detail deadlines, procedures and instructions for voting to accept or reject the PS I Plan and for filing objections to confirmation of the PS I Plan. In addition, detailed voting instructions accompany each ballot. Each Holder of a Claim or Equity Interest entitled to vote on the PS I Plan should read this Disclosure Statement, the PS I Plan, the Disclosure Statement Order, all exhibits thereto and the instructions accompanying the ballot that was distributed to them in their entirety before voting on the PS I Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes. No solicitation of votes to accept the PS I Plan may be made except pursuant to section 1125 of the Bankruptcy Code. Upon confirmation, the PS I Plan will be a legally binding arrangement and it should therefore be read in its entirety. Accordingly, solicited parties may wish to consult with their attorneys regarding the contents of the PS I Plan.

## II.

### SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER PS I PLAN

The following table summarizes the classification and treatment of the Claims and Equity Interests under the PS I Plan. For a more detailed description of the classification and treatment for all Classes, please refer to the discussion in *Section V, "Summary Of PS I Plan"* and to the PS I Plan itself.[4]

---

[4] This table is only a summary of the classification, impairment and entitlement to vote of Holders of Claims and Equity Interests under the PS I Plan. Reference should be made to the entire Disclosure Statement and the PS I Plan and all exhibits thereto for a complete description of the classification and treatment of Claims and Interests. Accordingly, this summary is qualified in its entirety by reference to the entire Disclosure Statement and the PS I Plan and all exhibits thereto.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims[*][†] |
|---|---|---|---|---|
| **Class 1 – Priority Non-Tax Claims** | _Unimpaired_.  The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims.  Each Holder of an Allowed Priority Non-Tax Claim will, in full and final satisfaction of such Priority Non-Tax Claim, be paid in full, in cash, on or as soon as practicable following the Effective Date, unless the Holder consents to other treatment. | No ~~--~~ deemed to accept | $241,000~~0~~ | ~~100% (or such other amount consented to by each Holder of a Priority Non-Tax Claim)~~N/A |
| ~~**Class 2A – ProtoStar Ltd. CS Facility Claims**~~ | ~~_Impaired_.  Each Holder of an Allowed ProtoStar Ltd. CS Facility Claim will, in full and final satisfaction of such Allowed ProtoStar Ltd. CS Facility Claim, receive its Pro Rata share of (i) any cash on hand in the PS II DIP Account remaining after repayment of the PS II DIP Claims and (ii) ProtoStar Ltd. Trust A Interests.~~ | ~~Yes~~ | ~~$243,000,000~~ | ~~TBD*~~ |

---

[*] ~~As of the date hereof, the recoveries of~~ certain Classes of Claims ~~dependent on recoveries from the proceeds of the PS II Sale are as of yet undetermined.  Following approval by the Bankruptcy Court of the PS II Sale and in advance of the Voting Deadline, ProtoStar will include in the PS II Sale Notice an updated table summarizing the classification and treatment of the Claims and Equity Interests under the Plan.[†]~~  Estimated recovery percentages for certain Classes of ~~unsecured~~ Claims are attributable to proceeds of ~~Chapter 5~~ Causes of Action through interests in the ~~Unsecured~~ Liquidating ~~Trust Interests~~Trusts allocable to Holders of Claims in such Classes.  To date, ProtoStar has not conducted significant analysis of the value of such ~~Chapter 5~~ Causes of Action and actual recoveries may vary significantly from the estimates set forth herein.

[†]  Estimated recovery percentages for certain Classes of Claims reflect the possibility the PS I Liens may be avoided pursuant to the PS I Lien Challenge.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims[*][†] |
|---|---|---|---|---|
| Class 2B – ProtoStar Ltd. Noteholder Claims | *Impaired*. Each Holder of an Allowed Noteholder Guarantee Claim will, in full and final satisfaction of such Allowed Noteholder Guarantee Claim and subject to the Noteholders' right to credit bid, receive its Pro Rata share of (i) any cash on hand in the PS I DIP Account and (ii) Trust B Interests (solely with respect to the Equity Interests of PS I). | Yes | $200,000,000 | TBD[*] |
| Class 3 – ProtoStar Ltd. Unsecured Claims | *Impaired*. Each Holder of an Allowed ProtoStar Ltd. Unsecured Claim will, in full and final satisfaction of such Allowed ProtoStar Ltd. Unsecured Claim, receive its Pro Rata share of (i) Unsecured Liquidating Trust Interests, (ii) PS I Net Sale Proceeds, if any, remaining after payment in full of the PS I Secured Claims and the PS I Unsecured Claims and (iii) PS II Net Sale Proceeds, if any, remaining after payment in full of the PS II Secured Claims, the PS II Unsecured Claims, the PS I DIP Claims on account of Junior Priority DIP Collateral and the Adequate Protection Obligations (each as defined in the PS I Final DIP Order). | Yes | $28,000,000 | 0-3%[‡] |

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims[*†] |
|---|---|---|---|---|
| Class 4 – PS I Secured Claims | *Impaired.* Each Holder of an Allowed PS I Secured Claim will, in full and final satisfaction of such Allowed PS I Secured Claim, receive its Pro Rata share of (i) the PS I Net Sale Proceeds and (ii) Trust B Interests. | Yes | $200,000,000 | 80-90% |
| Class 5 – PS I Unsecured Claims | *Impaired.* Each Holder of an Allowed PS I Unsecured Claim will, in full and final satisfaction of such Allowed PS I Unsecured Claim, receive its Pro Rata share of (i) Unsecured Liquidating Trust Interests and (ii) any remaining PS I Net Sale Proceeds after payment in full of the Allowed PS I Secured Claims. | Yes | $8,500,000[5] | 0-3%[±] |
| Class 6 – PS II Secured Claims | *Impaired.* Each Holder of an Allowed PS II Secured Claim will, in full and final satisfaction of such Allowed PS II Secured Claim, receive its Pro Rata share of (i) the PS II Net Sale Proceeds and (ii) PS II Trust A Interests. | Yes | $243,000,000 | TBD* |
| Class 7 – PS II Unsecured Claims | *Impaired.* Each Holder of an Allowed PS II Unsecured Claim will, in full and final satisfaction of such Allowed PS II Unsecured Claim, receive its Pro Rata share of (i) Unsecured Liquidating Trust Interests and (ii) any remaining PS II Net Sale Proceeds after payment in full of the PS II Secured Claims. | Yes | $14,000,000 | TBD* |

---

[5] In connection with the PS I Sale, Space Systems/Loral Inc. ("SS/L") has agreed to waive any claims against ProtoStar (the "SS/L Claim")—which ProtoStar values at approximately $3,200,000—if PS I closes the PS I Sale with Intelsat. As such, the SS/L Claim is not included in Class 5 estimated aggregate amount of Allowed Claims. If PS I does not close the PS I Sale with Intelsat, Class 5 estimated aggregate amount of Allowed Claims will increase by the amount of the SS/L Claim.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims[*][†] |
|---|---|---|---|---|
| ~~Class 8 – PSS Secured Claims~~ | ~~*Impaired*.  Each Holder of an Allowed PSS Secured Claim will, in full and final satisfaction of such Allowed PSS Secured Claim, receive its Pro Rata share of PSS Trust A Interests.~~ | ~~Yes~~ | ~~$243,000,000~~ | ~~0-3%[±]~~ |
| ~~Class 9 – PSS Unsecured Claims~~ | ~~*Impaired*.  Each Holder of an Allowed PSS Unsecured Claim will, in full and final satisfaction of such Allowed PSS Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust Interests.~~ | ~~Yes~~ | ~~$182,000~~ | ~~0-3%[±]~~ |
| ~~Class 10 – PSA Unsecured Claims~~ | ~~*Impaired*.  Each Holder of an Allowed PSA Unsecured Claim will, in full and final satisfaction of such Allowed PSA Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust Interests.~~ | ~~Yes~~ | ~~$39,000~~ | ~~0-3%[±]~~ |
| **Class ~~11~~2 – ~~PSD~~PS I Secured Claims** | *Impaired*.  Each Holder of an Allowed ~~PSD~~PS I Secured Claim will, in full and final satisfaction of such Allowed ~~PSD~~PS I Secured Claim, receive its Pro Rata share of ~~PSD~~(i) the PS I Net Sale Proceeds and (ii) Lender Liquidating Trust ~~A~~ Interests. | Yes | $~~243,000,000~~2 00,000,000 | ~~0~~85-~~3~~93%[=][†] |
| **Class ~~12~~3 – ~~PSD~~PS I Unsecured Claims** | *Impaired*.  Each Holder of an Allowed ~~PSD~~PS I Unsecured Claim will, in full and final satisfaction of such Allowed ~~PSD~~PS I Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust ~~A~~ Interests. | Yes | $~~0~~21,300,000[5] | ~~N/A~~0-85%[*][†] |

---

[5]  In connection with the PS I Sale, Space Systems/Loral Inc. ("SS/L") agreed to waive any claims against ProtoStar (the "SS/L Claim") -- which ProtoStar values at approximately $3,200,000 -- if PS I closed the PS I Sale with Intelsat.  On December 4, 2009, PS I closed the PS I Sale with Intelsat.  As such, the SS/L Claim has been waived and is therefore not included in Class 3 estimated aggregate amount of Allowed Claims.

| Class Description | Treatment | Entitlement to Vote | Estimated Aggregate Amount of Allowed Claims | Estimated Percentage Recovery of Allowed Claims[*†] |
|---|---|---|---|---|
| **Class ~~13~~4 – Equity Interests** | *Impaired*. ProtoStar Ltd., as the sole Holder of Equity Interests in PS I will, in full and final satisfaction of such Equity Interests, receive Unsecured Liquidating Trust B Interests. On the Effective Date, ~~all~~Equity Interests ~~of the ProtoStar entities~~in PS I (which will include any and all Claims subordinated pursuant to section 510(b) of the Bankruptcy Code that are in any way arising from, of or in connection with the Equity Interests) will be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise.~~ Holders of Equity Interests of the ProtoStar entities will not receive or retain any property under the Plan on account of such Equity Interests.~~ | No ~~---~~deemed to ~~reject~~accept | N/A | N/A[6] |
| ~~**Class 14 – Intercompany Claims**~~ | ~~*Impaired*. On the Effective Date, distributions will be made on account of secured or unsecured Intercompany Claims from the proceeds of the appropriate Debtor obligor and/or collateral, as applicable, and consistent with Claims of equivalent priority in Classes 2A–12.~~ | ~~No — deemed to accept~~ | ~~$238,000,000[6]~~ | ~~TBD~~ |

After careful review of ~~ProtoStar~~PS I's current business operations, estimated recoveries in a liquidation scenario and prospects as an ongoing business, ProtoStar has concluded that the

---

[6]     Estimated recoveries of Holders in Classes 3 and 4 are in part attributable to proceeds of Causes of Action through interests in the Liquidating Trusts allocable to Holders of Claims in such Classes. To date, ProtoStar has not conducted significant analysis of the value of such Causes of Action. Because Holders in Class 4 may only receive distributions after Holders in Classes 2 and 3 are repaid in full, the range of potential distributions to such Holders is difficult to predict at this time.

[6]     ~~The estimated aggregate amount of Intercompany Claims reflected herein include secured and unsecured claims by and against the ProtoStar entities as reflected in the Liquidation Analysis attached hereto as Exhibit 3.~~

recoveries to creditors will be maximized by the ~~Sales~~PS I Sale (and liquidation of assets not purchased).

**A.      Solicitation and Acceptance of PS I Plan**

**1.      General**

This Disclosure Statement and other documents described herein are being furnished by ProtoStar to Holders of Claims against and Equity Interests in ~~ProtoStar~~PS I pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the PS I Plan.

A copy of the Disclosure Statement Order entered by the Bankruptcy Court and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the PS I Plan (the "Confirmation Hearing Notice") are also being transmitted with this Disclosure Statement.  The Disclosure Statement Order and the Confirmation Hearing Notice set forth in detail the deadlines, procedures and instructions for casting votes to accept or reject the PS I Plan, for filing objections to confirmation of the PS I Plan, the treatment for balloting purposes of certain types of Claims and the assumptions for tabulating ballots.  In addition, detailed voting instructions accompany each ballot, which are color-coded for each Class.  Each Holder of a Claim or Equity Interest within a Class entitled to vote should read the Disclosure Statement, the PS I Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing and the instructions accompanying the ballots in their entirety before voting on the PS I Plan.  These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

**2.      Who Is Entitled To Vote**

Pursuant to the Disclosure Statement Order, the Bankruptcy Court has established the date of entry of the Disclosure Statement Order on the docket (i.e. ~~November~~February [~~18~~2], ~~2009,~~2010, the "Record Date") as the record date for determining the Holders of Claims and Equity Interests entitled to vote to accept or reject the PS I Plan.  The Holders of Claims in Classes 2~~A, 2B, 3, 4, 5, 6, 7, 8, 9, 10, 11~~ and ~~12~~3 are entitled to vote.  Holders of Claims in Class 1 are unimpaired and consequently are conclusively presumed to accept the PS I Plan and are not entitled to vote.  ~~Holders~~The Holder of Equity Interests in Class ~~13 will receive or retain no distribution of property under the Plan, are presumed to have rejected the Plan and are not entitled to vote thereon.  Holders of Claims in Class 14 are impaired and, as proponents~~is impaired but, as a proponent of the PS I Plan, ~~are~~is presumed to accept the PS I Plan.

**3.      Summary Of Voting Procedures**

If you are entitled to vote to accept or reject the PS I Plan, a ballot is enclosed for voting purposes.  If you hold Claims or Equity Interests in more than one Class and you are entitled to vote Claims or Equity Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class.  Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s).

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PS I PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY PROTOSTAR'S NOTICE AND BALLOTING AGENT KURTZMAN CARSON CONSULTANTS LLC (THE "NOTICE AND BALLOTING AGENT") AT 2335 ALASKA AVE., EL SEGUNDO, CA 90245, ATTENTION: BALLOT PROCESSING, **NO LATER THAN 4:00 P.M., PREVAILING PACIFIC TIME, ON** [JANUARY 6], 2009**FEBRUARY [25], 2010** (**THE "VOTING DEADLINE"**).  BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED.  FAXED OR ELECTRONIC COPIES OF BALLOTS WILL NOT BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PS I PLAN WILL NOT BE COUNTED.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PS I PLAN WILL NOT BE COUNTED.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO PROTOSTAR, THE COURT OR COUNSEL TO PROTOSTAR.**

### 4. Inquiries

If you are a Holder of a Claim or Equity Interest entitled to vote on the PS I Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have questions about the procedures for voting your Claim or Equity Interest or about the packet of materials that you received, please contact the Notice and Balloting Agent, Kurtzman Carson Consultants LLC, at 2335 Alaska Ave., El Segundo, CA 90245, Attention: ProtoStar Ballot Processing, or by telephone at (866) 381-9100.

Anyone wishing to obtain additional copies of the PS I Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent, at (866) 381-9100, or view such documents by accessing the Notice and Balloting Agent's website: http://www.kccllc.net/ProtoStar or the Bankruptcy Court's website: www.deb.uscourts.gov. Note that a PACER (https://ecf.deb.uscourts.gov/) password and login are needed to access documents on the Court's website.

### B. Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on March [ ], 2010 at [ ] (prevailing Eastern Time), before the Honorable Mary F. Walrath, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to Confirmation be filed and served so that they are received on or before [ March [5]], 2010 at 4:00 p.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing or at any adjourned Confirmation Hearing.

### C. Overview of Chapter 11 Process

The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in the Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor in possession may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case without Bankruptcy Court authorization. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One official creditors' committee -- the Creditors' Committee -- has been appointed in these Chapter 11 Cases to represent the collective interests of general unsecured creditors of ProtoStar.

A chapter 11 debtor may emerge from bankruptcy or its assets may be sold and the proceeds distributed to creditors through a confirmed chapter 11 plan, such as the PS I Plan. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and equity interests of shareholders and holders of options or warrants. The provisions of ProtoStar's PS I Plan are summarized below. *See Section V, "Summary of PS I Plan."*

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the terms for satisfying claims against, and equity interests in, a debtor. Upon confirmation of a plan, such plan is binding on the debtor, any issuer of securities under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan has been filed, holders of certain claims against, or equity interests in, a debtor are permitted to vote to accept or reject such plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

ProtoStar submits this Disclosure Statement to Holders of Claims against, and Equity Interests in, ProtoStar to satisfy the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement sets forth specific information regarding ProtoStar's pre-bankruptcy history, the nature of the Chapter 11 Cases and the proposed distributions to creditors upon

consummation of the PS I Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims and Equity Interests entitled to vote must follow for their votes to be counted.

**III.**

**HISTORICAL INFORMATION**

### A.    ProtoStar's Businesses

ProtoStar is a satellite operator that was formed in 2005 to acquire, modify, launch and operate high-power geostationary (i.e., fixed with respect to a given point on Earth) communication satellites optimized for direct-to-home ("DTH") satellite television and broadband internet access across the Asia-Pacific region.  ProtoStar's business plan seeks to develop a constellation of high-powered geostationary satellites to lease satellite capacity to DTH and broadband service providers located in Asia within the coverage area of ProtoStar's satellites.  ProtoStar's satellites and satellite network are designed to meet the needs of DTH service providers and allow ProtoStar to offer a unique combination of services.

Since its formation, ProtoStar has successfully developed and launched the Satellites.  To support these efforts, ProtoStar raised nearly $500 million in debt and equity financing and marketed the transponders on each of its satellites to receptive DTH service providers throughout each satellite's respective coverage areas.  ProtoStar's value proposition lies in allowing its DTH service provider customers to avoid allocating the large capital expenditure investments required to launch their own satellites and instead focus their efforts on the business of DTH services -- namely procuring set-top-boxes and programming, retaining subscribers, providing ongoing customer care and managing their businesses.  ProtoStar's target customers include privately-owned broadcasting networks, cable television programmers, DTH operators and private telecommunications networks.

The PS I Satellite was launched on July 7, 2008.  The PS I Satellite is equipped with twenty-two 36 MHz equivalent Ku-band and thirty-eight 36 MHz equivalent C-band transponders.  ~~The~~Prior to its sale to Intelsat, the PS I Satellite ~~provides~~provided Ku-band coverage for digital DTH services, high-definition television and broadband internet to under-served areas from Southeast Asia to the Middle East.  A portion of the Ku-band transponders ~~are~~were aimed at the Indian subcontinent, with the remainder aimed at the Southeast Asia region.  The C-band transponders ~~enable~~enabled ProtoStar to provide cellular backhaul, traditional last mile telecom and basic broadcasting services.  The PS I Satellite ~~is currently~~was positioned in an orbital slot located at 98.35°EL (i.e. East Longitude on the geostationary arc).

ProtoStar launched a second satellite, the PS II Satellite, on May 16, 2009, positioning it in an orbital slot located at 107.35°EL.  Following the successful completion in-orbit testing, the PS II Satellite was relocated to an orbital slot located at 107.7°EL, where it is likely to remain for its useful life, unless and until a new buyer determines otherwise.  The PS II Satellite features high-powered S- and Ku-band transponder capacity ~~and will~~intended to significantly expand ProtoStar's capacity throughout the Asia-Pacific region.  With the addition of the PS II Satellite

13

to its fleet, ProtoStar is able to provide optimized DTH satellite television service and broadband internet access across the Asia-Pacific region, reaching billions of people in India, Indonesia, Taiwan, the Philippines and Southeast Asia.  The PS II Satellite became operational on or about June 17, 2009.

## B.      Organizational Structure

ProtoStar Ltd. is the direct parent company of each of the other ProtoStar entities, including PS I.  Each of the ProtoStar entities is a privately owned entity and equity securities in ProtoStar entities are not listed or traded on any public exchange or market.  PSS maintains its corporate headquarters at 100 California Street, Suite 700, San Francisco, California 94111.  ProtoStar Ltd., PS I, PS II and PSD are headquartered in Bermuda.  PSA is headquartered in Singapore.

PSS employs all of ProtoStar's United States-based employees and provides general and administrative services to certain of the other ProtoStar entities pursuant to various services agreements between PSS and such other ProtoStar entities.  Accordingly, tasks performed for PS I, including with respect to the PS I Satellite prior to the PS I Sale, have been performed by employees of PSS.

## C.      B. Prepetition Indebtedness

### 1.      Working Capital Facility

ProtoStar Ltd. and PS I are parties to that certain Credit Agreement, dated as of March 28, 2007 (as amended by Amendment No. 1, dated as of July 5, 2007, Amendment No. 2, dated as of February 23, 2009, and Amendment No. 3, dated as of May 29, 2009, and as otherwise amended, restated, or supplemented, the "WC Agreement Facility"), among PS I, as borrower, ProtoStar Ltd., as guarantor, the lenders from time to time party thereto (collectively, the "WC Lenders"), The Bank of New York Mellon (as successor to The Bank of New York, "BNYM"), as first lien collateral agent (the "Prepetition First Lien Collateral Agent"), and Canyon Capital Advisors LLC ("Canyon"), as administrative agent for the WC Lenders (the "WC Agent").  The WC Agreement Facility and all obligations under the WC Agreement Facility are secured by first priority liens, subject to any permitted liens, against, and security interests in (i) substantially all of the assets of PS I and (ii) the equity interests of PS I held by ProtoStar Ltd, (collectively, the "PS I Collateral") and the proceeds thereof.  The obligations under the WC Agreement Facility are unsecured against ProtoStar Ltd., other than ProtoStar Ltd.'s pledge of its equity interests in PS I as described above.  As of the Petition Date, the outstanding principal balance under the WC Agreement Facility was $10,000,000.  Upon information and belief, the outstanding principal balance under the WC Agreement Facility, as of the Petition Date, was held by certain of the Secured Noteholders (as defined below).

All obligations outstanding under the WC Agreement Facility were repaid on September 16, 2009, with the proceeds of borrowings under and pursuant to the terms of the PS I Final DIP Order.

## 2. PS I Secured Notes

PS I issued $160,000,000 of 12.5% Senior Secured Convertible Notes due 2012 (the "12.5% Senior Secured Notes" and the holders thereof, from time to time, the "Prepetition 12.5% Senior Secured Noteholders"), pursuant to that certain indenture, dated as of September 28, 2006 (as amended by the Supplemental Indenture, dated as of February 23, 2009, and as otherwise amended, modified and supplemented from time to time, the "Senior Secured Notes Indenture"), between PS I, as issuer, ProtoStar Ltd., as guarantor, and BNYM, as indenture trustee (the "~~Indenture~~Senior Secured Notes Trustee").  BNYM also acts as collateral agent under the Guarantee and Security Agreement, dated as September 28, 2006 (as amended, modified and supplemented from time to time), among PS I, ProtoStar Ltd., as guarantor, and BNYM (the "Prepetition ~~Secured Notes~~Second Lien Collateral Agent," and together with the WC Agent and the Prepetition First Lien Collateral Agent, the "PS I Prepetition Agents").  The obligations under the Senior Secured Notes (as defined below) are secured by liens, subject to permitted liens, against, and a security interest in, the PS I Collateral.  The obligations under the Senior Secured Notes are unsecured against ProtoStar Ltd., other than ProtoStar Ltd.'s pledge of its equity interests in PS I as described above.  On February 23, 2009, PS I offered the Prepetition 12.5% Senior Secured Noteholders the opportunity to exchange the 12.5% Senior Secured Notes for new notes (with the same collateral package) bearing interest at 18.0% (the "18.0% Senior Secured Notes," and together with the 12.5% Senior Secured Notes, the "Senior Secured Notes," and the holders thereof, from time to time, the "Prepetition 18.0% Senior Secured Noteholders," and together with the Prepetition 12.5% Senior Secured Noteholders, the "~~Secured~~ Noteholders").  As of the Petition Date, the outstanding principal amount of the Senior Secured Notes was approximately $182.7 million.

## 3. Intercreditor Agreement

ProtoStar Ltd. and PS I are party to that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of September 28, 2006, by and among PS I, ProtoStar Ltd., the Prepetition First Lien Collateral Agent and the Prepetition ~~Secured Notes~~Second Lien Collateral Agent, which, among other things, describes the relative priorities of the liens granted for the ratable benefit of the WC Lenders and ~~Secured~~ Noteholders with respect to the PS I Collateral.

## 4. Credit Suisse Facility

ProtoStar Ltd. is party to that certain Facility Agreement (as amended, restated, or supplemented, the "CS Facility," and together with the Secured Notes Indenture and the WC ~~Agreement~~Facility, the "Prepetition Secured Facilities"), dated as of March 19, 2008, among ProtoStar Ltd., as borrower, PS II, PSD and PSS, as guarantors, Credit Suisse, Singapore Branch, as Arranger, Agent, Security Agent, Calculation Agent and Account Bank (in its separate legal roles as Agent, Security Agent and Calculation Agent, "CS~~," and together with Canyon, the Prepetition First Lien Collateral Agent and the Prepetition Secured Notes Collateral Agent, the "Prepetition Agents"~~), the Financial Institutions party thereto as lenders (collectively, the "CS Facility Lenders," and together with the ~~Secured~~ Noteholders and the WC Lenders, the "Prepetition Secured Lenders"), and Credit Suisse International, as Hedging Bank.  The CS

Facility and all obligations under the CS Facility are secured by first priority liens against, and a security interest in, all or substantially all of the assets of ProtoStar Ltd. (other than the stock of PS I held by ProtoStar Ltd.), PS II, PSD and PSS.  As of the Petition Date, the outstanding principal amount on account of the CS Facility was in excess of $242,000,000, plus accrued and unpaid interest thereon and unpaid fees, expenses, charges and other obligations incurred in connection therewith, as provided for in the CS Facility.

### **5.** **Intercompany Claims**

Intercompany Claims between the ProtoStar debtor entities reflect net balances resulting from transfers of funds between entities as a result of, among other things, transfers made by one ProtoStar entity on account of another ProtoStar entity related to cash shortfalls, financing reserves or other operating expenses and in the case of the intercompany claim owing from PS II to ProtoStar Ltd., a subordinated secured note evidencing proceeds of the CS Facility transferred to PS II in connection with the acquisition, launch and operation of the PS II Satellite.

### **D.** ~~C.~~ Events Leading To Chapter 11 Filing

On April 1, 2009, PS I received a notice from Agrani, dated March 30, 2009 (the "Agrani Termination Notice"), purporting to terminate that certain Amended and Restated Satellite Capacity Agreement, dated November 16, 2007 (the "Agrani Agreement"), between PS I and Agrani whereby Agrani agreed to lease satellite capacity on the PS I Satellite.  ~~PS I and~~ ProtoStar ~~Ltd. dispute~~disputes the validity of the Agrani Termination Notice and intends to assert claims against Agrani to recover damages for its multiple breaches of the Agrani Agreement.

On April 3, 2009, PS I received a notice from Intersputnik (the "Intersputnik Termination Notice"), purporting to terminate the PS I Concession Agreement based on alleged interference experienced by a nearby satellite that Intersputnik believes was caused by the PS I Satellite.  ProtoStar disputes the validity of the Intersputnik Termination Notice and now understands that the termination may have been initiated by Intersputnik as a result of its own disputes with the government of the Republic of Belarus, which at the time served as the sponsoring "notifying administration" for the PS I Satellite orbital slot and associated radio frequencies under the International Telecommunication Union's (the "ITU") regulatory regime governing the use priority for orbital slots and radio frequencies.  Nonetheless, as a result of receipt of the Intersputnik Termination Notice, PS I was required to shut down transponder operations on the PS I Satellite and therefore ~~is not currently generating~~rendered unable to generate any revenue from that Satellite.  Accordingly, ProtoStar sought opportunities to move the PS I Satellite to a new orbital slot or to find a new sponsoring "notifying administration," or government.

Without the PS I Satellite generating sufficient income, ProtoStar sought various strategic alternatives and solutions to a perceived potential liquidity crunch.  ProtoStar sought to raise capital through potential equity and debt investments and pursued negotiations with potential purchasers of one or both of the Satellites.  However, ProtoStar was unable to avoid events of default under its prepetition indebtedness~~,~~ and the prepetition lenders accelerated the full balance of ProtoStar's prepetition indebtedness.  Consequently, ProtoStar ~~sought to negotiate~~negotiated an arrangement whereby its incumbent lenders would provide incremental funding for the

operation of ProtoStar's businesses to bridge to either a sale of one or both of the Satellites or a consensual comprehensive restructuring ~~with~~for the benefit of all of ProtoStar's stakeholders.

## IV.

## CHAPTER 11 CASES

### A. Case Administration

#### 1. Retention Of Professionals

ProtoStar retained and has been represented in the Chapter 11 Cases by: (i) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, as bankruptcy counsel, (ii) Pachulski Stang Ziehl & Jones LLP, as bankruptcy counsel, (iii) UBS Securities LLC, as financial advisor and investment banker, (iv) Appleby, as special Bermuda counsel, and (v) various ordinary course professionals.

On August 11, 2009, the United States Trustee appointed the Official Committee of Unsecured Creditors of ProtoStar Ltd., et al. (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code. The Creditors' Committee selected and has been represented in the Chapter 11 Cases by: (i) Lowenstein Sandler PC, as bankruptcy counsel, (ii) Greenberg Traurig LLP, as bankruptcy counsel, (iii) The Bank Street Group LLC, as financial advisor, and (iv) Attride-Stirling & Woloniecki, as special Bermuda counsel.

#### 2. Schedules And Establishment Of Bar Date

On August 28, 2009, each of the ProtoStar entities filed its Schedules. On December 17, 2009, each of the ProtoStar entities filed amended Schedules.

In accordance with Bankruptcy Rule 3003(c)(3), on September 3, 2009, the Bankruptcy Court entered an order (Docket No. 216, the "Bar Date Order"), among other things, establishing October 14, 2009 as the last day for parties to file proofs of claim asserting claims against ProtoStar that arose prior to the Petition Date (the "General Bar Date"), and establishing October 30, 2009 as the last day for parties to file requests for payment of administrative expenses arising (i) between the Petition Date and September 30, 2009 and (ii) under section 503(b)(9) of the Bankruptcy Code) (the "Administrative Bar Date"). Pursuant to Bankruptcy Rule 3003(c)(2) and the Bar Date Order, any creditor whose Claim was not included in the Schedules or scheduled as disputed, contingent or unliquidated, and who failed to file a proof of Claim on or before the General Bar Date will not be entitled to vote on the PS I Plan or receive a distribution under the PS I Plan. In accordance with the Bar Date Order, both the General Bar Date and the Administrative Bar Date have occurred.

Parties in interest filed over 70 proofs of claim against ProtoStar entities asserting aggregate Claims in excess of $700 million. ProtoStar disputes the validity and amount of a substantial portion of these Claims and ProtoStar's claims reconciliation process is underway.

## B. Continuation Of Business After Petition Date

Since the Petition Date, ProtoStar ~~has been authorized to continue~~continues to manage and operate its businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### 1. Satellite Operations

Pending the closing of the PS II Sale, ProtoStar continues to operate the PS II Satellite, providing capacity to customers including its anchor customer that has entered into agreements with ProtoStar to utilize the entire S-band payload on the PS II Satellite for the life of the satellite. ProtoStar is currently marketing Ku-band capacity on the PS II Satellite to other customers on a preemptible basis.

~~While~~Prior to the closing of the PS I Sale, ProtoStar also ~~continues to operate~~operated the PS I Satellite, although ProtoStar ~~is currently~~was unable to provide capacity to its customers due to the ~~coordination difficulties related to its concession agreement~~Intersputnik Termination Notice described above, which ProtoStar believes was erroneous and strongly disputes.

### 2. Financing

On August 24, 2009, the Bankruptcy Court entered a final order (Docket No. 162) (the "PS I Final DIP Order"), pursuant to which ProtoStar was authorized to incur debtor in possession financing under an agreement (the "PS I DIP Credit Agreement") for use in connection with the operations and ~~sale process pertaining to~~PS I Sale (the "PS I ~~Satellite~~DIP Facility"). The PS I Final DIP Order authorized borrowings of up to $17 million in principal amount, a portion of which was used to repay all amounts outstanding under the prepetition WC ~~Agreement.~~Facility. Pursuant to the PS I Final DIP Order and PS I DIP Credit Agreement, the PS I DIP Facility was incurred on a superpriority administrative expense basis, and the Noteholders consented to ProtoStar's use of cash collateral.

On August 25, 2009, the Bankruptcy Court entered a separate ~~final debtor in possession financing~~ order (Docket No. 166) (the "PS II Final DIP ~~Final~~ Order," and together with the PS I Final DIP Order, the "Final DIP Orders"), pursuant to which ProtoStar was authorized to incur debtor in possession financing under an agreement (the "PS II DIP Credit Agreement," and together with the PS I DIP Credit Agreement, the "DIP Credit Agreements") to borrow up to $6 million in principal amount ~~under the PS II DIP Agreement~~ for use in connection with the operations and ~~sale process pertaining to the PS II Satellite. ProtoStar obtained financing pursuant to the DIP Credit Agreements and the Final DIP Orders on a superpriority administrative expense basis, and the lenders under the Prepetition Secured Facilities permitted ProtoStar to use cash collateral. In connection with ProtoStar's entry into~~the PS II Sale (the "PS II DIP Facility," and together with the PS I DIP Facility, the "DIP Facilities"). In connection with the DIP Credit Agreements, ProtoStar and the agents under the DIP Credit Agreements entered into an intercreditor agreement governing, among other things, the relative priorities of the liens and claims granted to the ~~DIP Lenders~~lenders to each of the DIP Credit Agreements pursuant to the Final DIP Orders.

ProtoStar borrowed under the DIP ~~Financings~~Facilities in order to finance its operations, maintain business relationships with vendors, suppliers and customers, pay employees, satisfy other working capital and operational needs and administer and preserve the value of its estates as well as to enable it to conduct auction and sale processes for the Satellites and related assets.

Paragraph 19(c) of the PS I Final DIP Order provides that if (i) the liens or claims of the Noteholders and WC Lenders were not timely and properly challenged in accordance with the terms of the PS I Final DIP Order and (ii) a final order was not entered granting such a challenge in its entirety, then ProtoStar, the Creditors' Committee and any other party in interest would be barred from bringing any such challenge and the claims of the Noteholders and the WC Lenders would be allowed in full and not subject to subordination or recharacterization without further notice to or order of the Court.

On ~~November 5,~~September 15, 2009, the ~~Bankruptcy Court entered an order approving an amendment to the PS II~~PS I DIP Credit Agreement~~, which provided~~ was amended to provide for, among other things, an extension of the maturity date and certain milestones, ~~in order to accommodate the revised timeline of the PS II Auction~~and to conform certain other terms to the PS I Final DIP Order.  On November 13, 2009, the PS I DIP Credit Agreement was further amended to provide for, among other things, an extension of the maturity date and certain milestones.

Pursuant to the PS I Sale Proceeds Distribution Order, on December 18, 2009, ProtoStar used $5,876,738.07 of the proceeds from the PS I Sale to repay new money borrowings under the PS I DIP Facility.  On December 18, 2009, ProtoStar borrowed $2.5 million under the PS I DIP Facility and, as of December 31, 2009, $14,193,458 is outstanding under the PS I DIP Facility (inclusive of $10,690,000 used to refinance prepetition WC Facility borrowings).

3.      **Adversary Proceedings**

Pursuant to the PS I Final DIP Order, the Creditors' Committee was initially permitted until October 10, 2009 -- the Investigation Termination Date (as defined in the PS I Final DIP Order -- to investigate and commence an adversary proceeding by the filing of a complaint challenging the liens securing the prepetition claims of the ~~Secured~~ Noteholders and WC Lenders ~~and/or the liens securing such claims~~(the "PS I Liens") and the amount of such claims. The Investigation Termination Date was subsequently extended by agreement of the parties and, on October 21, 2009, the Creditors' Committee commenced an adversary proceeding (the "PS I Lien Challenge") by filing a complaint with the Bankruptcy Court challenging the extent, validity and priority of the PS I Liens ~~(as amended from time to time, the "PS I Lien Avoidance Complaint"). [.~~  On ~~[ ],~~November 12, 2009, the Creditors' Committee filed an amended complaint (the "PS I Lien Avoidance Complaint~~.  On [ ], 2009, the Bankruptcy Court entered a scheduling order setting forth a schedule for discovery, filing of responsive papers and motion practice and hearing before the Bankruptcy Court with respect to the matters alleged in the~~"). On January 11, 2010, the Creditors' Committee requested leave to file a second amended PS I Lien Avoidance Complaint.~~]~~  On January 13 and 14, 2009, the defendants named in the Lien Avoidance Complaints filed motions to dismiss the Lien Avoidance Complaint with prejudice.

If the Creditor's Committee is successful in ~~its challenge of~~ the PS I ~~Liens~~Lien Challenge, the claims of the Noteholders and WC Lenders on account of such obligations would likely be unsecured claims against ProtoStar Ltd. and PS I and treated pari passu with other unsecured creditors at those estates.  As a result, distributions to unsecured creditors of those estates would increase.  However, if the Creditor's Committee is unsuccessful in the PS I Lien Challenge, the claims of the Noteholders and WC Lenders on account of such obligations would be secured claims against ProtoStar Ltd. and PS I and would be senior to the claims of unsecured creditors at those estates.  As a result, the holders of unsecured claims against those estates would not receive a distribution from the PS I Sale Proceeds.

~~Pursuant to the PS II Final DIP Order, the Creditors' Committee was given until [October 10, 2009], to investigate and assert any causes of action ProtoStar may have to challenge the prepetition CS Facility Claims asserted by the CS Facility Lenders and the liens securing claims (the "CS Facility Liens").  By agreement of the parties, that time period was extended until [ ], 2009.  As of the date hereof, no complaint challenging the CS Facility Claims or the CS Facility Liens has been filed.  If the Creditors' Committee successfully asserts such a challenge, distributions to unsecured creditors of ProtoStar Ltd. and PS II (as well as, potentially, PSS, PSA and PSD) would increase.~~

As described in greater detail below, the Lender Liquidating Trustee will separately maintain a reserve (the "PS I Claim Reserve") containing sufficient funds otherwise distributable to the Noteholders to provide for proportional recoveries for the Holders of PS I Unsecured Claims in the event the Creditor's Committee is successful in the PS I Lien Challenge.

Notwithstanding the filing of the PS I Lien Avoidance Complaint, the Noteholder Claims are Allowed Claims although the determination of such Claims' Secured or Unsecured status will be determined by resolution of the PS I Lien Challenge.

### 4.     ~~Auctions~~PS I Auction and Sale ~~Processes~~

On August 3, 2009, ProtoStar filed ~~a motion (~~the "PS I Sale Motion~~")~~ seeking entry of an order (a) establishing the PS I Bidding Procedures for the sale of all or substantially all of PS I's assets, including the PS I Satellite (the "PS I Assets"), (b) authorizing and scheduling a date and time for the PS I Auction, (c) scheduling a date and time for the PS I Sale Hearing, (d) approving cure amount procedures, (e) setting objection deadlines and (f) approving the PS I Sale (Docket No. 68).  On August 24, 2009, the Bankruptcy Court entered an order approving the PS I Bidding Procedures (Docket No. 160).  On October 8, 2009, ProtoStar, in accordance with the PS I Bidding Procedures and after consultation with the ~~Secured~~ Noteholders and ~~Indenture~~Senior Secured Notes Trustee (collectively, the "Lender Representatives") and the Creditors' Committee, and in order to better promote the goals of the bidding process, filed a notice of revised dates in connection with the PS I Auction and PS I Sale Hearing – postponing the auction process by approximately two weeks.

Accordingly, bids for the PS I Assets were due October 23, 2009.  ProtoStar received nine bids, of which eight were deemed "Qualified Bids."  Prior to the PS I Auction and in accordance with the PS I Bidding Procedures, ProtoStar announced that the initial bid submitted

by Eutelsat, whose bid included $95 million cash consideration and up to $4.5 million for payment of cure costs in connection with the assumption and assignment of certain "Purchased Contracts~~"~~," would be the "~~baseline bid~~Baseline Bid" for the PS I Auction, and the terms of Eutelsat's bid, including the form of asset purchase agreement submitted by Eutelsat (the "PS I Baseline Bid APA"), were made known to the other bidders in the PS I Auction. The PS I Auction was commenced on October 29, 2009 at Milbank's offices in New York, with nine Qualified Bidders (including the ~~Secured~~ Noteholders) in attendance. The PS I Auction lasted approximately nine hours and included over 20 rounds of bidding, with bidders ultimately submitting bids based on the PS I Baseline Bid APA.

At the conclusion of the PS I Auction, ProtoStar, in consultation with the Lender Representatives and the Creditors' Committee, determined Intelsat had submitted the highest or otherwise best offer at the PS I Auction and deemed Intelsat the "Successful Bidder" at the PS I Auction. Intelsat's final bid provided for a $210 million cash purchase price plus up to $4.5 million in cure payments with respect to the "Purchased Contracts" pursuant to an agreement on substantially the same terms as the PS I Baseline Bid APA (the "PS I Successful Bidder APA"). In addition, ProtoStar, in consultation with the Lender Representatives and the Creditors' Committee, determined Eutelsat had submitted the next highest or otherwise best offer at the PS I Auction after Intelsat and deemed Eutelsat the "Next Highest Bidder" at the PS I Auction. Eutelsat's final bid provided for a $207 million cash purchase price plus up to $4.5 million in cure payments with respect to the "Purchased Contracts" pursuant to an agreement on substantially the same terms as the Baseline Bid APA (the "PS I Next Highest Bidder APA").

On October 30, 2009, ProtoStar filed a notice (the "PS I Sale Agreement Notice") of its selection of the Intelsat as the "Successful Bidder" and Eutelsat as the "Next Highest Bidder" at the PS I Auction ~~and~~, attaching the Successful Bidder APA and Next Highest Bidder APA.

On November 6, 2009, the Bankruptcy Court entered an order approving the PS I Sale, and authorizing ProtoStar to close with Intelsat ~~on~~pursuant to the PS I Successful Bidder APA or, in the event ProtoStar ~~does~~did not so close with Intelsat, with Eutelsat pursuant to the PS I Next Highest Bidder APA. ~~ProtoStar expects the PS I Sale will be consummated in connection with the Plan.~~

~~On August 3, 2009, ProtoStar filed a motion (the "PS II Sale Motion" and, together with the PS I Sale Motion, the "Sale Motions") seeking entry of an order (a) establishing the PS II Bidding Procedures for the sale of all or substantially all of PS II's assets, including the PS II Satellite (the "PS II Assets"), (b) authorizing and scheduling a date and time for the PS II Auction, (c) scheduling a date and time for the PS II Sale Hearing, (d) approving cure amount procedures, (e) setting objection deadlines and (f) approving the PS II Sale (Docket No. 67). On August 24, 2009, the Bankruptcy Court entered an order approving the PS II Bidding Procedures (Docket No. 161). On October 26, 2009, ProtoStar, in accordance with the PS II Bidding Procedures and after consultation with the CS Facility Lenders and the Creditors' Committee, and in order to better promote the goals of the bidding process, filed a notice of revised dates in connection with the PS II Auction and PS II Sale Hearing – postponing the auction process by approximately two months.~~

Accordingly, it is currently contemplated that bids for the PS II Assets will be due December 9, 2009. Prior to the PS II Auction to be commenced at 10:00 a.m. on December 15, 2009 at Milbank's offices in New York, ProtoStar expects to announce a "baseline bid" for the PS II Auction in accordance with the PS II Bidding Procedures. Similar to the PS I Auction, ProtoStar expects to conduct a competitive auction and select, in consultation with the CS Facility Lenders and the Creditors' Committee, a Successful Bidder and a Next Highest Bidder at the end of the PS II Auction. ProtoStar will seek authority from the Bankruptcy Court to close with either the Successful Bidder or, in the event ProtoStar does not close with the Successful Bidder, with the Next Highest Bidder at the PS II Sale Hearing. The PS II Sale Hearing is currently scheduled for December 18, 2009 at 3:00 p.m. (EST).

**FOLLOWING THE CONCLUSION OF THE PS II AUCTION AND ENTRY OF AN ORDER APPROVING THE PS II SALE AND PRIOR TO THE VOTING DEADLINE WITH RESPECT TO THE PLAN, PROTOSTAR WILL FILE AND SERVE PS II SALE NOTICE SETTING FORTH THE MATERIAL TERMS OF THE PS II SALE AND THE IMPACT OF SUCH SALE ON THE RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. THE PS II SALE NOTICE WILL INCLUDE ADDITIONAL DISCLOSURE PERTAINING TO THE RESULTS OF THE PS II SALE AND WILL NOT ALTER THE DISTRIBUTION PRIORITIES OR MECHANICS OR THE TREATMENT OF CLAIMS AND EQUITY INTERESTS SET FORTH IN THE PLAN.**

As set forth above, the order approving the PS II Bidding Procedures expressly provides that the CS Facility Lenders are qualified as Qualified Bidders (as defined in the PS II Bidding Procedures Order) for all purposes without the need to meet any of the qualification provisions of the PS II Bidding Procedures and preserves the CS Facility Lenders' right to credit bid for the PS II Satellite at the PS II Auction in accordance with section 363(k) of the Bankruptcy Code. Accordingly, the descriptions contained herein with respect to proceeds from the PS II Sale and the treatment provided for the CS Facility Claims are subject to, and qualified by, the CS Facility Lenders' right to credit bid

On December 4, 2009, PS I closed the PS I Sale with Intelsat.

## C.    Bermuda Proceeding

On July 29, 2009, each of the ProtoStar entities organized in Bermuda, including PS I (the "Bermuda Entities"), also presented a winding up petition in the Supreme Court of Bermuda under the Companies Act 1981. The Supreme Court of Bermuda appointed John C. McKenna as the provisional liquidator (the "Provisional Liquidator") of the Bermuda Entities.

The appointment of the Provisional Liquidator created a moratorium under Bermuda law that prevents creditors from taking actions to collect their claims against the Bermuda Entities. Pursuant to the orders appointing the Provisional Liquidator, the Provisional Liquidator oversees the activities of the Bermuda Entities during the Chapter 11 Cases and possesses the rights to be consulted prior to and to object to any sale of assets and the proposal of any PS I Plan. Accordingly, under the Order appointing him, the Provisional Liquidator reports to the Bermuda Court from time to time on the progress of the Chapter 11 Cases and is entitled to seek guidance

from the Bermuda Court in the exercise of any of his powers in relation to certain transactions contemplated by the Bermuda Entities in the Chapter 11 Cases.

ProtoStar has consulted with the Provisional Liquidator with respect to, among other things, the PS I Sale, the PS II Sale and the PS I Plan.  The Provisional Liquidator has not objected to either of the Sales and has indicated that he will not object to the PS I Plan.

## V.

## SUMMARY OF PS I PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PS I PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PS I PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PS I PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND TO THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PS I PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PS I PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PS I PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PS I PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN PROTOSTAR UNDER THE PS I PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN PROTOSTAR AND OTHER PARTIES IN INTEREST.

IN ACCORDANCE WITH THE BANKRUPTCY CODE AND APPLICABLE LAW, PARTIES ASSERTING CLAIMS AGAINST MULTIPLE DEBTORS ARISING FROM THE SAME UNDERLYING OBLIGATION SHALL BE CAPPED IN THEIR RECOVERIES AT THE FULL AMOUNT OF SUCH UNDERLYING OBLIGATION.

A.      Treatment of PS I Administrative Expense Claims and Priority Tax Claims

1.      PS I Administrative Expense Claims

All Pursuant to the Bar Date Order dated September 3, 2009, requests for payment of Administrative Expense Claims that arose on or before September 30, 2009, were required to be Filed no later than the Administrative Expense Bar Date (i.e., 4:00 p.m. (prevailing Pacific time) on October 30, 2009).  All PS I Administrative Expense Claims accruing on or after October 1,

2009 through the date that is ten (10) days prior to the date of the Confirmation Hearing (the "Second Administrative Expense Bar Date") (other than the PS I DIP Claims and Professional Fee Claims) and not otherwise paid in the ordinary course of ~~ProtoStar's businesses~~PS I's business shall be filed with the Bankruptcy Court by the Second Administrative Expense Bar Date, and objections (if any) to such PS I Administrative Expense Claims ~~shall~~will be filed no later than forty-five (45) days after the Second Administrative Expense Bar Date. Any Holder of ~~an~~a PS I Administrative Expense Claim (other than the PS I DIP Claims and Professional Fee Claims) who fails to file a timely request for the payment of ~~an~~a PS I Administrative Expense Claim that is required to be filed on or before the Second Administrative Expense Bar Date: (a) shall be forever barred, estopped and enjoined from asserting such PS I Administrative Expense Claim against ~~each of the ProtoStar entities~~PS I, any Purchaser or the Liquidating Trust Assets (or filing a request for the allowance thereof), and ~~each of the ProtoStar entities, their~~PS I, its property, and the Liquidating Trust Assets shall be forever discharged from any and all indebtedness or liability with respect to such PS I Administrative Expense Claim; and (b) such Holder shall not be permitted to participate in any distribution under the PS I Plan on account of such PS I Administrative Expense Claim.

On the later to occur of (a) the Effective Date and (b) the date on which ~~an~~a PS I Administrative Expense Claim ~~will~~shall become an Allowed Claim, ~~ProtoStar~~PS I or the ~~Lender~~ Liquidating ~~Trustee~~Trustees, as applicable, will (i) pay to each Holder of an Allowed PS I Administrative Expense ~~Claim, PS I DIP Claim or PS II DIP~~ Claim, in cash, the full amount of such Allowed PS I Administrative Expense Claim, or (ii) satisfy and discharge such Allowed PS I Administrative Expense Claim on such other terms and conditions as may be agreed between the Holder of such PS I Administrative Expense Claim, on the one hand, and ~~ProtoStar, the Prepetition Secured Lenders  or~~PS I or the Lender Liquidating Trustee (as the case may be~~) (with respect to the Creditors' Committee or Unsecured Liquidating Trustee, solely to the extent such other terms and conditions include one or more Unsecured Claims~~), on the other hand.

On the Effective Date, PS I will distribute to the PS I DIP Agent (i) an amount necessary to repay the PS I DIP Claims (other than those related to the refinancing of the WC Facility) in full and (ii) an amount necessary to pay those PS I DIP Claims related to the refinancing of the WC Facility in accordance with any PS I Reserve Distribution Order.

Notwithstanding anything herein or in the PS I Plan to the contrary, all entities seeking awards by the Bankruptcy Court of Professional Fee Claims for compensation for services rendered or reimbursement of expenses incurred prior to the Effective Date will (a) file, on or before the date that is thirty (30) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full by the Lender Liquidating Trustee or, after any PS I Trust Asset Transfer, the Unsecured Liquidating Trustee, in cash, in such amounts as are Allowed by the Bankruptcy Court, within five (5) Business Days of entry of such order. ~~ProtoStar~~PS I, the Lender Liquidating Trustee or the Unsecured Liquidating Trustee, as applicable, ~~are~~is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

### 2. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim will, in full and final satisfaction of such Allowed Priority Tax Claim, be paid in full, in cash, on the Effective Date, unless the Holder consents to other treatment.

### B. Treatment of Allowed Claims

### 1. Class 1 – Priority Non-Tax Claims

The PS I Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims.  Each Holder of an Allowed Priority Non-Tax Claim will, in full and final satisfaction of such Priority Non-Tax Claim, be paid in full, in cash, on or as soon as practicable following the Effective Date, unless the Holder consents to other treatment.

### ~~2. Class 2A – ProtoStar Ltd. CS Facility Claims~~

~~Each Holder of an Allowed ProtoStar Ltd. CS Facility Claim will, in full and final satisfaction of such Allowed ProtoStar Ltd. CS Facility Claim, receive its Pro Rata share of (i) any cash on hand in the PS II DIP Account remaining after repayment of the PS II DIP Claims and (ii) ProtoStar Ltd. Trust A Interests.~~

### ~~3. Class 2B – ProtoStar Ltd. Noteholder Claims~~

~~Each Holder of an Allowed Noteholder Guarantee Claim will, in full and final satisfaction of such Allowed Noteholder Guarantee Claim and subject to the Noteholders' right to credit bid, receive its Pro Rata share of (i) any cash on hand in the PS I DIP Account and (ii) Trust B Interests (solely with respect to the Equity Interests of PS I).~~

### ~~4. Class 3 – ProtoStar Ltd. Unsecured Claims~~

~~Each Holder of an Allowed ProtoStar Ltd. Unsecured Claim will, in full and final satisfaction of such Allowed ProtoStar Ltd. Unsecured Claim, receive its Pro Rata share of (i) Unsecured Liquidating Trust Interests, (ii) PS I Net Sale Proceeds, if any, remaining after payment in full of the PS I Secured Claims and the PS I Unsecured Claims and (iii) PS II Net Sale Proceeds, if any, remaining after payment in full of the PS II Secured Claims, the PS II Unsecured Claims, the PS I DIP Claims on account of Junior Priority DIP Collateral and the Adequate Protection Obligations (each as defined in the PS I Final DIP Order).~~

### 2. ~~5.~~ Class ~~4~~2 – PS I Secured Claims

Each Holder of an Allowed PS I Secured Claim will, in full and final satisfaction of such Allowed PS I Secured Claim, receive its Pro Rata share of (i) the PS I Net Sale Proceeds and (ii) Lender Liquidating Trust ~~B~~ Interests.

### 3. ~~6.~~ Class ~~5~~3 – PS I Unsecured Claims

Each Holder of an Allowed PS I Unsecured Claim will, in full and final satisfaction of such Allowed PS I Unsecured Claim, receive its Pro Rata share of ~~(i)~~ Unsecured Liquidating Trust A Interests ~~and (ii) any remaining PS I Net Sale Proceeds after payment in full of the Allowed PS I Secured Claims~~.

### ~~7.        Class 6    PS II Secured Claims~~

~~Each Holder of an Allowed PS II Secured Claim will, in full and final satisfaction of such Allowed PS II Secured Claim, receive its Pro Rata share of (i) the PS II Net Sale Proceeds and (ii) PS II Trust A Interests.~~

### ~~8.        Class 7    PS II Unsecured Claims~~

~~Each Holder of an Allowed PS II Unsecured Claim will, in full and final satisfaction of such Allowed PS II Unsecured Claim, receive its Pro Rata share of (i) Unsecured Liquidating Trust Interests and (ii) any remaining PS II Net Sale Proceeds after payment in full of the PS II Secured Claims.~~

### ~~9.        Class 8 – PSS Secured Claims~~

~~Each Holder of an Allowed PSS Secured Claim will, in full and final satisfaction of such Allowed PSS Secured Claim, receive its Pro Rata share of PSS Trust A Interests.~~

### ~~10.        Class 9 – PSS Unsecured Claims~~

~~Each Holder of an Allowed PSS Unsecured Claim will, in full and final satisfaction of such Allowed PSS Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust Interests.~~

### ~~11.        Class 10    PSA Unsecured Claims~~

~~Each Holder of an Allowed PSA Unsecured Claim will, in full and final satisfaction of such Allowed PSA Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust Interests.~~

### ~~12.        Class 11    PSD Secured Claims~~

~~Each Holder of an Allowed PSD Secured Claim will, in full and final satisfaction of such Allowed PSD Secured Claim, receive its Pro Rata share of PSD Trust A Interests.~~

### ~~13.        Class 12    PSD Unsecured Claims~~

~~Each Holder of an Allowed PSD Unsecured Claim will, in full and final satisfaction of such Allowed PSD Unsecured Claim, receive its Pro Rata share of Unsecured Liquidating Trust Interests.~~

### **4.** ~~14.~~ Class 1~~3~~4 – Equity Interests

ProtoStar Ltd., as the sole Holder of Equity Interests in PS I will, in full and final satisfaction of such Equity Interests, receive Unsecured Liquidating Trust B Interests. On the Effective Date, all Equity Interests ~~of the ProtoStar entities~~in PS I (which will include any and all Claims subordinated pursuant to section 510(b) of the Bankruptcy Code that are in any way arising from, of or in connection with the Equity Interests) will be deemed cancelled and of no further force and effect, whether surrendered for cancellation or otherwise. ~~Holders of Equity Interests of the ProtoStar entities will not receive or retain any property under the Plan on account of such Equity Interests.~~

### ~~15.     Class 14 – Intercompany Claims~~

~~On the Effective Date, distributions will be made on account of secured or unsecured Intercompany Claims from the proceeds of the appropriate Debtor obligor and/or collateral, as applicable, and consistent with Claims of equivalent priority in Classes 2A -12.~~

## C.     Establishment Of Liquidating Trusts

### 1.     Lender Liquidating Trust

On the Effective Date, ~~ProtoStar~~PS I and the Lender Liquidating Trustee will execute the Lender Liquidating Trust Agreement and will take all other steps necessary to establish the Lender Liquidating Trust for the benefit of the Lender Liquidating Trust Beneficiaries in accordance with the PS I Plan. The Lender Liquidating Trust will be irrevocably funded with the Lender Liquidating Trust Assets~~,~~ on the Effective Date of the PS I Plan for the benefit of the Lender Liquidating Trust Beneficiaries. Such funding shall be exempt from any stamp real estate transfer, mortgage reporting, sales, use or other similar tax.

For the avoidance of doubt, the Lender Liquidating Trust Assets only include assets subject to the Noteholders' validly perfected liens and not any unencumbered assets.

The identity of the Lender Liquidating Trustee, and the structure and governance of the Lender Liquidating Trust~~,~~ will be determined by the ~~Prepetition Secured Lenders~~Noteholders (in consultation with, solely with respect to funding and distributions of amounts on account of the winding down of the ~~Bermuda Entities~~PS I in the Bermuda Proceeding, the Provisional Liquidator) and will be ~~set forth~~named in the Lender Liquidating Trust Agreement included in the Plan Supplement. In the event the Lender Liquidating Trustee is no longer willing or able to serve as trustee, then the successor will be appointed by the Holders of Lender Liquidating Trust Interests, or as otherwise determined by the Bankruptcy Court, and notice of the appointment of such Lender Liquidating Trustee will be filed with the Bankruptcy Court.

## 2. Unsecured Liquidating Trust

On the Effective Date, ~~ProtoStar~~PS I and the Unsecured Liquidating Trustee will execute the Unsecured Liquidating Trust Agreement and will take all other steps necessary to establish the Unsecured Liquidating Trust for the benefit of the Unsecured Liquidating Trust Beneficiaries in accordance with the PS I Plan. The Unsecured Liquidating Trust will be irrevocably funded with the Unsecured Liquidating Trust Assets, on the Effective Date of the ~~Plan~~PS I Plan for the benefit of the Unsecured Liquidating Trust Beneficiaries. Such funding shall be exempt from any stamp real estate transfer, mortgage reporting, sales, use or other similar tax.

For the avoidance of doubt, the Unsecured Liquidating Trust Assets will include any unencumbered assets of PS I, all Chapter 5 Causes of Action of PS I and its Estate.

The identity of the Unsecured Liquidating Trustee, and the structure and governance of the Unsecured Liquidating Trust, will be determined by ~~the Prepetition Secured Lenders,~~ the Creditors' Committee and the Provisional Liquidator ~~and~~. The Unsecured Liquidating Trustee will be ~~set forth~~named in the Unsecured Liquidating Trust Agreement included in the Plan Supplement; *provided, however,* that the Unsecured Liquidating Trust Agreement will provide that immediately following any PS I Trust Asset Transfer, the majority holders of Unsecured Liquidating Trust Interest will be entitled to appoint a replacement Unsecured Liquidating Trustee with or without cause. In the event the Unsecured Liquidating Trustee is no longer willing or able to serve as trustee, then the successor will be appointed by the Holders of Unsecured Liquidating Trust Interests, or as otherwise determined by the Bankruptcy Court, and notice of the appointment of such Unsecured Liquidating Trustee will be filed with the Bankruptcy Court.

### D. ~~Sale-Related Incentive Plans~~Establishment Of Reserves

PS I intends to seek entry of the PS I Reserve Distribution Order, on a motion to be heard prior to or at the Confirmation Hearing, granting authority to (a) distribute to the PS I DIP Agent an amount necessary to pay those PS I DIP Claims related to the refinancing of the WC Facility, a portion of which distribution will reduce distributions otherwise payable to the Senior Secured Notes Trustee for the Noteholders (to the extent a Final Order is entered invalidating the Liens held by the Noteholders and WC Lenders with respect to the PS I Collateral) in accordance with the Intercreditor Agreement, (b) distribute to the Holders of Class 2 Claims (PS I Secured Claims) on the Effective Date and periodically thereafter, (c) establish an amount of cash to be transferred to the PS I Claim Reserve on the Effective Date in order to provide a reasonable reserve of cash to ensure that Holders of Class 3 Claims (PS I Unsecured Claims) receive the same proportional recovery as the Holders of Class 2 Claims (PS I Secured Claims) should a Final Order be entered in the PS I Lien Avoidance Action invalidating the Liens held by the Noteholders and the WC Lenders with respect to the PS I Collateral and (d) establish an amount of cash to be transferred to the PS I Administrative Reserve on the Effective Date in order to provide a reasonable reserve of cash to ensure that the Lender Liquidating Trustee or, after the PS I Trust Asset Transfer, the Unsecured Liquidating Trustee is able to pay (i) Administrative Expense Claims provided for in the ProtoStar I Budget (as defined in the PS I DIP Credit Agreement), including PS I Administrative Expense Claims provided for in the ProtoStar I

Budget (as defined in the PS I DIP Credit Agreement) through the Effective Date, and (ii) the ProtoStar Affiliate Administrative Expenses pursuant to the ProtoStar Affiliate Administrative Budget and in accordance with any PS I Reserve Distribution Order.

On the Effective Date, PS I will fund, and thereafter the Lender Liquidating Trustee or, after any PS I Trust Asset Transfer, the Unsecured Liquidating Trustee, will maintain the PS I Administrative Reserve, until such time as both (a) all PS I Administrative Expense Claims are paid in full or otherwise satisfied and discharged in accordance with Article II.A.2 herein and (b) ProtoStar Affiliate Administrative Expenses provided for in the ProtoStar Affiliate Administrative Budget are satisfied in full.

On the Effective Date, PS I will fund, and thereafter the Lender Liquidating Trustee will maintain, the PS I Claim Reserve, pending resolution, by Final Order of the Bankruptcy Court, of the PS I Lien Avoidance Complaint. Until such time as the PS I Lien Avoidance Action is resolved by Final Order of the Bankruptcy Court, all amounts held in the PS I Claim Reserve shall be considered the Noteholders' collateral.

**E.** ~~1.~~ **PS I Sale-Related Incentive Plan**

~~On October 30, 2009, ProtoStar filed the PS I MIP Motion seeking approval of the PS I MIP. The PS I MIP Payments, to the extent earned and payable, will be made in accordance with any PS I MIP Order (which order shall be acceptable to counsel for the Noteholders) from funds that would have otherwise been payable to the Noteholders.~~

~~**2.**~~ ~~**PS II Sale-Related Incentive Plan**~~

~~ProtoStar~~PS I intends to seek Bankruptcy Court approval of a revised management incentive plan related to the PS ~~II~~I Sale. Any payments, to the extent earned and payable, under this management incentive plan will be made in accordance with an order entered by the Court ~~(which order shall be acceptable to counsel for the CS Facility Lenders) and the priorities set forth in the Plan~~ from funds otherwise payable to the ~~CS Facility Lenders.~~Noteholders.

**F.** ~~E.~~ **Directors And Officers Tail Insurance**

As of the Effective Date, ~~ProtoStar~~PS I will purchase and maintain continuing director and officer insurance coverage for a tail period of six (6) years, ~~as may~~the material terms of which, including the amount of premiums associated therewith, will be agreed upon by ~~ProtoStar,~~PS I and counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders. .~~

**G.** ~~F.~~ **Executory Contracts And Unexpired Leases**

Any executory contracts or unexpired leases that have not expired by their own terms on or prior to the Effective Date, (i) which ~~ProtoStar~~PS I has not assumed and assigned or rejected with the approval of the Bankruptcy Court (whether as part of the ~~Sales~~PS I Sale or otherwise), or (ii) that are not the subject of a motion to assume the same pending as of the Effective Date,

~~shall~~will be deemed rejected by ~~ProtoStar~~PS I on the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court ~~shall~~will constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except to the extent that ~~ProtoStar~~PS I identifies any executory contracts or unexpired leases on a list included in the Plan Supplement which ~~ProtoStar~~PS I does not intend to reject, which list shall be satisfactory to counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~.

*If the rejection of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against ~~ProtoStar~~PS I, the Liquidating Trusts, or their properties, successors or assigns, unless a Proof of Claim is timely Filed with the Claims Agent and served upon (i) the Liquidating Trustees, and (ii) any counsel for the Liquidating Trustees, on or before (x) thirty (30) days after the later to occur of (i) the Effective Date and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (y) such other date as may be ordered by the Bankruptcy Court.*

### **H.** ~~G.~~ Conditions Precedent To Confirmation And Effective Date Of PS I Plan

#### 1. Conditions Precedent To Confirmation

The following are conditions precedent to confirmation of the PS I Plan that must be (i) satisfied or (ii) waived in accordance with the PS I Plan:

a. An Order approving the PS I Sale shall have been entered by the Bankruptcy Court;

~~b. An Order approving the PS II Sale shall have been entered by the Bankruptcy Court;~~

b. ~~c.~~ An Order finding that this Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

c. ~~d.~~ The entry of the Confirmation Order in form and substance reasonably satisfactory to ~~ProtoStar,~~PS I and counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~;

d. ~~e.~~ The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to ~~ProtoStar,~~PS I and counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~, except as otherwise explicitly set forth ~~herein~~in the PS I Plan; and

e. One or more PS I Reserve Distribution Orders establishing the amounts of the PS I Administrative Reserve and PS I Claim Reserve shall have been entered by the Bankruptcy Court.

f.   The occurrence of the Confirmation Date.

**2.        Conditions Precedent To Effective Date**

The following are conditions precedent to the effectiveness of the PS I Plan that must be (i) satisfied or (ii) waived in accordance with the PS I Plan:

a.   Confirmation shall have occurred and the Confirmation Order shall have been entered by the Bankruptcy Court;

b.   The Confirmation Order shall have become a Final Order;

c.   The Closing ~~Dates~~Date shall have occurred;

d.   There shall not be in effect on the Effective Date any (i) Order entered by a U.S. court, (ii) order, opinion, ruling or other decision entered by any other court or governmental entity or (iii) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the PS I Plan;

e.   All other actions and documents necessary to implement the PS I Plan shall have been effected or executed, including execution of the Liquidating Trust Agreements in form and substance satisfactory to ~~ProtoStar,~~PS I and counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~; provided, however, that the Unsecured Liquidating Trust Agreement shall be in form and substance satisfactory solely to ~~ProtoStar~~PS I, counsel for the Noteholder Supporting Creditors, counsel for ~~the CS Facility Lenders and~~ the Creditors' Committee ~~or Unsecured Liquidating Trustee, as applicable~~; and

f.   The Liquidating Trust Agreements shall have been fully executed and (i) the Lender Liquidating Trust Assets shall have been transferred to the Lender Liquidating Trust and (ii) the Unsecured Liquidating Trust Assets shall have been transferred to the Unsecured Liquidating Trust.

Each of the conditions listed in above may be waived by ~~ProtoStar~~PS I (in consultation with and upon the consent of counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~) in whole or in part without notice to parties in interest or the Bankruptcy Court and without a hearing, except that the conditions set forth in Section V.~~G~~H.2.c. and V.~~G~~H.2.f. above may only be waived in consultation with the Provisional Liquidator.  If the Confirmation Order is vacated, the PS I Plan ~~shall~~will be null and void in all respects and nothing contained in this Disclosure Statement or the PS I Plan ~~shall~~will: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, ~~ProtoStar~~PS I; (2) prejudice in any manner the rights of ~~ProtoStar~~PS I or any other party or (3) constitute an admission, acknowledgment, offer or undertaking by ProtoStar~~,~~ or the Noteholder Supporting Creditors, ~~the CS Facility Lenders or CS~~ in any respect.

**I.** ~~H.~~ **Release, Exculpation, Injunctive and Related Provisions**

ProtoStar believes that the releases set forth in the PS I Plan and described below are justified under the circumstances because of, among other reasons, (a) the role that ProtoStar and the Releasees have played in ProtoStar's restructuring both prior to and after the Petition Date, (b) the mutual nature of the releases provided for in the PS I Plan and described in Section V.I.1 below, (c) the releases by holders of claims described in Section V.I.2 below are such that (i) a vote in favor of the PS I Plan will release the Releasees and (ii) a vote against the PS I Plan will not release those parties, and (d) the explicit carve-out from all PS I Plan releases as to liability of any Releasee arising from any act, omission, transaction, agreement, event or other occurrence, constituting acts of fraud, gross negligence or willful misconduct.

The Court has not yet ruled on the legality or propriety of the third-party releases, which will be addressed in connection with Confirmation of the PS I Plan, if necessary.

### 1. Mutual Release by Releasees

*"Releasees" means ~~ProtoStar, ProtoStar~~PS I, PS I's officers and directors serving as of May 18, 2009 and thereafter and ~~ProtoStar~~PS I's employees (and each of ~~ProtoStar~~PS I's attorneys, financial advisors, investment bankers, accountants, and other professionals retained by ~~ProtoStar~~PS I) as well as the Provisional Liquidator (and each of the Provisional Liquidator's attorneys and other professionals retained by the Provisional Liquidator) and the respective agents, trustees and lenders with respect to the PS I DIP Credit Agreement, ~~the PS II DIP Credit Agreement,~~ the WC Agreement~~,~~ and the Senior Secured Notes Indenture ~~and the CS Facility~~, including but not limited to the PS I DIP Lenders, ~~the PS II DIP Lenders,~~ and the Noteholders ~~and the CS Facility Lenders~~ (and each of their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons).*

*On and after the Effective Date, for good and valuable consideration, including the services of the Releasees to facilitate the expeditious restructuring of ~~ProtoStar~~PS I and the implementation of the Plan, each of the Releasees shall be deemed to have unconditionally released one another from any and all Claims, obligations, rights, suits, damages, remedies and liabilities whatsoever, including any Claims that could be asserted on behalf of ~~ProtoStar~~PS I, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Releasees or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, however, that these releases will have no effect on the liability of any Releasee arising from any act, omission, transaction, agreement, event or other occurrence, constituting acts of fraud, gross negligence or willful misconduct. The Releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Liquidating Trustees and any chapter 7 trustee in the event the PS I Chapter 11 ~~Cases are~~Case is converted to chapter 7.*

### 2. Releases by Holders of Claims

*On and after the Effective Date, for good and valuable consideration, each holder of a Claim that has affirmatively voted to accept the Plan shall be deemed to have unconditionally released the Releasees from any and all Claims, obligations, rights, suits, damages, remedies and liabilities whatsoever, including any Claims that could be asserted on behalf of ~~ProtoStar~~PS I, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such holder of a Claim would have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (w) the purchase or sale, or the rescission of a purchase or sale, of any security of ~~a ProtoStar entity~~PS I, (x) ~~ProtoStar~~PS I, (y) the PS I Chapter 11 ~~Cases~~Case or (z) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments or other document including, without limitation, the Lender Liquidating Trust and Unsecured Liquidating Trust; provided, however, that these releases will have no effect on the liability of any Releasee arising from any act, omission, transaction, agreement, event or other occurrence, constituting fraud, gross negligence or willful misconduct; provided, further, however, the foregoing shall not constitute a waiver or release of any right of the Holder of an Allowed Claim to payment under this Plan on account of such Allowed Claim or any of the rights of any parties in respect of Assumed PS I Liabilities ~~and Assumed PS II Liabilities~~ under ~~any applicable~~the PS I Asset Purchase Agreement. The Releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Liquidating Trustees and any chapter 7 trustee in the event the PS I Chapter 11 ~~Cases are~~Case is converted to chapter 7.*

### 3. Injunction

*Except as otherwise expressly provided in the Plan, all Holders of Claims and Equity Interests shall be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against ~~ProtoStar, ProtoStar's Estates, ProtoStar~~PS I, PS I's directors and officers serving as of May 18, 2009 and thereafter, the PS I Estate, the Provisional Liquidator, the PS I DIP Lenders, the PS ~~II DIP Lenders, the~~I Prepetition Secured Lenders, BNYM, the Lender Liquidating Trust, the Lender Liquidating Trustee, the Unsecured Liquidating Trust and Unsecured Liquidating Trustee, unless a previous order modifying the stay provided under section 362 of the Bankruptcy Code was entered by the Court; (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against ~~ProtoStar, ProtoStar~~PS I, PS I's directors and officers serving as of May 18, 2009 and thereafter ~~their Estates~~, the PS I Estate, the Provisional Liquidator, the PS I DIP Lenders, the PS ~~II DIP Lenders, the~~I Prepetition Secured Lenders, BNYM, the Lender Liquidating Trust, the Lender Liquidating Trustee, the Unsecured Liquidating Trust and the Unsecured Liquidating Trustee; and (iii) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of ~~ProtoStar, ProtoStar~~PS I, PS I's directors and officers serving as of May 18, 2009 and thereafter ~~their Estates~~, the PS I Estate, the Provisional Liquidator, the PS I DIP Lenders, the PS ~~II DIP Lenders, the~~I Prepetition Secured Lenders, BNYM, the Lender Liquidating Trust, the Lender Liquidating Trustee, the Unsecured Liquidating Trust and the Unsecured*

*Liquidating Trustee, in each case in respect of any Claims arising prior to the Petition Date; provided, however, that nothing herein shall release any entity from any claims, obligations, rights, causes of action or liabilities arising out of such entity's fraud, gross negligence or willful misconduct.*

### 4. Exculpation

*~~ProtoStar~~PS I, the PS I DIP Lenders, the PS ~~II DIP Lenders, the~~I Prepetition Secured Lenders, BNYM, the Provisional Liquidator and their respective successors, predecessors, control persons, members, agents and employees, and ~~ProtoStar~~PS I's officers and directors serving as of May 18, 2009 and thereafter (and each of their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons) shall neither have nor incur any liability to any Person or Entity (including any holder of a Claim or Equity Interest) for any prepetition or postpetition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date of the Plan, the disclosure statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, restructuring of ~~ProtoStar~~PS I. Notwithstanding the foregoing, such exculpations provided for in Article X of the Plan shall not extend to any damages, losses or claims arising from acts of fraud, gross negligence or willful misconduct.*

### J. ~~I.~~ Miscellaneous Provisions

### 1. Plan Supplement

The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours. Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement by contacting the Notice and Balloting Agent, or by visiting http://www.kccllc.net/ProtoStar. The documents contained in the Plan Supplement are an integral part of the PS I Plan and will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

### 2. Dissolution of Creditors' Committee

Upon the Effective Date, the Creditors' Committee will be deemed dissolved with respect to PS I, except with respect to, and to the extent of any applications for Professional Fee Claims or Creditors' Committee Member Expenses, and the Creditors' Committee Members and the Professionals retained by the Creditors' Committee will be relieved and discharged of all duties related to the PS I Chapter 11 ~~Cases~~Case.

### 3. Modification of PS I Plan

Subject to the limitations contained in the PS I Plan:

a.     On notice to the Creditors' Committee or the Unsecured Liquidating Trustee, as applicable, the PS I Plan may be amended or modified by ~~ProtoStar~~PS I (in consultation with and upon the consent of counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~) (a) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the PS I Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent ~~ProtoStar~~PS I (in consultation with counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~) institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistencies in the PS I Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the PS I Plan; *provided*, *however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code.

b.     ~~ProtoStar~~PS I reserves the right to modify or amend the PS I Plan upon a determination by the Bankruptcy Court that the PS I Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code.  To the extent permissible under section 1127 of the Bankruptcy Code without the need to resolicit acceptances, ~~ProtoStar~~PS I reserves the right to sever any provisions of the PS I Plan that the Bankruptcy Court finds objectionable.

c.     After the Effective Date, the Lender Liquidating Trustee may amend or modify, upon order of the Bankruptcy Court, the PS I Plan in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the PS I Plan in such manner as may be necessary to carry out the purpose and intent of the PS I Plan other than the treatment provided under the PS I Plan for Holders of PS I Unsecured Claims including without limitation with respect to the Unsecured Liquidating Trust Agreement, Chapter 5 Causes of Actions, Creditors' Committee, Creditors' Committee's Professionals and Creditors' Committee's Members, without Creditors' Committee or Unsecured Liquidating Trustee, as applicable, consent.

Notwithstanding anything herein or in the PS I Plan to the contrary, ProtoStar reserves the right (in consultation with counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~) to seek confirmation of the PS I Plan with respect to any one or more of the Debtors separately from any one or more of the other Debtors.

## 4.     Revocation of PS I Plan

~~ProtoStar~~PS I reserves the right (in consultation with counsel for the Noteholder Supporting Creditors ~~and counsel for the CS Facility Lenders~~) to revoke or withdraw the PS I Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If ~~ProtoStar~~PS I revokes or withdraws the PS I Plan, or if Confirmation or the Effective Date does not occur, then (i) the PS I Plan ~~shall~~will be null and void in all respects, (ii) any settlement or compromise embodied in the PS I Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the PS I Plan, and any document or agreement executed pursuant hereto, ~~shall~~will be deemed null and void, and (iii) nothing contained in the PS I Plan

~~shall~~will (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, any ProtoStar entity or any other Person, (b) prejudice in any manner the rights of such ProtoStar entity or any other Person, or (c) constitute an admission of any sort by any ProtoStar entity or any other Person.

### 5.  Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, under the PS I Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in ~~ProtoStar~~PS I; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, ~~this~~the PS I Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to ~~this~~the PS I Plan, including, but not limited to the ~~Sales of the Satellites, shall~~PS I Sale, will not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent ~~shall~~will forego the collection of any such tax or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by ~~ProtoStar~~PS I in ~~the Chapter~~its chapter 11 ~~Cases~~case, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code, including the ~~Sales~~PS I Sale, or otherwise, ~~shall~~will be deemed to be or have been done in furtherance of ~~this~~the PS I Plan.

## VI.

## SUMMARY OF CERTAIN DISTRIBUTABLE ASSETS

### A.  PS I Sale and Reserve Distributions

#### 1.  PS I Net Sale Proceeds Distributions

On the Effective Date, PS I will distribute to the PS I DIP Agent, in accordance with the PS I Reserve Distribution Order, an amount necessary to pay those PS I DIP Claims related to the refinancing of the WC Agreement, a portion of which distribution shall reduce distributions otherwise payable to the Senior Secured Notes Trustee for the Noteholders (to the extent a Final Order is entered invalidating the Liens held by the Noteholders and WC Lenders with respect to the PS I Collateral) in accordance with the Intercreditor Agreement.

~~Distributions of the~~ PS I Net Sale Proceeds neither placed in the PS I Claim Reserve nor distributed to the PS I DIP Agent will be distributed to the Noteholders on account of PS I Secured Claims ~~will be in accordance with the PS I Final DIP Order, including without limitation~~

~~pursuant to paragraph 14(a)(vi) thereof, and~~, in accordance with the priorities set forth in and the other provisions of the <u>PS I</u> Plan as well as any subsequent Order(s) of the Court with respect to the distribution of such amounts.  ~~Distributions will be made to BNYM, which shall~~, including the PS I Sale Proceeds Distribution Order and any PS I Reserve Distribution Order(s).  Such distributions will be made to Senior Secured Notes Trustee, which will, after payment of the Senior Secured Notes Trustee's reasonable fees and reasonable out-of-pocket expense in accordance with the terms of the Senior Secured Notes Indenture, make distributions to the Noteholders through such Noteholders' respective DTC participants in accordance with the Senior Secured Notes Indenture.  In connection therewith, the Senior Secured Notes Trustee may fix a record and payable date for any distribution.  Whenever any distribution to be made in accordance with the foregoing is due on a day other than a Business Day, such distribution will be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

On November 13, 2009, ProtoStar filed a Motion to Distribute Sale Proceeds in Accordance with PS I Final DIP Order (the "Motion to Distribute") (Docket No. 402), seeking approval to distribute proceeds from the PS I Sale.  On December 17, 2009, the Bankruptcy Court entered the PS I Sale Proceeds Distribution Order granting in part and denying in part the Motion to Distribute.  Pursuant to the PS I Sale Proceeds Distribution Order, ProtoStar (i) repaid in full the outstanding Obligations (as defined in the PS I DIP Credit Agreement) under the PS I DIP Credit Agreement, in the aggregate amount of $5,876,738.07 on December 18, 2009 and (ii) will not, absent authorization of the Bankruptcy Court, repay any portion of the outstanding Obligations used to repay the Existing WC Obligations (as defined in the PS I Final DIP Order).

At this time, pursuant to the PS I Final DIP Order, the claims of the Noteholders and WC Lenders are Allowed in full and free of subordination or recharacterization.

### 2.    PS I Administrative Reserve Distributions

Funds held in the PS I Administrative Reserve shall be distributed as follows:

(i)         *First*, to pay PS I Administrative Expense Claims as described in Section V.A.1 herein;

(ii)        *Second*, to pay the ProtoStar Affiliate Administrative Expenses pursuant to the ProtoStar Affiliate Administrative Budget and in accordance with any PS I Reserve Distribution Order; and

(iii)       *Third*, to the Lender Liquidating Trust Beneficiaries or after any PS I Trust Asset Transfer, to the Unsecured Liquidating Trust.

B.

3. PS ~~II Sale~~ I Claim Reserve Distributions

~~Subject to the CS Facility Lenders' right to credit bid pursuant to the PS II Bidding Procedures Order in accordance with section 363(k) of the Bankruptcy Code, distributions of the PS II Net Sale Proceeds to the CS Facility Lenders will be in accordance with the PS II Final DIP Order, including without limitation pursuant to paragraph 42 thereof, and in accordance with the priorities set forth in and the other provisions of the Plan. Whenever any distribution to be made in accordance with the foregoing is due on a day other than a Business Day, such distribution will be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.~~

Funds held in the PS I Claim Reserve shall be distributed as follows: (a) following entry of a Final Order determining the Liens held by the Noteholders and WC Lenders with respect to the PS I Collateral to be valid, the funds shall be distributed to Lender Liquidating Trust Beneficiaries in accordance with the Lender Liquidating Trust Agreement and Section VI.B.1 below, (b) within five (5) Business Days of entry of a Final Order invalidating the Liens held by the Noteholders and WC Lenders with respect to the PS I Collateral, the funds shall be transferred as part of a PS I Trust Asset Transfer for distribution to Holders of Class 3 Claims (PS I Unsecured Claims), and any residual amounts held in the PS I Claim Reserve after such Holders receive the same proportionate recovery as the Holders of Class 2 Claims (PS I Secured Claims) will be distributed Pro Rata to the Holders of Class 2 and Class 3 Claims (subject to the reserve for Disputed Claims), (c) pursuant to any stipulation approved by the Bankruptcy Court among (i) the Creditors' Committee or the Unsecured Liquidating Trustee, (ii) the Noteholder Supporting Creditors or the Lender Liquidating Trustee and, (iii) to the extent still in existence as of the date of such stipulation, PS I, (d) in accordance with any PS I Reserve Distribution Order(s) or (e) pursuant to any other Order of the Bankruptcy Court, including to the extent the Bankruptcy Court finds the amount of the PS I Claim Reserve exceeds the maximum amount recoverable by all Holders of Allowed Class 3 Claims and Holders of Disputed Class 3 Claims.

B. ~~C.~~ Liquidating Trust Distributions

1. Lender Liquidating Trust Distributions

The Lender Liquidating Trustee, on behalf of the Lender Liquidating Trust, or such other Entity as may be designated in accordance with the Lender Liquidating Trust Agreement, will make the distributions to Lender Liquidating Trust Beneficiaries required under the PS I Plan in accordance with the Lender Liquidating Trust Agreement and the priorities set forth therein and in ~~this~~the PS I Plan. Whenever any distribution to be made under the PS I Plan or the Lender Liquidating Trust Agreement is due on a day other than a Business Day, such distribution ~~shall~~will be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due. The Lender Liquidating Trustee ~~shall~~will have the authority to make distributions as provided for under the PS I Plan, administer and liquidate any ~~assets of the Estates (other than that portion of the assets that are used to satisfy in full all Administrative Expense Claims (including Professional Fee Claims), Priority Claims and the Unsecured~~of the Lender Liquidating Trust Assets~~)~~, remaining as of the Effective Date ~~and otherwise wind down the Estates~~. To the extent the Senior Secured Notes

Trustee, one or more of the PS I Prepetition Agents or other paying agents provides services at the request of the Lender Liquidating Trustee related to distributions under ~~this~~the PS I Plan, the Lender Liquidating Trustee may, without further approval of the Bankruptcy Court, provide the Senior Secured Notes Trustee, the PS I Prepetition Agents or other paying agents, as the case may be, with reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.

In connection therewith, the Senior Secured Notes Trustee or other paying agent may fix a record and payable date for any distribution of Lender Liquidating Trust Assets to Holders of Lender Liquidating Trust ~~B~~ Interests. Noteholders may be required to identify themselves to the Lender Liquidating Trustee in order to receive distributions and allocable tax information from the Lender Liquidating Trust.

The Lender Liquidating Trust Assets, including all proceeds from the liquidation thereof, will be distributed by the Lender Liquidating Trustee in the following order of priority:

(i)      *First*, to satisfy the expenses of administering the Lender Liquidating Trust, including, without limitation, reasonable fees and expenses of any attorneys, advisors, other professionals and employees employed by the Lender Liquidating Trustee;

(ii)      ~~The Lender Liquidating Trust Assets, including all proceeds from the liquidation thereof, shall be distributed~~*Second,* to the Lender Liquidating Trust Beneficiaries ~~by the Liquidating Trustee~~ in accordance with the Lender Liquidating Trust Agreement ~~and the priorities set forth therein and in this Plan~~until the Allowed PS I Secured Claims shall have been paid in full; and

(iii)      *Third*, to the Unsecured Liquidating Trust.

### 2. Unsecured Liquidating Trust Distributions

The Unsecured Liquidating Trustee, on behalf of the Unsecured Liquidating Trust, or such other Entity as may be designated in accordance with the Unsecured Liquidating Trust Agreement, ~~shall~~will have authority to ~~object to and resolve Claims,~~ make the distributions to Unsecured Liquidating Trust Beneficiaries required under the PS I Plan in accordance with the Unsecured Liquidating Trust Agreement and in accordance with the priorities set forth in and the other provisions of the PS I Plan, and administer and liquidate any assets in the Unsecured Liquidating Trust and otherwise wind down the ~~Estates~~PS I Estate, including, without limitation, the following which ~~shall~~will be funded with the Unsecured Liquidating Trust Assets: (a) general administration costs (e.g., trustee/trust fees, etc.), (b) access to and review of information for any and all potential ~~Claims~~PS I Chapter 5 Causes of Action (excluding Other Causes of Action), (c) analysis and assessment related to ~~objection to, and resolution of, Claims~~PS I Chapter 5 Causes of Action (excluding Other Causes of Action), (d) preparation of ~~objections to, and  resolution of, Claims, (e) access to and review of information for any and all potential Chapter 5 Causes of Action (excluding Other Causes of Action), (f) analysis and assessment related to Chapter 5~~

~~Causes of Action (excluding Other Causes of Action), (g) preparation of Chapter 5 Causes of Action (excluding Other Causes of Action) and (h~~<u>PS I Chapter 5 Causes of Action (excluding Other Causes of Action) and (e</u>) distribution of proceeds (<u>e.g.</u>, claims agent, etc.). Whenever any distribution to be made under the <u>PS I </u>Plan or the Unsecured Liquidating Trust Agreement is due on a day other than a Business Day, such distribution ~~shall~~<u>will</u> be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

The Unsecured Liquidating Trust Assets, including all proceeds from the liquidation thereof, ~~shall~~<u>will</u> be distributed to the Unsecured Liquidating Trust Beneficiaries by the Unsecured Liquidating Trustee in the following order of priority:

<u>(i)</u>      ~~(i)~~ *First*, to satisfy the expenses of administering the Unsecured Liquidating Trust, including, without limitation, reasonable fees and expenses of any attorneys, advisors, other professionals and employees employed by the Unsecured Liquidating Trustee~~; and~~

     ~~(ii) *Second*, to the Holders of Unsecured Liquidating Trust~~

<u>(ii)</u>      <u>*Second*, to the Lender Liquidating Trust for the benefit of the Holders of Lender Liquidating Trust Interests to repay the Unsecured Liquidating Trust Cash transferred to the Unsecured Liquidating Trust on the Effective Date out of proceeds of the PS I Sale;</u>

<u>(iii)</u>      <u>*Third*, to the Holders of Unsecured Liquidating Trust A</u> Interests in accordance with the ~~liquidation priorities set forth in the~~ Unsecured Liquidating Trust Agreement~~; *provided* *however*, that the Unsecured Liquidating Trust Agreement shall provide that the proceeds of any Chapter 5 Causes of Action of:~~

     ~~(A) PS I shall be allocated first to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of PS I Unsecured Claims until such PS I Unsecured Claims shall have been paid in full and, second, to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims.~~

     ~~(B) PS II shall be allocated first to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of PS II Unsecured Claims until such PS II Unsecured Claims shall have been paid in full and, second, to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims.~~

     ~~(C) PSA shall be allocated first to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of PSA Unsecured Claims until such PSA Unsecured Claims shall have been paid in full and, second, to those Holders of Unsecured~~

~~Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims.~~

~~(D) PSD shall be allocated first to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of PSD Unsecured Claims until such PSD Unsecured Claims shall have been paid in full and, second, to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims.~~

~~(E) PSS shall be allocated first to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of PSS Unsecured Claims until such PSS Unsecured Claims shall have been paid in full and, second, to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims.~~

~~(F) ProtoStar Ltd. shall be allocated to those Holders of Unsecured Liquidating Trust Interests that received such interests on account of ProtoStar Ltd. Unsecured Claims~~ until the Allowed PS I Unsecured Claims shall have been paid in full; and

(iv) *Fourth,* to the Holders of Unsecured Liquidating Trust B Interests.

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN PROTOSTAR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PS I PLAN, AND ALL OTHER RELATED DOCUMENTS. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PS I PLAN AND ITS IMPLEMENTATION. RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO PROTOSTAR OR THAT IT CURRENTLY DEEMS IMMATERIAL MAY ALSO HARM ITS BUSINESS.

### A. Risk That Distributions Will Be Less Than Estimated

A substantial amount of time may elapse between the Effective Date and the receipt of a final Distribution under the PS I Plan for certain Holders of Claims as a result of, among other reasons, (i) such Holders may have substantial and/or complicated Disputed Claims and (ii) ProtoStar's estimate of allowable Claims could be contested at an estimation hearing.

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis in Exhibit 3 hereto are based on ProtoStar's current estimates of Allowed

Claims.  ProtoStar projects that the Claims asserted against ~~ProtoStar~~PS I's Estates will be resolved in and reduced to an amount that approximates its estimates.  However, there can be no assurance that ProtoStar's estimates will prove accurate.  Distributions to creditors also will be affected by the amount of cash ~~ProtoStar~~PS I and/or the Liquidating Trustees are able to realize from further recoveries on account of, among other things, the Excluded Actions, as well as the costs of ~~ProtoStar~~PS I and/or the Liquidating Trustee in continuing to administer the Chapter 11 ~~Cases~~Case and wind up ~~ProtoStar~~PS I's ~~Estates~~Estate.

~~ProtoStar~~PS I, pre-Effective Date, and thereafter the Liquidating Trustee reserve their respective rights to object to the amount or classification of any Claim.  Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection.  Any such creditor may not receive the estimated Distributions set forth herein.

## B.  Financial Information Disclaimer

### 1.  Information Presented Is Based On ProtoStar's Books And Records; No Audit Was Performed

While ProtoStar has endeavored to present information fairly in this Disclosure Statement, because of the complexity of its financial matters, ProtoStar's books and records upon which this Disclosure Statement is based might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

### 2.  Forward Looking Statements Are Not Assured; Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

While ProtoStar believes that its financial projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected.

## ~~C.  Business Factors~~

### ~~1.  Risk of Satellite Failure~~

~~Random failure of satellite components or systems may result in damage to or loss of a satellite before the end of its expected useful life.  In-orbit failure may result from various causes including: (i) component or systems failure; (ii) loss of power or station-keeping fuel; (iii) inability to control or position the satellite; (iv) solar, electrostatic and other astronomical events~~

and (v) collision with micrometeorites or space debris. With the exception of certain ground-based remedial measures such as uploading software patches or reconfiguration of existing components and systems, repair of satellites in space is not feasible. Satellites are built with some redundant components and systems to permit their continued operation in the event of certain component or system failures. If these back-up components fail and primary components cannot be restored, such satellites could lose capacity or functionality or be a total loss.

If either of the Satellites were to fail, ProtoStar's ability to generate proceeds from the Auctions could be materially adversely affected.

**2.     Factors Relating to Regulatory Environment**

ProtoStar operates in a highly regulated industry. International and domestic regulatory authorities in the various jurisdictions in which ProtoStar operates, including the ITU and the Government of Indonesia, license the use of orbital slots and associated radio frequencies, as well as the broadcast and distribution of content within such jurisdictions. Such regulatory authorities can modify, revoke, withdraw or impose charges, fees or conditions upon the licenses that ProtoStar or the winning bidders would need in order to operate the Satellite and so increase the cost of doing business. In addition, the Sales may be subject to the approval of regulatory authorities, including the U.S. Department of State, which proscribes the transfer of U.S.-manufactured satellites and associated technology to certain countries. If licenses for the use of orbital slots and associated radio frequencies for the Satellites, as well as the broadcast and distribution of content within such jurisdictions, are revoked, withdrawn or modified, ProtoStar's operations and financial condition could be materially and adversely impacted.

**3.     Ground Support Risks**

ProtoStar operates and monitors the Satellites from ground support stations located in Singapore and Indonesia. In the event of natural disaster, war or other political risk, or one or more of the ground stations otherwise becomes unable to support the Satellites, ProtoStar does not have immediate back-up capabilities for these functions. Accordingly, ProtoStar's financial condition could be materially and adversely affected if it becomes necessary to obtain new ground support on short notice.

**C.**     ~~D.~~  **Litigation Risks**

To the extent that Distributions to certain Classes may be derived, in whole or in part, based upon recoveries from Chapter 5 Causes of Action asserted by the Creditors' Committee and/or the Unsecured Liquidating Trustee, there can be no assurance that any such Chapter 5 Causes of Action will produce recoveries that will enhance the distributions to be made to Holders of Unsecured Claims under the **PS I** Plan.

Notwithstanding ProtoStar's best efforts to provide reasonable estimates of the expected return to the Holders of Claims, there is always a possibility that the efforts of the Unsecured Liquidating Trust will be more expensive or less successful than predicted. Additionally, there may be significant delay before any distribution is made on account of Allowed Claims, given the uncertainties of litigation.

For the reasons set forth in this Disclosure Statement, ProtoStar believes that the very same risks described herein are present in and significantly greater to creditors in a chapter 7 case.

**D.**  ~~E.~~ **Bankruptcy Risks**

    **1.**    **Objection To Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or equity interests of such class.  ProtoStar believes that the classification of Claims and Equity Interests under the PS I Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

    **2.**    **Unliquidated Claims**

Several Claims or groups of Claims against ProtoStar are currently unliquidated and have been estimated, individually or as a group, for purposes of determining the estimated recoveries listed above in Section II.  These unliquidated Claims include, without limitation, Administrative Expense Claims.  The potential exists for such Claims to be ultimately liquidated in amounts exceeding, on an individual or aggregate basis, the estimates used or in a higher priority than described in the PS I Plan.  In such scenarios, estimated recoveries for Holders of Claims in all classes could be less than estimated herein.

    **3.**    **Risk Of Non-Confirmation Of PS I Plan**

Even if the Voting Classes accept the PS I Plan, the PS I Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a chapter 11 plan is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if ~~ProtoStar~~PS I were liquidated under chapter 7 of the Bankruptcy Code.  ProtoStar believes that the PS I Plan satisfies all the requirements for confirmation of a chapter 11 plan under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court would also conclude that the requirements for confirmation of the PS I Plan have been satisfied.

**VIII.**

**VOTING REQUIREMENTS**

On February [ ], ~~2009,~~2010, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved this Disclosure Statement, set voting procedures, and

scheduled the Confirmation Hearing.  A copy of the Disclosure Statement Order and the Confirmation Hearing Notice are enclosed with this Disclosure Statement as part of the solicitation package.  The Disclosure Statement Order sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines.  The Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions attached to the ballot should be read in connection with this Section VIII of the Disclosure Statement.

If you have any questions about the procedure for voting your Claims or Equity Interests or the packet of materials you received, please contact:

> Kurtzman Carson Consultants LLC
> Attention: ProtoStar Ballot Processing
> 2335 Alaska Ave.
> El Segundo, CA 90245
> (866) 381-9100

Anyone wishing to obtain additional copies of the PS I Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the Notice and Balloting Agent, at (866) 381-9100, or view such documents by accessing the Notice and Balloting Agent's website: http://www.kccllc.net/ProtoStar or the Bankruptcy Court's website: www.deb.uscourts.gov. Note that a PACER (https://ecf.deb.uscourts.gov/) password and login are needed to access documents on the Court's website.

The Bankruptcy Court may confirm the PS I Plan only if it determines that the PS I Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures of ProtoStar concerning the PS I Plan have been adequate and have included information concerning all distributions made or promised by ProtoStar in connection with the PS I Plan and the Chapter 11 ~~Cases~~Case.  In addition, the Bankruptcy Court must determine that the PS I Plan has been proposed in good faith and not by any means forbidden by law.

In particular, in order to confirm the PS I Plan, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that the PS I Plan:  (i) has been accepted by the requisite votes of all Classes of Impaired Claims and Equity Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in respect of one or more dissenting Classes; (ii) is "feasible," which means that there is a reasonable probability that confirmation of the PS I Plan will not be followed by liquidation or the need for further financial reorganization; and (iii) is in the "best interests" of all Holders of Claims or Equity Interests, which means that such Holders will receive at least as much under the PS I Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.  ProtoStar believes that the PS I Plan satisfies all of these conditions.  ***See Section IX, "Confirmation of PS I Plan."***

## A.    Voting Deadline

This Disclosure Statement and the appropriate ballot(s) are being distributed to all Holders of Claims and Equity Interests who are entitled to vote on the PS I Plan.  There is a

separate ballot designated for each Impaired voting Class in order to facilitate vote tabulation; however, all ballots are substantially similar in form and substance, and the term "ballot" is used without intended reference to the ballot of any specific Class of Claims or Equity Interests.

**IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PS I PLAN, ALL BALLOTS MUST BE ACTUALLY RECEIVED BY THE NOTICE AND BALLOTING AGENT BY NO LATER THAN THE VOTING DEADLINE, THAT IS, BY NO LATER THAN [ FEBRUARY [25], 2009 2010 AT 4:00 P.M. (PREVAILING PACIFIC TIME).  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PS I PLAN.  ONLY BALLOTS CONTAINING ORIGINAL SIGNATURE PAGES WILL BE COUNTED.**

### B.    Holders of Claims Entitled to Vote

The Holder of a Claim against or Equity Interest in ~~ProtoStar~~ PS I that is Impaired under the PS I Plan is entitled to vote to accept or reject the PS I Plan if the PS I Plan provides a distribution in respect of such Claim or Equity Interest.  **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NO DISPUTED CLAIM OR DISPUTED INTEREST WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(c) OF THE BANKRUPTCY CODE HAVE BEEN MET, UNLESS A CLAIMANT WHOSE CLAIM OR INTEREST IS DISPUTED HAS FILED A MOTION FOR TEMPORARY ALLOWANCE FOR VOTING PURPOSES UNDER BANKRUPTCY RULE 3018(a), AND THE BANKRUPTCY COURT GRANTS SUCH MOTION FOR TEMPORARY ALLOWANCE PRIOR TO THE VOTING DEADLINE**.

A vote on the PS I Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Disclosure Statement Order also sets forth assumptions and procedures for tabulating ballots that are not completed fully or correctly.

The Holders of Claims in Classes 2 ~~A, 2B, 3, 4, 5, 6, 7, 8, 9, 10, 11~~ and ~~12~~ 3 are entitled to vote.  Holders of Claims in Class 1 are unimpaired and consequently are conclusively presumed to accept the PS I Plan and are not entitled to vote.  ~~Holders~~ The Holder of Equity Interests in Class ~~13 will receive or retain no distribution of property under the Plan, are presumed to have rejected the Plan and are not entitled to vote thereon.  Holders of Claims in Class 14 are impaired and, as proponents~~ 4 is impaired but, as a proponent of the PS I Plan, ~~are~~ is presumed to accept the PS I Plan.

### C.    Vote Required For Acceptance By Class

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims and/or equity interests votes to accept the proposed chapter 11 plan, except under certain

circumstances.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount of the allowed claims in that class and more than one-half in number of allowed claims in that class, but for that purpose, counts only those who actually vote to accept or reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in dollar amount and a majority in number of the allowed claims in that class <u>actually voting</u> cast their ballots in favor of acceptance.  Holders of ~~claims~~<u>Claims</u> who fail to vote are not counted as either accepting or rejecting a plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, but for that purpose, counts only those who <u>actually vote</u> to accept or reject the plan.  Thus a class of interests will have voted to accept the plan if two-thirds of the allowed interests actually voted are voted in favor of acceptance.  Holders of <u>Equity </u>Interests who fail to vote are not counted as either accepting or rejecting the<u> PS I</u> Plan.

### D.     Voting Procedures

#### 1.     Ballots

All votes to accept or reject the <u>PS I </u>Plan with respect to any Class of Claims or Equity Interests must be cast by properly submitting the duly completed and executed form of ballot designated for such Class.  Holders of Impaired Claims or Equity Interests voting on the<u> PS I</u> Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

**ANY BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE <u>PS I </u>PLAN OR THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE <u>PS I </u>PLAN WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE<u> PS I </u> PLAN.**

**ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE<u> PS I </u> PLAN.**

Ballots must be delivered to the Notice and Balloting Agent, at its address set forth above, and received by the Voting Deadline.  **THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE HOLDER.**  If such delivery is by mail, it is recommended that Holders use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to assure timely delivery.

In accordance with Rule 3018(c) of the Bankruptcy Rules, the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these Chapter 11

Cases. **PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT**.

In most cases, each ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim or Allowed Equity Interest for voting purposes (if the Claim or Equity Interest is a Disputed Claim or Disputed Equity Interest, this amount may not be the amount ultimately Allowed for purposes of Distribution), and the Class to which the Claim or Equity Interest has been attributed.

### 2. Withdrawal Or Change Of Votes On PS I Plan

A ballot may be withdrawn by delivering a written notice of withdrawal to the Notice and Balloting Agent so that the Notice and Balloting Agent <u>actually receives</u> such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

In order to be valid, a notice of withdrawal must (i) specify the name of the Holder who submitted the votes on the PS I Plan to be withdrawn, (ii) contain the description of the Claims or Equity Interests to which it relates, and (iii) be signed by the Holder in the same manner as on the ballot that the Holder seeks to withdraw. ProtoStar expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the PS I Plan.

Any Holder who has submitted to the Notice and Balloting Agent prior to the Voting Deadline a properly completed ballot may change such vote by submitting to the Notice and Balloting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the PS I Plan. In the case where more than one timely, properly completed ballot is received with respect to the same Claim, the ballot that bears the latest date will be counted for purposes of determining whether sufficient acceptances required to confirm the PS I Plan have been received.

### 3. Voting Multiple Claims

Separate forms of ballots are provided for voting the various Classes of Claims and Equity Interests. Ballot forms may be copied if necessary. Any person who holds Claims and/or Equity Interests in more than one Class is required to vote separately with respect to each Claim or Equity Interest. Any person holding multiple Claims or Equity Interests within a Class should use a single ballot to vote such Claims or Equity Interests. Please sign and return in accordance with your ballot(s) in accordance with the terms set forth in this Disclosure Statement. **ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE ACCEPTED BY THE NOTICE AND BALLOTING AGENT. BALLOTS WITH COPIED SIGNATURES WILL NOT BE ACCEPTED.**

**IX.**

**CONFIRMATION OF PS I PLAN**

## A.  Hearing On Confirmation Of PS I Plan At Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the PS I Plan.  At the Confirmation Hearing, the Bankruptcy Court will confirm the PS I Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on March [ ], 2010, at [ ] (prevailing Eastern Time) before the Honorable Mary F. Walrath, United States Bankruptcy Court, District of Delaware, 824 North Market Street, 5th Floor, Courtroom 4, Wilmington, DE 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B.  Deadline To Object To Confirmation

Any objection to the confirmation of the PS I Plan must be made in writing, specify in detail (i) the name and address of the objector, (ii) all factual and legal grounds for the objection and (iii) the amount and type of the Claims held by the objector.  Any such objection must be filed with the Bankruptcy Court, with a copy to the Honorable Mary F. Walrath's chambers, and served so that it is actually received by the Bankruptcy Court, chambers, and the following parties on or before the Confirmation Objection Deadline, (i.e., [ March [5]], 2010, at 4:00 p.m. (prevailing Eastern Time)): (a) ProtoStar, 100 California Street, Suite 700, San Francisco, California, Attention: Cynthia M. Pelini; (b) Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attention: Matthew S. Barr, Esq. and Peter K. Newman, Esq.; (c) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware, Attn: Laura Davis Jones, Esq.; (d) Richards, Kibbe & Orbe LLP, One World Financial Center, New York, New York 10281, Attn: Michael Friedman, Esq.; (e) Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Stephen M. Miller, Esq.; (f) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq. and Shai Y. Waisman, Esq.; (g) Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, Suite 1501, Wilmington, DEDelaware 19801, Attn: Steven K. Kortanek, Esq.; (h) the Office of the United States Trustee for the District of Delaware, 844 King Street, Room 2207, Lockbox #35, Wilmington, Delaware 19899-0035, Attn: Jane M. Leamy, Esq.; (i) Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey  07068, Attn: Jeffrey D. Prol, Esq.; (j) Greenberg Traurig, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, Delaware 19301, Attn: Dennis A. Meloro, Esq.; and (k) the prepetition agents for ProtoStar's prepetition secured facilities and their respective counselShearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022, Attn: James L. Garrity Jr., Esq. and Ned S. Schodek, Esq.

## C.  Requirements For Confirmation Of PS I Plan

Among the requirements for confirmation of the PS I Plan are that the PS I Plan (i) is accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the PS I Plan "does not discriminate unfairly" and is "fair and equitable" as to such

Class, (ii) is feasible, and (iii) is in the "best interests" of creditors and equity interest holders that are Impaired under the ~~PS I~~ Plan.

## 1. Requirements Of Section 1129(a) Of Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

(A)     The PS I Plan complies with the applicable provisions of the Bankruptcy Code.

(B)     ~~ProtoStar~~PS I has complied with the applicable provisions of the Bankruptcy Code.

(C)     The PS I Plan has been proposed in good faith and not by any means forbidden by law.

(D)     Any payment made or to be made by ~~ProtoStar~~PS I or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the PS I Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

(E)     ~~ProtoStar~~PS I has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, officer or voting Liquidating Trustee, an affiliate of ~~ProtoStar~~PS I participating in a plan with ~~ProtoStar~~PS I, or a successor to ~~ProtoStar~~PS I under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy, and ~~ProtoStar~~PS I has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Liquidating Trusts, and the nature of any compensation for such insider.

(F)     Any governmental regulatory commission with jurisdiction, after Confirmation, over the rates of ~~ProtoStar~~PS I has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(G)     With respect to each Class of Claims or Equity Interests, each Holder of an Impaired Claim or Equity Interest either has accepted the PS I Plan or will receive or retain under the PS I Plan on account of such Holder's Claim or Equity Interest property of a value, as of the Effective Date of the PS I Plan, that is not less than the amount that such Holder would so

50

receive or retain if ~~ProtoStar~~PS I were liquidated under chapter 7 of the Bankruptcy Code on such date.

(H)     Except to the extent the PS I Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests has either accepted the PS I Plan or is not Impaired under the PS I Plan.

(I)     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the PS I Plan provides that Administrative Expenses and priority claims (including Priority Tax Claims and Non-Priority Tax Claims) will be paid in full on the Effective Date.

(J)     If any Class of Claims is Impaired under the PS I Plan, at least one such Class of Claims has accepted the PS I Plan, determined without including any acceptance of the PS I Plan by any insider.

(K)     Confirmation of the PS I Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of ~~ProtoStar~~PS I or any successor to ~~ProtoStar~~PS I under the PS I Plan, unless such liquidation or reorganization is proposed in the PS I Plan.

(L)     All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the PS I Plan provides for the payment of all such fees on the Effective Date of the PS I Plan.

All transfers of property of the PS I Plan will be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

## 2.     Best Interests of Creditors

Confirmation of a PS I Plan requires, among other things, that each Holder of a Claim in an Impaired Class and each Holder of an Equity Interest either:  (a) accepts the PS I Plan; or (b) receives or retains under the PS I Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if ~~ProtoStar~~PS I were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly referred to as the "Best Interests Test."

To determine the value that the Holders of Impaired Claims and Equity Interests would receive if ~~ProtoStar~~PS I were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of ProtoStar's assets and properties in the context of a chapter 7 liquidation case.  Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

The cash available for satisfaction of Allowed Claims would consist of the proceeds resulting from the disposition of ~~ProtoStar~~PS I's few remaining assets, augmented by the cash, if any, held by ~~ProtoStar~~PS I at the time of the commencement of the chapter 7 case. Any such Cash amount would then be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation and such additional PS I Administrative Expense Claims and other Priority Claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by ~~ProtoStar~~PS I during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for attorneys, appraisers, accountants or other professionals and costs and expenses of ~~ProtoStar~~PS I and the Creditors' Committee. Such PS I Administrative Expense Claims would have to be paid in cash, in full from the liquidation proceeds before the balance of those proceeds could be made available to pay other Claims.

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the PS I Plan by an Impaired Class, ~~ProtoStar~~PS I must demonstrate, and the Bankruptcy Court must determine that with respect to such Class, each holder of a Claim will receive property of a value, as of the Effective Date of the PS I Plan, that is not less than the amount that such holder would receive if ~~ProtoStar~~PS I were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the PS I Plan. This requirement is commonly referred to as the "Best Interests of Creditors Test."

The PS I Plan satisfies the Best Interests of Creditors Test. The PS I Plan provides greater recovery to the Holders of Claims than such Holders would receive under a liquidation under chapter 7 primarily because the PS I Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administrating ~~ProtoStar~~PS I's assets for the benefit of its Creditors. ~~ProtoStar~~PS I has already completed a significant amount of analysis concerning the litigation that a Chapter 7 trustee would have to reevaluate before such litigation would commence.

Moreover, in chapter 7 cases, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though ~~ProtoStar~~PS I has already accumulated much of the funds and has already incurred many of the expenses associated with generating those funds. Accordingly, ~~ProtoStar~~PS I believes that there is a reasonable likelihood that ~~ProtoStar~~PS I's Creditors would "pay again" for the funds accumulated by ~~ProtoStar~~PS I, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed. It is also anticipated that a chapter 7 liquidation would result in delay in the distributions to ~~ProtoStar~~PS I's creditors. Among other things, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See FED. R. BANKR. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the chapter 11 case. Based on the foregoing, the PS I Plan

provides an opportunity to bring the greatest return to ~~ProtoStar~~PS I's creditors.

### 3. Acceptance by Impaired Class

The Bankruptcy Code requires as a condition to confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the claim or interest receives cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it so long as the plan has been accepted by at least one impaired class. Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that for a sale of any property that is subject to the liens securing such claims that such liens attach to the proceeds of such sale. The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan, on account of that entity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of such interest or (b) if the class does not

receive such an amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The PS I Plan provides that if any Impaired Class rejects the PS I Plan, ~~ProtoStar~~PS I reserves the right to seek to confirm the PS I Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the PS I Plan or is deemed to have rejected the PS I Plan, ~~ProtoStar~~PS I will request confirmation of the PS I Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. ~~ProtoStar~~PS I reserves the right to alter, amend, modify, revoke or withdraw the PS I Plan or any PS I Plan exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### D.  Alternatives To Confirmation And Consummation Of PS I Plan

The PS I Plan reflects the negotiations held by ProtoStar with certain of the Noteholders ~~and the CS Facility Lenders, each of whom,~~ who support the PS I Plan. ProtoStar believes that the PS I Plan affords Holders of Claims and Equity Interests the greatest opportunity for realization on ~~ProtoStar~~PS I's assets and, therefore, is in the best interests of such Holders. If the PS I Plan is not confirmed, however, the theoretical alternatives include: (a) liquidation of ~~ProtoStar~~PS I under chapter 7 of the Bankruptcy Code or (b) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code. Thorough consideration of these alternatives to the PS I Plan has led ProtoStar and the parties in support to conclude that the PS I Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes certain inherent risk in any other course of action available in these Chapter 11 Cases.

#### 1.  Liquidation Under Chapter 7

If the PS I Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a liquidation under chapter 7, a trustee or trustees may be elected or appointed to liquidate the assets of ~~ProtoStar~~PS I. However, ProtoStar believes that liquidation under chapter 7 would result in smaller distributions being made to creditors and interest holders than those provided for in the PS I Plan because, among other reasons, (a) additional administrative expenses resulting from the appointment of and services to be rendered by trustees and attorneys and other professionals to assist such trustee, (b) the relative lack of familiarity with ~~ProtoStar's businesses~~PS I's business that would inevitably hinder such professionals in the management of the estate and (c) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation. In addition, distributions would be substantially delayed in a chapter 7 liquidation because of the factors set forth above and the need to litigate or otherwise resolve many of the claims settled by the PS I Plan. If these cases are converted to chapter 7, it is likely ~~ProtoStar~~PS I's operations would cease and its assets would be liquidated piecemeal under conditions that prioritize expediency over value. For these reasons, ~~ProtoStar~~PS I believes the orderly liquidation of ~~ProtoStar~~PS I's assets under chapter 11, as provided for in the PS I Plan in the event a going concern sale is ultimately not consummated, preserves value and maximizes distributions relative to a chapter 7 liquidation.

Based on the foregoing and on the Liquidation Analysis, ~~ProtoStar~~PS I believes that a liquidation of its assets under chapter 7 or otherwise would produce no greater and likely less value for distribution to creditors than that recoverable under the PS I Plan.

### 2. Alternative PS I Plan of Reorganization or Liquidation

If the PS I Plan is not confirmed, ~~ProtoStar~~PS I (or if the Bankruptcy Court were not to grant extensions of ~~ProtoStar~~PS I's exclusive periods in which to file and solicit a plan, any other party in interest in these Chapter 11 Cases) could propose a different plan or plans. Such plans might involve either a reorganization and continuation of ~~ProtoStar's businesses~~PS I's business, an orderly liquidation of its assets, or a combination of both. With respect to an alternative plan, ~~ProtoStar~~PS I has explored various alternatives in connection with the formulation of the PS I Plan. ~~ProtoStar~~PS I believes that the PS I Plan enables creditors to realize the most value under the circumstances.

## X.

## CERTAIN U.S. FEDERAL INCOME TAX
## CONSEQUENCES OF PS I PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the PS I Plan to ~~ProtoStar~~PS I and certain U.S. Holders (as defined below) of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the PS I Plan are complex and are subject to significant uncertainties. ~~ProtoStar~~PS I has not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the PS I Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. This summary is intended for general information purposes and only addresses certain U.S. federal income tax consequences of the PS I Plan applicable to U.S. Holders. In addition, this summary does not address foreign, state or local tax consequences of the PS I Plan, nor does it purport to address the U.S. federal income tax consequences of the PS I Plan to special classes of taxpayers (such as Persons who are related to ~~ProtoStar~~PS I within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, investors in pass-through entities, Persons holding Claims as part of an integrated, straddle or conversion transaction and Holders of Claims who are themselves in bankruptcy) unless otherwise noted herein. Furthermore, this discussion assumes that U.S. Holders hold only Claims in a single Class. U.S. Holders in multiple Classes should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

As used in this discussion, a "U.S. Holder" is any Holder of a Claim that is (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source or (iv) a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust, and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

This discussion assumes that the various debt and other arrangements to which ~~ProtoStar~~PS I is a party will be respected for U.S. federal income tax purposes in accordance with their form.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A U.S. HOLDER OF A CLAIM.  ALL U.S. HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PS I PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SUMMARY.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.**     **Certain U.S. Federal Income Tax Consequences to ~~Protostar~~PS I in Connection With Implementation of the PS I Plan**

~~ProtoStar Ltd. and its non-U.S. subsidiaries believe they have~~PS I believes it has conducted ~~their~~its operations to date so that ~~ProtoStar Ltd. and its non-U.S. subsidiaries have~~PS I has not been engaged in a trade or business within the United States and ~~have~~has not earned income effectively connected with such a business that would be subject to U.S. federal income tax.  However, the IRS may conclude that ~~ProtoStar Ltd. and/or one or more of its non-U.S. subsidiaries~~PS I has engaged in a trade or business within the United States.  Such a determination could result in an unanticipated tax liability.  The remainder of this discussion assumes that ~~ProtoStar Ltd. and each of its non-U.S. subsidiaries~~PS I conducted ~~their~~its

operations to date so that it would not be treated as engaged in a trade or business within the United States and has not earned income effectively connected with such a business.

Based on the above, ~~ProtoStar Ltd. and each of its non-U.S. subsidiaries~~PS I does not expect to be subject to U.S. federal income taxes as a result of the consummation of the ~~Plan. PSS does not expect to incur any material U.S. federal income tax as a result of the consummation of the~~PS I Plan.

**B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders in Connection With Implementation of the PS I Plan**

**1.      Tax Consequences to U.S. Holders of Claims in ~~Classes 2A, 2B, 4, 6, 8 and 11~~Class 2**

Pursuant to the PS I Plan, U.S. Holders of Claims in ~~Classes 2A, 2B, 4, 6, 8 and 11 (together,~~Class 2 (the "Senior Claimholders"), will receive cash and Lender Liquidating Trust Interests in full satisfaction and discharge of their Claims.  In general, each Senior Claimholder will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of the cash and the fair market value of ~~the Lender Liquidating Trust Interests received by~~ the Senior Claimholder ~~in satisfaction of its Claims~~'s rights with respect to the Liquidating Trusts  (other than any cash or the value of any ~~Lender Liquidating Trust Interests~~rights in a trust that is allocable to accrued but unpaid interest which will be treated as described in Section X.B.3. below) and (ii) the Senior Claimholder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Senior Claimholder, whether the Claim (or the obligation constituting the Claim) was purchased at a discount and whether and to what extent the Senior Claimholder  previously claimed a bad debt deduction with respect to its Claim.

**2.      Tax Consequences to U.S. Holders of Claims in ~~Classes 3, 5, 7, 9, 10 and 12~~Class 3**

Pursuant to the PS I Plan, U.S. Holders of Claims in ~~Classes 3, 5, 7, 9, 10 and 12 (together,~~ Class 3 (the "Junior Claimholders") will receive Unsecured Liquidating Trust A Interests in the Unsecured Liquidating Trust and, in certain cases, cash, in full satisfaction and discharge of their Claims.  In general, each Junior Claimholder will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of the cash, if any, and the fair market value of the ~~Unsecured~~Junior Claimholder's rights with respect to the Liquidating ~~Trust Interests it receives~~Trusts (other than any cash or the value of any ~~Unsecured Liquidating Trust Interest~~rights in a trust that is allocable to accrued but unpaid interest which will be treated as described in Section X.B.3. below) and (ii) the Junior Claimholder's adjusted tax basis in its Claims.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of each Junior Claimholder, whether the Claim (or the obligation constituting the Claim) was purchased at a discount and whether and to what extent the Junior Claimholder has previously claimed a bad debt deduction with respect to its Claim.

### 3. Distribution in Discharge of Accrued Interest

In general, to the extent that any amount of cash~~, Lender Liquidating Trust Interests or Unsecured~~ or rights with respect to a Liquidating Trust ~~Interests~~ received by a U.S. Holder of an Allowed Claim is received in satisfaction of interest that accrued during its holding period, the amount of the cash and the value of the ~~Lender Liquidating Trust Interests or Unsecured Liquidating Trust Interests~~trust rights will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).

The PS I Plan provides that all amounts transferred to a U.S. Holder of an Allowed Claim will be allocated first to the principal amount of such Claim, as determined for U.S. federal income tax purposes, with any excess allocated to unpaid accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

**EACH U.S. HOLDER IS URGED TO CONSULT ITS TAX ADVISOR REGARDING THE ALLOCATION OF CONSIDERATION FOR TAX PURPOSES.**

### 4. Gain Attributable to Market Discount

Under the "market discount" provisions of section 1276 and 1278 of the Tax Code, the gain realized by a U.S. Holder of an Allowed Claim that receives cash~~, Lender Liquidating Trust Interests and/or Unsecured~~ or Liquidating Trust Interests in satisfaction of their Claim may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim (or the debt instrument constituting the Claim) that accrued during the U.S. Holder's holding period (unless the U.S. Holder elected to include market discount in income as it accrued). In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" (interest paid in cash or other property, other than debt of the issuer, at least annually) or, (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

### C. U.S. Federal Income Tax Treatment of the Liquidating Trusts and U.S. Holders Of Interests in the Liquidating Trusts

#### 1. Classification of the Liquidating Trusts

Holders of Allowed Claims of Classes 2~~A, 2B, 3, 4, 5, 6, 7, 8, 9, 10, 11~~ and ~~12~~3 will receive either Lender Liquidating Trust Interests or Unsecured Liquidating Trust A Interests in connection with the implementation of the PS I Plan. Each of the Liquidating Trusts is intended to qualify as a "grantor trust" for U.S. federal income tax purposes. In general, a "grantor trust" is not a separate taxable entity. Assuming each Liquidating Trust is classified as a grantor trust, for U.S. federal income tax purposes, the assets transferred by ~~ProtoStar~~PS I to each Liquidating

Trust pursuant to the PS I Plan will be treated as being owned at all times thereafter by the ~~Holders of Allowed Claims that are beneficiaries and, therefore, grantors of such trust~~Liquidating Trust Beneficiaries. The IRS, in Revenue Procedure 94-45, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Each Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the PS I Plan, and in conformity with Revenue Procedure 94-45, all parties (including ~~ProtoStar~~PS I, the Liquidating Trustees and the ~~appropriate Holders of Allowed Claims~~Liquidating Trust Beneficiaries) are required to treat each Liquidating Trust, for U.S. federal income tax purposes, as a grantor trust of which the ~~appropriate Holders of Allowed Claims~~Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that each Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. No ruling from the IRS nor opinion of counsel has been requested concerning the tax status of either Liquidating Trust as a grantor trust. As a result, there can be no assurance that the IRS will treat the Liquidating Trusts as grantor trusts. If the IRS were to challenge successfully the U.S. federal income tax classification of a Liquidating Trust, the U.S. federal income tax consequences to that Liquidating Trust, the ~~Holders of Allowed Claims and ProtoStar~~Liquidating Trust Beneficiaries and PS I could vary from those discussed herein (including the potential for an entity level tax on any income of the Liquidating Trust).

2.     **General Tax Reporting by the Liquidating Trusts and Holders of Interests in the Liquidating Trusts**

For all U.S. federal income tax purposes, the PS I Plan requires all parties (including ~~ProtoStar~~PS I, the Liquidating Trustees and the ~~appropriate Holders of Allowed Claims~~Liquidating Trust Beneficiaries) to treat the transfer of assets by ~~ProtoStar~~PS I to each of the Liquidating Trusts, for U.S. federal income tax purposes, as a transfer of assets directly to the ~~appropriate Holders of Allowed Claims~~Liquidating Trust Beneficiaries followed by the transfer of such assets by such ~~Holders of Allowed Claims~~Liquidating Trust Beneficiaries to the appropriate Liquidating Trust. Consistent therewith, the PS I Plan requires all parties to treat the Liquidating Trusts as grantor trusts and the ~~holders of interests in a Liquidating Trust as the~~creditors as owners and grantors of ~~such trust~~the trusts. Thus, following receipt of interests in a Liquidating Trust, ~~Holders of Allowed Claims~~Liquidating Trust Beneficiaries will be treated as the direct owners of a specified undivided interest in the assets of such Liquidating Trust for all U.S. federal income tax purposes (which assets will have a tax basis equal to their fair market value on the date transferred to the applicable Liquidating Trust). The PS I Plan requires the trustee of each Liquidating Trust to determine the fair market value of the assets transferred to such Liquidating Trust as of the date the assets are transferred to the Liquidating Trust and, further, requires all parties, including the Liquidating Trust Beneficiaries, to consistently use such valuations in filing any required returns and reports with the IRS. Accordingly, the PS I Plan requires each ~~Holder of an Allowed Claim that is a~~ Liquidating Trust Beneficiary to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by ~~such~~the Liquidating ~~Trust~~Trusts, in accordance with its ~~relative~~ beneficial interest in the trust. The character of items of income, gain, loss, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. It is not clear how to allocate items of income, gain, loss, deduction and credit of the Liquidating Trusts to the beneficiaries in a

59

situation like this where the PS I Lien Avoidance Action challenge to the validity of the Liens held with respect to the PS I Collateral creates uncertainty regarding the economic ownership of the Trust assets.

The U.S. federal income tax reporting obligation of a trust beneficiary is not dependent upon the Liquidating Trust distributing any cash or other proceeds. Therefore, a beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the income of a Liquidating Trust whether or not such Liquidating Trust makes any concurrent distribution to the beneficiary. In general, a distribution by a Liquidating Trust to a beneficiary of an interest in such trust will not be taxable to such beneficiary because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets. Beneficiaries are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trusts.

The Liquidating Trustees will file with the IRS returns for the Liquidating Trusts as grantor trusts pursuant to Treasury Regulation section 1.671-4(a) and will also send to each applicable Liquidating Trust Beneficiary, a separate statement setting forth such beneficiary's share of items of income, gain, loss, deduction, or credit of the trust and will instruct the beneficiary to report such items on its U.S. federal income tax return.

### D. Information Reporting and Backup Withholding

Certain payments under the PS I Plan may be subject to information reporting by the payer to the IRS. Moreover, such reportable payments may be subject to backup withholding in certain circumstances. Under the Tax Code's backup withholding rules, a U.S. Holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the PS I Plan, unless the U.S. Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the U.S. Holder is a U.S. person, the taxpayer identification number is correct and that the U.S. Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PS I PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S. HOLDER IN LIGHT OF SUCH U.S. HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL U.S. HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PS I PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS,

AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XI.

## CONCLUSION

~~ProtoStar~~PS I believes that confirmation and implementation of the PS I Plan is preferable to any alternatives because it will provide the greatest recoveries to holders of Claims and Equity Interests.  Any alternative to confirmation of the PS I Plan, such as a chapter 7 liquidation or attempts to confirm another plan of reorganization or liquidation, would involve significant delays, uncertainty, and substantial additional administrative costs.  Moreover, as described above, ~~ProtoStar~~PS I believes that the PS I Plan maximizes value for all parties in interest as compared to a chapter 7 liquidation.

Dated: ~~November 11, 2009~~ January 26, 2010

PROTOSTAR LTD.~~,~~ on behalf of itself and its affiliated debtors and debtors in possession

By: _____

    Name:  Cynthia M. Pelini

    Title:   Chief ~~Executive~~ Restructuring Officer and

          Chief Financial Officer

# Exhibit 1

# **Exhibit 2**

# Exhibit 3